**APPEAL**

# U.S. Bankruptcy Court
# Eastern District of Pennsylvania (Philadelphia)
## Adversary Proceeding #: 18−00137−mdc

*Assigned to:* Chief Judge Magdeline D. Coleman                    *Date Filed:* 06/11/18
*Lead BK Case:* 18−13098
*Lead BK Title:* Lyndel Toppin
*Lead BK Chapter:* 13
*Demand:*
  *Nature[s] of Suit:*  91 Declaratory judgment
               72 Injunctive relief −
                   other

*Plaintiff*
−−−−−−−−−−−−−−−−−−−−−−−−−

**Lyndel Toppin**                    represented by    **STEPHEN MATTHEW DUNNE**
146 S. 62nd Street                                     Dunne Law Offices, P.C.
Philadelphia, PA 19145                                 1515 Market Street
SSN / ITIN: xxx−xx−2550                                Suite 1200
                                                       Philadelphia, PA 19102
                                                       U.S.A.
                                                       215−551−7109
                                                       Fax : 215−525−9721
                                                       Email: bestcasestephen@gmail.com

                                                       **PREDRAG FILIPOVIC**
                                                       I Fight 4 Justice
                                                       1735 Market Street
                                                       Ste. 3750
                                                       Philadelphia, PA 19103
                                                       267 265 0520
                                                       Email: pfesq@ifight4justice.com
                                                       *TERMINATED: 06/18/2019*

                                                       **MEGAN N. HARPER**
                                                       City of Philadelphia − Law/Revenue Dept.
                                                       1401 JFK Blvd.
                                                       Room 580
                                                       Philadelphia, PA 19102
                                                       215 686 0503
                                                       Email: megan.harper@phila.gov
                                                       *TERMINATED: 02/14/2019*

                                                       **DAVID M. OFFEN**
                                                       The Curtis Center
                                                       601 Walnut Street
                                                       Suite 160 West
                                                       Philadelphia, PA 19106
                                                       (215) 625−9600
                                                       Email: dmo160west@gmail.com
                                                       *TERMINATED: 02/14/2019*

1

V.

*Defendant*
────────────────────────

**Jewell Williams**
Sheriff of the City of Philadelphia
Land Title Building
Fifth Floor
100 South Broad Street
Philadelphia, PA 19110

represented by **MEGHAN ANNETTE BYRNES**
City of Philadelphia
1515 Arch Street
Ste 17−151
Philadelphia, PA 19102
215−683−5011
Email: meghan.byrnes@phila.gov

**JOSHUA DOMER**
City of Philadelphia Law Department
1401 JFK Blvd
5th Floor
Philadelphia, PA 19102
215 686 0519
Email: joshua.domer@phila.gov

**MEGAN N. HARPER**
(See above for address)

*Defendant*
────────────────────────

**Abdeldayem Hassan**
309 Barker Avenue
Lansdowne, PA 19050
*aka* **Abdeldyem Hassan**

represented by **STEPHEN MATTHEW DUNNE**
(See above for address)
*TERMINATED: 02/14/2019*

**DAVID M. OFFEN**
(See above for address)

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 09/24/2020 | | 155 | Transcript regarding Hearing Held on 8/21/2020 EMERGENCY MOTION FOR EXPEDITED CONSIDERATION OF PLAINTIFFS MOTION TO DISMISS ALL CLAIMS FOR RELIEF AGAINSTDEFENDANT ABDELDAYEM HASSAN A/K/A ABDELDYEM HASSAN FILED BY LYNDEL TOPPIN REPRESENTED BY STEPHEN MATTHEW DUNNE. Transcribed by Writer's cramp, Inc 268 pages. The transcript may be viewed at the Bankruptcy Court Clerk's Office. [For information about how to contact the transcriber, call the Clerk's Office] (related document(s) 153 ). Notice of Intent to Request Redaction Deadline Due By 10/1/2020. Redaction Request Due By 10/15/2020. Redacted Transcript Submission Due By 10/25/2020. Transcript access will be restricted through 12/23/2020. (D., Tasha) (Entered: 09/24/2020) |

2

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 13 |
| | . | |
| Lyndel Toppin, | . | |
| | . | |
| Debtor. | . | Bankruptcy #18-13098 (MDC) |

.......................................................

|  |  |  |
|---|---|---|
| Lyndel Toppin, | . | |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| Sheriff of the City of | . | |
| Philadelphia, | . | |
| | . | |
| Defendant. | . | Adversary #18-137 (MDC) |

.......................................................

Philadelphia, PA
August 21, 2020
11:01 a.m.

TRANSCRIPT OF EMERGENCY MOTION FOR EXPEDITED CONSIDERATION OF
PLAINTIFF'S MOTION TO DISMISS ALL CLAIMS FOR RELIEF AGAINST
DEFENDANT ABDELDAYEM HASSAN A/K/A ABDELDYEM HASSAN FILED BY
LYNDEL TOPPIN REPRESENTED BY STEPHEN MATTHEW DUNNE

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Paintiff:                    Predrag Filipovic, Esq.
                                     1735 Market St.-Ste. 3750
                                     Philadelphia, PA 19103

                                     Stephen M. Dunne, Esq.
                                     Dunne Law Offices, PC
                                     1515 Market St.-Ste. 1200
                                     Philadelphia, PA 19102

2

| | |
|---|---|
| For the Sheriff of the City of Philadelphia, Jewell Williams: | Megan N. Harper, Esq.<br>Deputy City Solicitor<br>City of Philadelphia<br>Law Department<br>1401 JFK Blvd.-5th Fl.<br>Philadelphia, PA 19102 |
| | Joshua Domer, Esq.<br>Assistant Deputy City Solicitor<br>City of Philadelphia<br>Law Department<br>1401 JFK Blvd.-5th Fl.<br>601 Walnut St.<br>Philadelphia, PA 19102 |
| For Abdeldayem Hassan: | David M. Offen, Esq.<br>The Law Offices of<br>David M. Offen<br>The Curtis Center<br>Ste. 160 W-1st Fl.<br>Philadelphia, PA 19106 |
| Audio Operator: | John Barbetta |
| Transcribing Firm: | Writer's Cramp, Inc.<br>1027 Betty Lane<br>Ewing, NJ 08628<br>609-588-8043 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

3

## Index

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| **Witnesses For The Plaintiff:** | | | | | |
| Mr. Whyte | 57 | 101 | 117 | | |
| Mr. Thornton | 121 | | | | |
| Ms. Taylor | 216 | | | | |
| | | | | | |
| **Witnesses For The Sheriff of the City of Philadelphia:** | | | | | |

| EXHIBITS: |  | **Marked** | **Received** |
|---|---|---|---|
| P-23 | Sheriff Responses to RFA | 158 | 160 |
| C-2 | Fax Notice of Case | 164 | 177 |
| C-4 | Service Event Report | 226 | 234 |
| C-13 | Plaintiff Responses To Defen. | 108 | |
| C-14 | Notice To Vacate (5/18/18) | 67 | 77 |
| C-15 | Notice To Vacate (5/24/18) | 77 | 83 |
| C-16 | Notice To Vacate (5/30/18) | 84 | 87 |
| C-17 | Notice To Vacate (6/1/18) | 88 | 89 |
| C-18 | Notice To Vacate (6/5/18) | 89 | 91 |
| C-19 | Notice To Vacate (6/7/18) | 91 | 92 |
| C-22 | Deposition of Barrington Whyte | 102 | |
| C-26 | Sheriff Directive | 126 | 131 |
| C-29 | Deposition of Sean Thornton | 163 | |

## OPENING STATEMENTS:

| Mr. Filipovic | 39 |
|---|---|
| Ms. Harper | 50 |

                                                                    4

1          THE COURT:  This is the matter of Toppin vs.

2   Williams.  Appearances please.

3          MR. FILIPOVIC:  For the record, Predrag Filipovic on

4   behalf of Plaintiff Lyndel Toppin, Your Honor.

5          MR. DUNNE:  Stephen Dunne on behalf of Lyndel

6   Toppin, Your Honor.

7          THE COURT:  Hold on.  I'm writing this down.  Next.

8          MS. HARPER:  Good morning, Your Honor.

9          MR. DUNNE:  Steve Dunn --

10          MS. HARPER:  I'm sorry.  Go ahead, Mr. Dave.

11          MR. OFFEN:  -- David Offen appearing with -- with

12   Abdeldayem Hassan.  He's already settled.  He is here strictly

13   as a witness, Your Honor.

14          THE COURT:  And where is he?

15          MR. OFFEN:  He is -- you'll see him, he's right

16   there.

17          THE COURT:  Right where?

18          MR. HASSAN:  That's me.

19          THE COURT:  Okay.  I'm sorry, counsel.  When you

20   said "with you," I thought he was in your --

21          MR. OFFEN:  I'm sorry, Your Honor.

22          THE COURT:  I'm looking at is he -- where is he on

23   your video?

24          MR. OFFEN:  No, when I said "with him," I was making

25   sure that thing worked.  Last night when I spoke to him

5

1     because I had spoken to Eileen, I said I will make sure he

2     appears.  He's been asked as a witness and I wanted to make

3     sure he's available to testify for whoever needs him.

4                THE COURT:  Okay.

5                MS. HARPER:  Good morning, Your Honor.  Megan Harper

6     for the City of -- for the Sheriff of the City of

7     Philadelphia.  With me here in this room is Joshua Domer, also

8     for the Sheriff of the City of Philadelphia.  We have two

9     witnesses also with us if you'd like to see them.  They are in

10    the room with us right now.

11               THE COURT:  Yes, please.

12               MS. HARPER:  Okay.  No, I can't see.

13               THE COURT:  Well, I know you're supposed to be six

14    feet so I'm not --

15               MS. HARPER:  Yeah.  We got our masks on.

16               THE COURT:  All right.  But I'm trying --

17               MS. HARPER:  If it's okay so with -- to my left.

18               THE COURT:  Put your mask on, yes.  Thank you.

19               MS. HARPER:  To my left --

20               THE COURT:  I don't want anybody saying they got

21    COVID because I had a trial.  All right.  So Ms. Harper and

22    Mr. Domer.

23               MS. HARPER:  To my left is Captain Sean Thornton.

24               THE COURT:  Captain?

25               MS. HARPER:  Sean, S-E-A-N,

6

```
 1              THE COURT:  Uhm-hum.
 2              MS. HARPER:  Thornton, T-H-O-R --
 3              THE COURT:  R-N-T-O-N?
 4              MS. HARPER:  That's correct, Your Honor.
 5              THE COURT:  Witness.  Okay.  Who else?
 6              MR. DORMER:  To my right, Your Honor -- this is
 7     Joshua Domer speaking.  To my right is Jetaria Taylor,
 8     Sergeant Jetaria Taylor of the Sheriff's Office.
 9              THE COURT:  Sergeant?
10              MR. TAYLOR:  Thank you, Judge.
11              MR. DORMER:  Correct.
12              THE COURT:  Okay.  I'm sorry.  Could you say the
13     name again?  I didn't hear that.
14              MR. DORMER:  I will say it and spell it.  It is
15     Jetaria Taylor.  That's J as in Josh, E-T-A-R-I-A.  Taylor, T-
16     A-Y-L-O-R.  Did I spell that correctly?
17              MS. HARPER:  Yes.
18              THE COURT:  Jetaria Taylor?
19              MS. HARPER:  Yes, ma'am.
20              THE COURT:  All right.  Witness.
21              MS. HARPER:  Your Honor, if I may take a moment just
22     to note that the case caption has not been amended, although
23     it should be.  We do have a new Sheriff for the City of
24     Philadelphia.
25              THE COURT:  Right.
```

7

```
 1            MS. HARPER:  Her name is Rochelle Bilal.  We've
 2    noted that in a couple of recent pleadings but there hasn't
 3    been an amended caption submitted to Your Honor.
 4            THE COURT:  Okay.  And what's this new Sheriff's
 5    name again?
 6            MS. HARPER:  Rochelle, R-O-C-H --
 7            THE COURT:  Oh!  I can spell Rochelle.
 8            MS. HARPER:  Okay.
 9            THE COURT:  Last name?
10            MS. HARPER:  Bilal, B-I --
11            THE COURT:  L-A-L?
12            MS. HARPER:   Yes, ma'am.
13            THE COURT:  Oh!  That's right.  Okay.  All right.
14    And then Mr. Dunne, I see you have two people with you.  Who
15    are they?
16            MR. DUNNE:  Yes, Your Honor.  Stephen Dunne for the
17    Plaintiff Lyndel Toppin.  Lyndel Toppin is on my right.
18            THE COURT:  Uhm-hum.
19            MR. DUNNE:  And Barrington Whyte is on my left.
20            THE COURT:  Barrington, what's his last name?
21            MR. DUNNE:  Last name is Whyte.
22            THE COURT:  Whyte.  Okay.
23            MR. DUNNE:  W-H-Y-T-E.
24            THE COURT:  Okay.  All right.  I guess, the first
25    order of business is there's an outstanding motion for summary
```

8

1    judgment, correct?

2         MS. HARPER:  Yes, Your Honor.

3         THE COURT:  Okay.  I think the city, the issue of

4    sovereign immunity is a relevant one that's a threshold

5    matter, I'll likely have to decide.  But given where we are

6    today, I just figured we'll go ahead and proceed with the

7    trial and I'll just address the sovereign immunity issue in

8    any decision I make.  I mean, that's where we are.  I'm not

9    going to -- I don't think it makes sense to put off the trial

10   even though they're, you know, that's a threshold matter that

11   I'll decide.  Okay.

12        So the motion for summary judgment, I'm just going to

13   address in the context of addressing the entire issue, okay?

14        MS. HARPER:  Yes, Your Honor.  And the issues raised

15   in the motion for summary judgment also include arguments made

16   in a motion for judgment on the pleadings, which remained open

17   as well and was under advisement.  So those are two open

18   matters on the docket.

19        THE COURT:  Oh!  I apologize.  We listed as a motion

20   for summary judgment.

21        MS. HARPER:  Yeah.

22        THE COURT:  Again, you know, again, it may be and I

23   apologize that I saw it only as a motion for summary judgment

24   but I'll address it.  Because if I believe that the city has

25   sovereign immunity, I'll just say sovereign immunity,

1   everything else doesn't matter or it doesn't have sovereign

2   immunity and I addressed the facts.

3          MS. HARPER:  We had also raised additional argument

4   and we can raise that in the context of a motion and in the

5   context of the trial but arguments over quasi-judicial

6   immunity as well as arguments over damages, then we can raise

7   those again at the appropriate time.

8          THE COURT:  Well, yeah, the arguments as to damages,

9   you know, that's really one as to trial.  Because I don't know

10  what they're going to prove at trial as to damages.  That may

11  be a post-trial issue.  And again, you know, sovereign

12  immunity, quasi-judicial immunity, all of those things are

13  threshold issues that I will decide.

14      (Buzzer sounds)

15         TH COURT:  The length of the -- Hello!  Given the

16  length of time involved in the various, you know, I think is

17  about two years now.  It went on two years, I think we just

18  proceed to trial.

19         MS. HARPER:  Thank you, Your Honor.

20         THE COURT:  All right.  Next is this motion that was

21  filed this morning at what time, motion to exclude Mr. Hassan

22  as a witness.

23         MR. FILIPOVIC:  Correct.

24         THE COURT:  Who's -- who's address that?

25         MR. FILIPOVIC:  I'll be arguing that, Your Honor.

1          THE COURT:  Okay.  And exactly why do you think that

2     Mr. Hassan should be excluded?

3          MR. FILIPOVIC:  Well, Your Honor, there's also a

4     motion, the matter is settled against Hassan.

5          THE COURT:  What does that have to do with anything?

6          MR. FILIPOVIC:  Well, that's just the first part of

7     it.  Well, it does if he were still a party, then he would --

8     you can't exclude a party.  Hassan is not a party.  Chris --

9     there is no cross claims filed by City of Philadelphia, the

10    remaining defendant against Hassan.

11         THE COURT:  And is he a fact witness or not?

12         MR. FILIPOVIC:  There are no --

13         THE COURT:  Was he intimately involved in the events

14    that are in dispute?

15         MR. FILIPOVIC:  No, Your Honor.  He was not

16    involved.  His last involvement was prior to filing of the

17    bankruptcy.

18         THE COURT:  And --

19         MR. FILIPOVIC:  We Stipulated --

20         THE COURT:  -- and --

21         MR. FILIPOVIC:  -- to all the other exhibits --

22         THE COURT:  Mister, let me just say, I'm denying

23    that motion.  That is absolutely ridiculous.  First of all,

24    don't ever file a motion-in-limine an hour before a trial.

25    You have wasted my time, my staff time.  This is ridiculous.

11

1    Did you find out the City wanted to examine Mr. Hassan?

2           MR. FILIPOVIC:  Yes.

3           THE COURT:  When did -- that he was wanted to call -

4    - wanted to cross examine him?

5           MR. FILIPOVIC:  Three days ago.  Three days ago on

6    August 17th.

7           THE COURT:  So you're going to wait until the

8    morning of the trial to then file a motion?

9           MR. FILIPOVIC:  Well, we prepare the stipulations,

10   Your Honor and the stipulation --

11          THE COURT:  Did the city stipulate that Mr. Hassan

12   would not testify, did they agree with that?

13          MR. FILIPOVIC:  Well, we wouldn't have filed a

14   motion if they did.

15          THE COURT: Then if they didn't agree to it, the fact

16   that you wait to the morning of a trial and a couple of hours

17   before, is unacceptable.

18          MR. FILIPOVIC:  Your Honor, we found out their

19   responses to our stipulation requests --

20          THE COURT:  Did you request --

21          MR. FILIPOVIC:  -- yesterday at 5:00 --

22          THE COURT:  -- on the 17th when they filed this?

23   Did you ask them that they rather -- they intended to proceed

24   with Mr. Hassan as a witness?

25          MR. FILIPOVIC:  Well, it was obvious they did

1   because they included him in the witness list.

2           THE COURT:  So was it -- so if it was obvious that

3   they did, why didn't you confirm that the stipulation would

4   mean that he no longer has to testify?  The fact --

5           MR. FILIPOVIC:  Your Honor --

6           THE COURT:  -- you waited till the last minute --

7           MR. FILIPOVIC:  -- Your Honor --

8           THE COURT:  -- counsel, I'm not excluding Mr.

9   Hassan.  The fact that the city may want to place the blame on

10  him, that's what people do all the time in trials and unless

11  they --

12          MR. FILIPOVIC:  Not without a cross claim, Your

13  Honor.  They never filed anything.

14          THE COURT: It doesn't matter that they don't have a

15  cross claim.  They don't need a cross claim to -- to list him

16  as a witness.  They were entitled to bring any witness that

17  they believe will support their position.  A defendant or not,

18  they could have called Mr. Hassan.

19          MR. FILIPOVIC: I understand.  But the cause of

20  action against the sole remaining defendant, Your Honor, has

21  no bearing --

22          THE COURT:  Counsel --

23          MR. GORMAN:  -- on his --

24          THE COURT:  -- counsel, it has bearing.  He was

25  involved the --

13

1          MR. FILIPOVIC:  Okay.

2          THE COURT:  -- and the fact that you tell me he

3    wasn't, doesn't make it so.  They are entitled to bring their

4    case, to bring whatever witnesses they want, to support their

5    position, even if Mr. Hassan had not been a defendant in this

6    matter.  They would have been entitled to bring him as a

7    witness to the extent they believe he has relevant

8    information.  He has relevant information.  He was the party

9    from -- based on the pleadings who purchased it.  He was the

10   party who obtained a writ of possession -- from the court.

11         MR. FILIPOVIC:  We did.  We stipulated to that, Your

12   Honor.

13         THE COURT:  Well, they can bring him and -- and put

14   whatever evidence they want.  The fact that you stipulated to

15   those things does not preclude them from putting whatever else

16   they want to bring and the fact that you somehow think because

17   the --

18         MR. FILIPOVIC:  That's fine, Your Honor, we wanted

19   to preserve Court's time.  The testimony --

20         THE COURT:  No, you wasted my time.  You wasted my

21   time.  You wasted 45 minutes of my time.  You had yesterday to

22   do this.  Could have called my courtroom deputy and ask for an

23   emergency hearing yesterday.  The fact that you did this this

24   morning now, all you succeeded counsel in doing is annoying

25   the Court.  That's all you succeeded in doing.  And that's not

```
 1   where you want to be.  And trust me I don't make my decisions
 2   on the fact that someone annoyed me.  But now I'm annoyed.
 3            MR. FILIPOVIC:  I'm sorry, Your Honor.
 4            THE COURT:  Counsel, this has been a pattern for you
 5   guys in this case.  The trial was scheduled last week.  Ms.
 6   Harper said she had to quarantine because you had a one-day
 7   delay, you show up and say, "Oh, my God, we can't proceed."
 8   There's always something on the plaintiff's side.  And I don't
 9   take kindly to this.  So I will warn you, consider yourself
10   warned.  You have another matter before me and unless it's an
11   absolute emergency and you wait to the last minute, I will be
12   issuing a rule to show cause.  As I've said --
13            MR. FILIPOVIC:  Yes, Your Honor.
14            THE COURT:  -- you have wasted my time, my staff's
15   time, my law clerk's time, all of our time to address a
16   needless last minute motion.  Now, I'm not going to beat a
17   dead horse but I think you can consider yourself sufficiently
18   warned.  Now --
19            MR. FILIPOVIC:  Yes, Your Honor.
20            THE COURT:  -- so that's denied.  Let's deal with
21   your motion to -- to dismiss Mr. Hassan.
22            MR. FILIPOVIC:  Yes, Your Honor.
23            THE COURT:  All right.  You want to dismiss him as a
24   defendant because the Debtor has settled with him?
25            MR. FILIPOVIC:  Correct.  Correct, Your Honor.
```

1          THE COURT:  Ms. Harper, why can't they do that?

2          MS. HARPER:  Your Honor, the Sheriff's Office sort

3   of got in the middle of this because it had been asked to

4   stipulate to the dismissal of Mr. Hassan, and just from a

5   procedural perspective had some concerns regarding that

6   process.  Given the this Sheriff's Office, counsel and myself

7   is aware of a settlement as opposed to just a decision to

8   release all claims against the defendant. So that's how the

9   Sheriff's Office sort of got stuck in the middle was a

10  procedural issue where we were raising and questioning whether

11  that was the appropriate means to proceed.

12         THE COURT:  Well, I mean, they can -- they can

13  settle, they can do whatever they want, whether they have to

14  do 9019, whether they need court approval, does the city care?

15         MS. HARPER:  Now, the city was being asked to

16  stipulate and that's why the city did not do that.  Because

17  what he was being asked to stipulate to didn't notify the

18  Court of a settlement –

19         THE COURT:  Right.  And you believed that they were

20  required to, they believe you weren't?

21         MS. HARPER:  Yes, yes.

22         THE COURT: That's a different issue.

23         MS. HARPER:  Yeah.

24         THE COURT:  That's a totally different issue –

25         MS. HARPER:  And that's --

```
 1    THE COURT:   -- to stipulate and dismiss Mr. Hassan, I think,
 2    you know, right.  Absent your -- I guess their position is you
 3    didn't have a counterclaim so your consent was not required.
 4    And if it wasn't I don't know why they asked you to begin
 5    with.  That's a whole different issue.  They believe you
 6    weren't -- where's my rule book at.
 7              MR. FILIPOVIC:  Well, Your Honor, the rule 41(a)(2)
 8    or in Bankruptcy Code 7041(a)(2), simply requires consent of
 9    all parties to dismiss a defendant from a lawsuit.  However,
10    the case law is very clear that when there is no cross claim,
11    the objecting defendant has no -- can't be prejudiced and so
12    therefore --
13              THE COURT:  Well, before on objecting on that basis,
14    counsel, they were objecting saying they weren't signing and
15    that if you wanted approval, go ask the Court.  Is that what
16    you did?
17              MR. FILIPOVIC:  And we did.
18              THE COURT:  And so you did.
19              MR. FILIPOVIC:  And we filed it.  Yeah.
20              THE COURT:  Okay.  So you filed that. When was –
21              MS. HARPER:  Yeah.  And, Your Honor –
22              THE COURT:  Wait a minute.
23              MS. HARPER:  -- it wasn't -- it was our position
24    that -- the Local Bankruptcy Rule 7041 required notice to the
25    court but --
```

1          THE COURT:  Hold on.  Hold on.  Let me pull out my

2     Local Rules.  What are my local -- what are the Local Rules

3     7041 say?  Hold on.  7041, Local Rules.  The Local Rules say

4     41 what -- settlement of an adversary proceeding?

5          MS. HARPER:  Yes, Your Honor.

6          THE COURT: "Plaintiff shall promptly report

7     settlement of an adversary proceeding to the courtroom deputy.

8     If judicial approval is required or is requested, the 40 shall

9     file a stipulation within 30 days.  If they do not timely

10    document the resolution, the court may enter an appropriate

11    order."  So when was this matter settled?

12         MR. FILIPOVIC:  Your Honor, according to the

13    settlement agreement --

14         THE COURT:  Counsel, when was it settled?  Don't --

15         MR. FILIPOVIC:  It was settled when all parties

16    fulfilled their obligations and covenants within the

17    settlement agreement, that's when that was settled.

18         THE COURT:  Counsel, when was the settlement

19    agreement signed?

20         MR. FILIPOVIC:  In January, Your Honor.  And we

21    reach out --

22         THE COURT:  January.

23         MR. FILIPOVIC:  Yes, and we reached out to the

24    counsel for Mr. Hassan.  I sent him an email on January 29th

25    asking to sign off on a stipulation and to get -- prepared a

1    praecipe or whatever is needed to dismiss his client.  We also

2    included a covenant that if we need Mr. Hassan to testify, he

3    has to make himself available.

4              THE COURT:  Well, that's a covenant in the

5    settlement.  I asked –

6              MR. FILIPOVIC:  Yes, it is.

7              THE COURT:  -- you when it was settled and you're –

8              MR. FILIPOVIC:  Well, when he -- well, if you

9    consider it settled when he delivered the funds, which I'm not

10   going to disclose the amounts.

11             THE COURT:  No, counsel.  It settled --

12             MR. FILIPOVIC:  Okay.

13             THE COURT:  -- when the terms are reached.  You

14   can –

15             MR. FILIPOVIC:  The terms are reached --

16             THE COURT:  In January.

17             MR. FILIPOVIC:  -- in January.  And we reached out

18   in January and again in February.  We didn't hear back from

19   Mr. Offen until July 13th.

20             THE COURT:  Mr. Offen, when did your client sign the

21   settlement?  Agreed to --

22             MR. OFFEN:  Everything was signed in January, Your

23   Honor.  They wanted me -- they filed the suit to dismiss the

24   defendant, they're putting together -- put together something.

25   They were the plaintiff here.  Mr. Hassan didn't have any

19

1    cross claims.  It made sense for him to settle.  It was

2    settled.  Made a lot of sense.  It was settled.  Then they

3    asked me again about putting some -- I see this -- we signed,

4    everything was signed.  The settlement stipulation was signed

5    in January.  Mr. Hassan did agree to testify.  The one thing I

6    warned him is --

7            THE COURT:  Well, well, well, I don't know -- want

8    to know.  But the point of the matter is --

9            MR. OFFEN:  Yes.

10           THE COURT:  -- it was settled in January.

11           MR. OFFEN:  Yes.

12           MR. DUNNE:  Your Honor, if I may?

13           THE COURT:  No, nobody may anything.  I'm asking the

14   questions here.

15           MR. DUNNE:  It was settled July 13th, Your Honor.

16           THE COURT:  Mr. Dunne, it was -- it was settled

17   January 13th you said?

18           MR. DUNNE:  I emailed your -- the courtroom deputy

19   on August 7th, Eileen --

20           THE COURT:  Counsel, when --

21           MR. DUNNE:  -- there's a copy of email.

22           THE COURT:  -- was it settled?

23           MR. DUNNE:  July 13th, Your Honor.  There was an

24   email that was sent --

25           THE COURT:  Mr. Dunne, both you and your co-counsel

1    are avoiding the elephant in the room.  You settled this in

2    January.

3              MR. DUNNE:  We were waiting for confirmation.

4              THE COURT:  Mr., no.  It was settled in January.  It

5    was signed -- did Mr. Hassan signed this in January?  Which

6    means that if he did not comply, he would have been in breach

7    of a settlement.  Every settlement has terms and conditions.

8    There's money to be paid, there's actions to be done but it

9    settled and had Mr. Hassan not paid the money that he agreed

10   upon or take the actions that he agreed upon, he would have

11   been in breach of a settlement.  So you guys settled this back

12   in January, January.

13       Ms. Godfrey, what was the first time that you hear

14   anything, got any communication from the plaintiff that this

15   matter had been settled.

16             THE CLERK:  Judge, I don't even recall that at all.

17   But I'm going to go look at my emails now.

18             MR. DUNNE:  It was August 7th, Eileen.

19             THE CLERK:  August 7th.

20             THE COURT:  So August 7th, a matter that was

21   scheduled to settle in January.  January.  You didn't report

22   to this Court in August.

23             MR. DUNNE:  We received the confirmation --

24             THE COURT:  Counsel, you signed the agreement.  It

25   was enforceable even if the Debtor had decided I don't want to

1    go forward.  Mr. Hassan could then say you're in breach.

2    Don't give me this one, well they have things to do.  Every

3    dag gone settlement have terms and conditions.  You have to

4    make the payment.  You have to do whatever you agreed to do,

5    that does not mean it's not settled.

6         So for you to sit here and say, "Oh, well, they have

7    to do all these things."  That matter was settled in January

8    and you didn't think it was incumbent to say something to the

9    Court until August?  You don't think it was incumbent to tell

10   the city had been settled or maybe --

11        MR. FILIPOVIC:  The city knew it had been settled,

12   Your Honor, if I may direct --

13        THE COURT:  Do you know, Ms. Harper?

14        MR. FILIPOVIC:  I'll tell reflect upon this, Your

15   Honor.

16        THE COURT:  I'm asking Ms. Harper.  When did you

17   know it was settled?

18        MS. HARPER:  I do recall an initial settlement

19   communication that I was copied on but the matter hadn't

20   settled at that point.  I think it was in further discussion

21   later on that I had with Mr. Offen where I learned and

22   confirmed that it had been settled.

23        THE COURT:  And when was that?

24        MS. HARPER:  I actually knew it some point.  I mean,

25   it's been many -- so many months, Your Honor, but I think I

1    knew -- did know this at some point over the summer and then

2    recently spoke with Mr. Offen just to confirm again when we're

3    having all this discussion about the stipulation to dismiss,

4    that in fact it been settled.

5            MR. FILIPOVIC:  Your Honor -- if I may, Your Honor.

6    If I may just interject here about city's knowledge of the

7    settlement.  City on -- on February 6th -- February 6th, city

8    filed a motion for emergency consideration and city in that

9    motion cited Rule 517 that applies to these proceedings --

10           THE COURT:  Saying what?

11           MR. FILIPOVIC:  Saying that they consulted with all

12   parties, the rule requires for a motion to be considered on

13   expedited basis.  Then to consult –

14           THE COURT:  What was the issue that they were

15   bringing before me?

16           MR. FILIPOVIC:  Well --

17           THE COURT:  What's it settlement?

18           MR. FILIPOVIC:  -- here it is.  Here it is, Your

19   Honor.  It was for clarification of your order.  But they

20   filed a motion and they said that they consulted with all

21   parties, citing the rule that says, "Shall consult all

22   parties."

23           THE COURT:  What does that have to do with anything?

24           MR. FILIPOVIC:  It has to do with it, Your Honor, if

25   I may just finish briefly.  It has to do with it because in

1    their motion, it says that they consulted with the plaintiff.

2    That they knew --

3              THE COURT:  And?

4              MR. FILIPOVIC:  -- well, they didn't consult with

5    all parties and the rule requires --

6              THE COURT:  So what?  What does --

7              MR. FILIPOVIC:  -- well, so then --

8              THE COURT:  -- that have to do with whether you told

9    the Court that this was settled?  Don't try to --

10             MR. FILIPOVIC:  Your Honor, your question was

11   whether city knew and we're discussing whether city knew.

12   City knew this in February because they only consulted with

13   us.

14             THE COURT:  Okay.  They knew in February.  Why

15   didn't you tell the Court that this was settled?  Don't try --

16             MR. FILIPOVIC:  Because we didn't hear back from Mr.

17   Offen until July and it was --

18             THE COURT: Was it signed?  Counsel, I don't want to

19   hear this nonsense about you didn't hear back from Mr. Offen.

20   Was there a signed settlement agreement?

21             MR. FILIPOVIC:  Yes, and it required --

22             THE COURT: I don't care what it required.

23             MR. FILIPOVIC:  The Local Rule -- okay.

24             THE COURT:  If Mr. Offen's client, Mr. Hassan had

25   not performed, you would have a breach of settlement

1    agreement; nothing else to do with performance.  That does not

2    mean that you did not have a settlement agreement.  Counsel, I

3    don't know where or what your understanding of a settlement

4    is, but a settlement means that the parties have resolved all

5    of their issues and certain actions are going to be taken.

6    Now, sometimes they agree that you're going to settle and no -

7    - no further actions are required.  In this case, you're

8    telling me is the parties agreed to settle, subject to certain

9    conditions subsequent.  Was a settlement, under the rules you

10   were required to advise the Court of that settlement.  Did the

11   settlement provide that Mr. Hassan would be dismissed from the

12   case, Mr. Offen?

13            MR. OFFEN:  Yes, he would be dismissed.  He would

14   pay a sum of money and he would be available to testify if

15   necessary.

16            THE COURT:  And so those terms were all agreed upon

17   in January when you signed, correct?

18            MR. FILIPOVIC:  Yes, they were.

19            THE COURT:  When did Mr. Hassan pay the money?

20            MR. FILIPOVIC:  In January.

21            THE COURT:  Oh, so he had performed and at that

22   point was entitled --

23            MR. FILIPOVIC:  He had partially performed.

24            THE COURT:  But it doesn't matter.  You should have

25   reported that to the Court.  You should have then said, "We

1    entered into," -- you don't have to tell me the terms because

2    I'm not quite sure whether Court approval is, and I'm not

3    going to address that because that's not before me today.

4    But the bottom line is you knew in January.  You knew that you

5    -- Mr. Hassan had agreed to certain terms and conditions,

6    whether he performed them or not, it had been settled.  And

7    had --

8                MR. FILIPOVIC:  Correct.

9                THE COURT:  -- a settlement.  Had he breached it,

10   you could have then moved to enforce the settlement.  But -

11               MR. FILIPOVIC:  I'm in state court, Your Honor.  We

12   could -- our only --

13               THE COURT:  There was a binding -- that was a

14   binding agreement that obligated Mr. Hassan to take certain

15   actions and the Debtor to take certain actions.  Now did the -

16   - did the agreement say we're not going to dismiss until he

17   performs.  Did it said that, Mr. Offen?

18               MR. FILIPOVIC:  No, it did not say that.

19               MR. OFFEN:  No.

20               MR. FILIPOVIC:   Your Honor, but we -- we, if I may?

21   We did not know if he's going to perform until the trial came

22   or we realized that we don't need him as a witness.  That's by

23   mere term of the settlement and that is available --

24               THE COURT:  But the settlement did not say --

25               MR. FILIPOVIC:  -- that's the material term of the

1     agreement.

2               THE COURT:  So what?

3               MR. FILIPOVIC:  He did not perform.

4               THE COURT:  It was settled.  You didn't report it to

5     the Court that it was settled on these terms.  You --

6               MR. FILIPOVIC:  We waited --

7               THE COURT:  -- you had an obligation under the Local

8     Rules to advise this Court that this matter had been settled,

9     whether court approval was required is a different issue, but

10    you had an obligation to say, "We settled this manner and one

11    of the terms is that he needs to appear and we settled for

12    some dollar number."  But assuming, that he performed and if

13    he hadn't performed, you would have a breach of settlement

14    claim against him.  That's what you would have had.  It wasn't

15    that the settlement was, "Oh, it would happen after he

16    testified."  That's not how a settlement works.

17              MR. FILIPOVIC:  I understand.

18              THE COURT:  -- (inaudible) works.  So you were

19    obligated to advise the Court back in January that this matter

20    had been settled.  Yet you wait until the last minute.  You

21    know what, counsel, I'm not going to waste any more time.  I'm

22    going to figure out what if anything I want to do about your

23    failures.  Because this is dag gone ridiculous that we have

24    spent how much time, almost 45 minutes, addressing matters

25    that are a waste of time.  You settled in January.  It was a

1   settlement that had terms.  It was settled.  The rules say you

2   report the settlement promptly of an adversary proceeding.  It

3   was settled with Mr. Hassan, you were required to report that.

4   Now your -- your nonsense about, "Oh, well he had to perform."

5   That's performance.  That does not mean it's not settled.

6   So now, Mr. Hassan has agreed to testify.  You don't want to

7   call him, that's your option.  Doesn't bar the city from doing

8   so.  So, where we are right now is I'm allowing Mr. Hassan to

9   be dismissed.  If some creditor want to say that you were

10  obligated to report it or get court approval, that's without

11  prejudice to anybody's right to say that you need court

12  approval for that.  Because that settlement was only -- I

13  don't even know. I mean, it was in the motion that says, "Oh,

14  we want to dismiss him on an emergency basis."  And now you

15  stand here and say, "Well, he had to testify."  Well, it's not

16  in agreement because he didn't agree to testify and maybe he

17  wouldn't show up.

18          MR. FILIPOVIC:  Well, we realize we don't need his

19  testimony, Your Honor.

20          THE COURT:  That makes no sense whatsoever to me,

21  none.

22          MR. FILIPOVIC:  Once we realized we didn't need him

23  to testify --

24          THE COURT:  It's not.  I'm not going to, counsel,

25  I'm telling you.

1           MR. FILIPOVIC: Yes, Your Honor.

2           THE COURT:  Go back and review what settlement

3    means, okay?

4           MR. FILIPOVIC: Yes, Your Honor.

5           THE COURT:  You need to go back and review because

6    your understanding is unsupported by anything and --

7           MR. FILIPOVIC:  Yes, Your Honor.

8           THE COURT:  Okay.  And I don't mean, and counsel

9    again, you've already annoyed me so I'm going to try to take

10   five and take a breather because as I said, if you wanted to

11   annoy me or any judge, the worst thing to do was file some

12   frivolous motion before -- an hour before a hearing.  That's

13   all I'm telling you.  That's --

14          MR. FILIPOVIC: I understand, I'm sorry.

15          THE COURT:  -- all I'm telling you.  So I'm annoyed

16   to begin with and I don't like to be annoyed.  I do not.  So

17   -- so what we're going to do is, I'm going to put this -- stop

18   the video.  You guys can get all your stuff together.  And

19   then I'll take a few minutes and then I'll come back and,

20   okay?

21          MR. FILIPOVIC:  Thank you.

22          THE COURT:  Eileen?

23          THE CLERK:  Yes, Judge.

24      (Off the record)

25          THE COURT:  Okay.  I'm back.  Just for the record so

1    that we keep the record straight, the motion to dismiss Mr.

2    Hassan, I think -- I think August 7th, an email was sent to

3    Ms. Godfrey advising that it had been settlement -- settled,

4    and including a July 13th email from Mr. Offen. Also on August

5    6th, the Debtor filed -- Debtor-Plaintiff filed a motion to

6    dismiss Mr. Hassan.  An objection to that was filed on August

7    10th.  On August 11th, a notice for a hearing on September 8th

8    was filed.  August 19th, which was approximately, I guess,

9    eight days later, the Debtor-Plaintiff then filed an expedited

10   motion for consideration.

11        The record will reflect the time period but it was not

12   reported until August 7th.  Clearly Mr. Offen had sent

13   something back in July.  So the question becomes the court is

14   that it was scheduled for August, a hearing was scheduled for

15   August.  It was September 8th, expedited consideration is

16   being asked for today.  I said the city, Ms. Harper, can you -

17   - you're not here anymore.  Oh, Ms. Harper -- Ms. Harper.  Can

18   somebody have Ms. Harper get back on?

19             MR. FILIPOVIC:  See if I have her cell phone.

20             THE COURT: No, I'm just going to chat and send her

21   something.  We are back on the record.  All right.

22             MS. HARPER:  My apologies, Your Honor.

23             THE COURT:  Okay.

24             MS. HARPER:  If I can get a minute to call my

25   witnesses back in.  One moment, Your Honor.  I apologize for

1    holding up the Court.

2            THE COURT:  That's no problem.

3        (Pause in proceeding)

4            MS. HARPER:  Okay, Your Honor.

5            THE COURT:  Okay.  What I was saying, Ms. Harper, is

6    that I was going through in -- in connection with the motion

7    to dismiss Mr. Hassan because the matter has been settled,

8    on August 7th -- August 6th, the Debtor apparently filed a

9    motion to dismiss.  On August 7th, he sent an email, or one of

10   the plaintiff's counsel sent an email to Ms. Godfrey advising

11   that the -- it had been settled pursuant to the Local Rules.

12   And so on August 10th, there was an objection filed.

13   Thereafter, Ms. Godfrey contacted Mr. Dunne to say there was

14   an objection filed and please, you know, we need a hearing

15   date.  He then on August 11th the next day, scheduled a notice

16   on the motion for September 8th, which would had been in the

17   ordinary course.  Approximately, eight days later, Debtor then

18   filed -- Debtor-Plaintiff files and expedited motion for

19   consideration of the motion to dismiss.  Oh, my God, it's the

20   doorbell.  I'm going to have to go answer that only because if

21   it's a package.  No packages are safe these days, so --

22       (Off the record)

23           THE COURT:  Okay.  I'm back.  I apologize for that.

24   Hopefully, we will not have any more interruptions.  There not

25   someone and to answer the door and pick up packages.  So where

1   I left off, Ms. Harper, was that the only -- the city has no

2   objection.  I mean, this was scheduled for September.  It's

3   now before me on an expedited basis.  Does the city, other

4   than procedural issues, have any objection to -- I said, I

5   have no issue with granting the motion to dismiss subject to

6   the Debtor, complying with any rules that are necessary, if

7   any, would reach the settlement?

8         MS. HARPER:  No, Your Honor.  I guess, I don't have

9   an objection to the actual request to dismiss Mr. Hassan, he

10  is here today.  He is prepared to participate, you know, and I

11  think the city -- the city views that its ability to have Mr.

12  Hassan testify the same way that Your -- Your Honor does.

13        THE COURT:  That's a different issue.

14        MS. HARPER:  Yeah.  So I -- in reality, no, I don't

15  think the city has concern for the plaintiff agreeing to

16  dismiss his case against Mr. Hassan, that's -- that's their

17  choice.

18        THE COURT:  Right.  If he wants to dismiss and if

19  there are any obligation with respect to the settlement, if

20  any, the Debtor-Plaintiff will be obligated to comply with

21  those.  But I want to make it clear that I am going to grant

22  this motion to dismiss subject to whatever obligations, if

23  any, the Debtor has with respect to needing court approval for

24  same.

25        MS. HARPER:  And --

1              THE COURT:  Whether he does or doesn't, you can do

2      that subject to whatever obligations he has to do, if any, I

3      don't know.

4              MS. HARPER:  I think it's at the court's discretion

5      and that was what -- what the concern was, is that the court

6      hadn't been given an opportunity to exercise its discretion as

7      to whether it wanted documentation of the settlement given

8      the --

9              THE COURT:  I may or may not.  I don't know.  You

10     know, whether the Debtor has an obligation to or not is still

11     whether I dismiss it or not, it's subject -- I'm going to

12     dismiss subject to, and reserving any issue with respect to

13     the terms of the dismissal.

14             MS. HARPER:  Does that -- yeah.  I don't know.  And

15     for clarification's sake, whether that means they had a

16     settlement, an enforceable settlement at this point or not but

17     that's not really my concern.  I just --

18             THE COURT:  Not mine either.  No, it's not my

19     concern.  You know, the Debtor wanted to settle, he can

20     settle.  If he wanted to settle with the city and proceeded

21     against Mr. Hassan.  I don't tell the Debtor what to do.  If

22     he wants to, you know, the Debtor believes that their claims

23     are primarily against the Sheriff.  It is what it is.  That's

24     the (inaudible).  If they want to settle for whatever they

25     settled with Mr. Hassan, and at some point, you know if they

1    don't prevail, they get what they got against Mr. Hassan.  If

2    they do, they got what they got against Mr. Hassan plus

3    whatever else.

4           All right.  I'm going to mute you guys one more

5    second.

6      (Pause in proceeding)

7           THE COURT:  All right.  All right.  So again, with

8    respect to the request to dismiss Mr. Hassan, I will grant the

9    motion subject to the Debtor complying whatever requirements

10   that may be necessary with respect to the settlement and

11   without waiving the court's right to decide whether it needs

12   to review the terms of the settlement.  I'm not quite sure why

13   I would get involved.  Typically, I don't unless somebody

14   brought something to my attention.  The Chapter 13 Trustee may

15   have to take a position, creditors may take a position.  I

16   think there aren't that many creditors in this case, are

17   there?

18           MR. FILIPOVIC:  No.

19           THE COURT:  The city isn't -- the city isn't a

20   creditor, correct?

21           MS. HARPER:  Correct, Your Honor.  The only other --

22   and if I may, I don't want to overstep my bounds because

23   again, I realize this isn't really my argument to make here,

24   but just to further impress upon the court, the reason why the

25   city was concerned is because we have a plaintiff who is

Case 18-00137-21dc-05044-55B   Document 204   Filed 09/24/20   Entered 12/09/24/20 09:43600f 2D1   Desc Main
Document     Page 34 of 268

34

1    acting through next friend.  As well as the fact that it was

2    -- well,  I think --

3              THE COURT:  Right.  Leave it there.  I mean, it is

4    what it is.  So but I don't want to prejudice anybody's rights

5    and that's all I'm saying.  But with respect to the Debtors

6    ability -- Debtor-Plaintiff's ability to -- to settle, that's

7    within their discretion.  Whether they need court approval,

8    I'm not deciding today and even if they don't have to, whether

9    it's something that I have the authority to look at if in

10   order to grant the dismissal, it's within my discretion.

11        I'm not quite, you know, some people never mind -- and it

12   has nothing to with do it.  I'm not referring to you, Mr.

13   Dunne or to your co-counsel when I say some people don't

14   understand that, {quote}, "authority," had nothing to do with

15   you.  Just commenting in general.

16        All right.  So Mr. Offen, I can hear you talking with Mr.

17   Hassan while I was on mute regarding his concern to go to --

18   to prayer at 1:00, 1:30.

19             MR. OFFEN:  The later mosque, yeah, the earlier ones

20   he said he would be here, not for 12:00, 12:30 but 1:30.

21   There is a mosque near him.

22             THE COURT:  And how long does that -- was that hour,

23   hour-and-a-half, Hassan?

24             MR. HASSAN:  Yeah.  Like one hour, yeah.

25             THE COURT:  And how far are you from the mosque?

35

```
1          MR. HASSAN:  I'm not that far like 15 minutes.
2          THE COURT:  So that means then one or two things.
3   Means he is not going to be available till -- if he goes at
4   1:30 he -- at 2:00, he won't be back till 2:45, which means
5   he's not going to be available till about 3:00 p.m.
6          MR. OFFEN:  Or Your Honor, he could go earlier.  His
7   first thing he said, the regular mosque he goes was 12:30.
8   He's said to me and that's when I said, can you go to a later
9   Friday service?
10         THE COURT:  Well, I mean, if he goes to the 12:30,
11  he'll be back by 2 o'clock.
12         MR. OFFEN:  Yeah.
13         THE COURT:  That might make more sense.  Because we
14  have to hear from all, we can make him the last witness.
15         MR. FILIPOVIC:  The plaintiff is not going to call
16  him, Your Honor.  We have our case in-chief, we are not going
17  to call Mr. Hassan.
18         THE COURT:  It's clear the city is.
19         MR. FILIPOVIC:  Right.
20         THE COURT:  So --
21         MR. FILIPOVIC:  But I'm just saying logistically,
22  no.
23         THE COURT:  So, how long do you think it's going to
24  take for the Debtor's witnesses, Debtor-Plaintiff witnesses?
25         MR. FILIPOVIC:  We have three, Your Honor.  We have
```

1    Barrington Whyte and the two people from the Sheriff's Office

2    that we deposed in this matter.  So, maybe subject to cross

3    examination by Ms. Harper, I can't see it taking less than

4    two-three -- two and a half hours to be generous.

5          THE COURT:  Okay.  So it's -- let's see how much

6    time we've wasted.  It's 12 o'clock for a 10:30 hearing.  We

7    wasted an hour and a half.  All right, which I'm stopping at 5

8    o'clock.  If this doesn't finish by 5:00, you guys are going

9    to just come back because we wasted an hour and a half.  And

10   I'll take responsibility for at least 15 minutes of those

11   answering doors and taking a time to sort of re-compose.

12         MR. FILIPOVIC:  I'll take the responsibility for the

13   motion in limine, Your Honor.

14         THE COURT:  It doesn't matter, counsel.  We are

15   where we are.  You know, I -- it is what it is.  I apologize

16   for losing my temper, I should not.  It is what it is.

17         MR. FILIPOVIC:  No, it's fine, Your Honor.

18         THE COURT:  It is what it is.  That's my favorite

19   saying, I have to put it back on my -- I have it on my -- on

20   my bench, but I don't have it here.  I guess, I should put

21   that on my table, on my desk at home.  But in any event,

22   counsel it would probably make sense then for Mr. Hassan to go

23   to the 12 -- I don't know if he's going to make it.  It's 12

24   o'clock.  He said he's 15 minutes away.  So that means he'll

25   be back by 2 o'clock.

1         MR. OFFEN:  Abdeldayem, can you do, make it for the

2    12:30 service today?

3         MR. HASSAN:  Yeah.  I can be back by 12 o'clock,

4    yeah.

5         THE COURT:  Okay.

6         MR. OFFEN:  No, no, no.  And you can be back by 2

7    o'clock.  Can you make it to your service today at the mosque

8    for 12:30 and then be back here for her Honor by 2 o'clock?

9         THE COURT:  Well, even if he –

10        MR. HASSAN:  Yeah.

11        THE COURT:  -- if he is past 2 o'clock.

12        MR. OFFEN:  That's fine.

13        THE COURT:  You know, 2:00, 2:15.  A hearing, two

14    and a half hours for the other witnesses, that takes us to 12,

15    to 1, to 2:30.  So be back by 2:30.

16        MR. HASSAN:  Okay.  That's good.

17        THE COURT:  And the city will have their -- their

18    witnesses.  Or I'm not quite sure if the city is going to put

19    their case or how -- how they want to proceed?  Are they

20    having the same witnesses?  Are they going to, you know,

21    reserve the right to then call them in their case-in-chief?  I

22    don't know.

23        MS. HARPER: Yeah and I want to be clear that, you

24    know, the city, of course is reserving the right to call Mr.

25    Hassan but -- but may not and is reserving its right to call

38

1    Mr. Hassan, depends on how things go.

2              THE COURT:  Okay.  Mr. Hassan, I'm going to --

3    you're going to be allowed to leave.  Do not talk with anybody

4    about -- I don't know who you talk to but, you know, don't

5    talk to anybody else about your case other than Mr. Offen and

6    so you can leave and when you get back, sign back in and we'll

7    be able to see that you're back, okay?

8              MR. HASSAN:  Okay.  Thank you.

9              THE COURT:  Thank you, Mr. Hassan.  Okay.

10             MR. OFFEN:  Your Honor, may I also then be excused

11   on that?

12             THE COURT:  Sure.

13             MR. OFFEN:  That's fine.

14             THE COURT:  I mean, you have no --

15             MR. OFFEN:  I'm just here for him.  His job today is

16   just tell the truth.  That's it.  Tell it like --

17             THE COURT:  Okay.

18             MR. OFFEN:  That's all he's going to be doing.

19             THE COURT:  Well, that's what I hope everybody does.

20   That mean, telling the facts are what they are.  I can't

21   change the facts.  I just take the facts and apply the law to

22   it.  It is what it is.  All right.  With that being said, Mr.

23   Offen you may be excused.  Mr. Hassan, Mr. Offen come back

24   around 2:15.  Mr. Hassan, 2:15.  That gives them more than

25   enough time.

 1          MR. OFFEN:  Thank you, Judge.

 2          THE COURT:  Okay.

 3          MR. HASSAN:  Thank you.

 4          THE COURT:  All right.  Thank you.  All right.  Who

 5   is handling this case for the plaintiff, who's going to speak,

 6   you counsel?  Okay.

 7          MR. FILIPOVIC:  Me, Your Honor.

 8          THE COURT:  Well now, that being said, Ms. Harper,

 9   who's going to present for the Sheriff?

10          MS. HARPER:  Yes, Your Honor.

11          THE COURT:  Who is, you?

12          MS. HARPER:  Myself, Your Honor.

13          THE COURT:  Okay.  So what that means is Mr. Domer,

14   Mr. Dunne, you do not get to say anything, you can consult,

15   you can pass notes, you can do whatever you want, you do not

16   get to argue, you do not get to interject, you don't get to

17   say anything.  One counsel, okay.

18       All right.  Counsel, you may proceed if you want opening

19   arguments or you want to forego those and get right into the

20   case.  You know --

21          MR. FILIPOVIC:  I have a brief opening statement,

22   Your Honor.

23          THE COURT:  Okay.

24          MR. FILIPOVIC:  If I may.  May it please the Court.

25    The plaintiff's sole cause of action and trial today is

40

1    against the Sheriff, City of Philadelphia and it's under

2    Section 362(a) of the Bankruptcy Code, which provides for an

3    automatic stay for certain actions once a petition under the

4    government has been filed.  "The automatic stays is imposed by

5    Section 362(a) it prohibits any act to collect or recover a

6    claim against the Debtor arose before commencement of the

7    case.  And any act to obtain possession of property of the

8    estate or the property from the estate or to exercise control

9    over the property of the estate," that's 362(a)(3).

10   "Willful violation of the automatic stay gives rise to the

11   damages as set forth in Section 362(k) of the code."  Through

12   City's own exhibits, primarily and some of our own, we'll show

13   that there was at least six instances and likely up to nine

14   instances of acts by the Sheriff, and I'll refer to the of

15   Sheriff City of Philadelphia, the named defendant.

16            THE COURT:  Well, is the city -- well, is the City

17   of Philadelphia a defendant in this?

18            MR. FILIPOVIC:  No, Sheriff of the City of

19   Philadelphia and I'll refer to them as the Sheriff.

20            THE COURT:  The Sheriff, not the city?  City is not

21   in --

22            MR. FILIPOVIC:  No, not the city.

23            THE COURT:  -- not in here, okay.

24            MR. FILIPOVIC:  Right.  I only say the City's

25   exhibits because they're pre-marked them as City 1 through

```
 1    whatever.

 2              THE COURT:  Okay.

 3              MR. FILIPOVIC:  And like we said, we'll show at

 4    least six and likely up to nine acts by the Sheriff that did

 5    exactly that.  They sought to obtain possession of property of

 6    the estate or the property from the estate and to exercise

 7    control of -- of such property.

 8              THE COURT:  And what property is that?

 9              MR. FILIPOVIC:  Plaintiff's residence.  Plaintiff's

10    primary residence.

11              THE COURT:  So basically, well, at the time, the

12    Debtor didn't own it.  So they tried to -- he had a right to

13    occupancy.  So it's the --

14              MR. FILIPOVIC:  Correct.

15              THE COURT:  It is right to occupancy that they tried

16    to exercise control over.

17              MR. FILIPOVIC:  Correct.  Correct, Your Honor.

18              THE COURT:  Okay.

19              MR. FILIPOVIC:  And plaintiff will show that at

20    least by May 8th, the Sheriff was fully aware the plaintiff

21    had filed for bankruptcy Chapter 13 in this court.  And the

22    Sheriff even recorded having received the notice of

23    plaintiff's bankruptcy filings and its own records.  We'll do

24    that through our own trial exhibits and through Sheriff's

25    trial exhibits, namely service event report entered by Deputy
```

1   Taylor on May 10th as City 4, Exhibit C4, as well as the risk

2   -- return of service, Plaintiff's 35.

3        And we will show notice, as well as through Sheriff's

4   responses to discovery, namely admissions, responses to

5   requests for admissions and those of admissions that are done

6   through depositions.  Plaintiff had broken up the request for

7   admissions into Exhibits, Plaintiff's 23 through 34, what we

8   will, for the purposes of expediency of the trial, we can just

9   enter them or read them into record as, you know, in bulk.

10       And most importantly, the Sheriff's actions do not

11  only contradict, the bankruptcy code but their own policy and

12  procedure that they have recorded and reduced to writing.  In

13  pertinent part, their policy and procedure says, "Bankruptcy,

14  when received by the Sheriff's Office all legal action is to

15  stop."  That's Plaintiff's Exhibit 16 and C-26.  There's more

16  to it but for purposes of the opening statement, that's as far

17  as I'm going to go today.

18       Plaintiff will also show damages through the testimony of

19  a firsthand witness of such damages, Mr. Barrington Whyte, who

20  is a plaintiff's nephew and a household member who has been

21  and ordered in front of the court, by this court to a specific

22  explicit order, which vested him with explicit authority to

23  testify on Mr. Toppin's behalf.

24            THE COURT:  But counsel, let's -- what did you say

25  he would be testifying to regarding when you listed his

43

1    testimony on the witness list?

2          MR. FILIPOVIC:  I will read verbatim of what his

3    test -- he is going to testify about, Barrington Whyte, Your

4    Honor, will be testifying.  I'll just read it verbatim.  I

5    don't want to misquote myself.

6          THE COURT:  Uhm-hum.

7          MR. FILIPOVIC: "Summary of testimony.  Will testify

8    regarding plaintiff's residence, relevant financial affairs,

9    bankruptcy filing, the notices to the Sheriff of the

10   bankruptcy filing.  Will also relate firsthand knowledge of

11   all the ill effects that the post-bankruptcy notice collection

12   and writ enforcement by the sheriff had on the plaintiff.

13         THE COURT:  So he's going to be testifying on his

14   own observations?

15         MR. FILIPOVIC: Correct.  His own observation of the

16   plaintiff and of the Sheriff's actions and his condition --

17         THE COURT:  Right.  Well, so he's not going to -- so

18   was the Debtor going to testify himself regarding the effect

19   upon him?

20         THE COURT:  Your Honor, the Debtor is deaf and mute

21   as was noted in the order.

22         THE COURT:  Okay.  So --

23         THE COURT:  So he can't testify.  That's why this

24   court --

25         THE COURT:  But that's -- counsel, I get what my

44

1    order says but.  But we're going to limit to his personal

2    observation –

3              MR. FILIPOVIC:  Correct.  Correct.

4              THE COURT:  -- to find on behalf of the Debtor.  In

5    this case, he's not testifying on behalf of the Debtor with

6    respect to his observations, correct?

7              MR. FILIPOVIC:  Well, he's testifying in the

8    capacity of the Debtor and that of his own.  He's going to

9    testify –

10             THE COURT:  That's not what that says.  It says he's

11   going to testify regarding his own personal observations.

12   That's why I'm asking you about it.

13             MR. FILIPOVIC:  Yes.

14             THE COURT:  His personal -- so I don't want to hear.

15   So he's not testifying on behalf of the Debtor with respect to

16   the damages.  He is supporting the Debtor but based on his own

17   personal knowledge.  He's not there testifying on what the

18   Debtor would have said.  Because that's not what that says.

19             MR. FILIPOVIC:  No, he's not to testify on what a

20   Debtor could -- would have said.  The Debtor doesn't speak so.

21             THE COURT:  Debtor can write --

22             MR. FILIPOVIC:  -- his own personal observation.

23             THE COURT:  -- I don't know.  Does the Debtor know

24   how to write?

25             MR. FILIPOVIC:  Well, he is deaf and mute, Your

45

```
 1    Honor, he does not.

 2              THE COURT:  That -- that doesn't mean you can't

 3    write because you deaf and --

 4              MR. FILIPOVIC:  You would have to learn to write.

 5              THE COURT:  Well, he couldn't have counsel, that's

 6    why I'm asking the question.  Helen Keller was deaf and mute.

 7    So she --

 8              MR. FILIPOVIC:  Yeah, I know.

 9              THE COURT:  -- could communicate; that was the

10    question.  Does he know --

11              MR. FILIPOVIC: Yeah, we're not going to be offering.

12              THE COURT:  -- how to communicate?  Okay.  That --

13              MR. FILIPOVIC:  No, very limited -- he's very

14    limited, Your Honor.  He's disabled to that regard and --

15              THE COURT:  Okay.

16              MR. FILIPOVIC:  -- Barrington Whyte will only

17    testify to his observations of his uncle with him.  He's lived

18    with him for most of his life.

19              THE COURT:  Okay.  That's what I want to make it

20    clear that it's only his personal observation.  That's it.

21    Okay.  And so you believe the damages are going to be based on

22    what Mr. Whyte testifies as to his personal observations of

23    the impact on his -- you said his uncle, right?

24              MR. FILIPOVIC:  Yeah, his uncle.

25              THE COURT:  His uncle with respect to the receipt of
```

46

1    the notices, correct?

2            MR. FILIPOVIC:  Correct.

3            THE COURT:  Okay.  All right.

4            MR. FILIPOVIC:  Not the receipt of the notices, but

5    the attempts to evict.

6            THE COURT:  Which -- whichever --

7            MR. FILIPOVIC:  Well, the notices to evict and --

8            THE COURT:  Yeah, the notices to evict.  Right.

9            MR. FILIPOVIC:  -- the service, yeah, which is

10    separate and apart from notices that were provided to the

11    Sheriff.  Just want to make that clear.

12            THE COURT:  I'm not talking about that.

13            MR. FILIPOVIC:  Okay.  Good.  Yeah.  The notices to

14    evict.

15            THE COURT:  What I'm talking about was the -- my

16    understanding that notices were posted.

17            MR. FILIPOVIC:  Yes.  Notices, orders --

18            THE COURT:  And if there was something more than

19    that, you know, I don't know.

20            MR. FILIPOVIC:  Yeah.

21            THE COURT:  But my understanding was that that

22    notices were posted and that was it.  That the --

23            MR. FILIPOVIC:  Right.  Several notices.

24            THE COURT:  -- the mail or something.  Yeah, but

25    nothing, no personal interaction, or maybe there was, I don't

47

1    know.

2          MR. FILIPOVIC:  Yeah, those were personally -- we --

3    you will hear a testimony regarding that from Ms. Taylor.  She

4    appeared at the residence in person.

5          THE COURT:  Right.  Counsel, I know that you can't

6    post on the building without personally appearing.

7          MR. FILIPOVIC:  Sure.

8          THE COURT:  My question is that, Mr. Whyte's

9    testimony is going to be limited to his observation of the

10   notices being posted or some interaction with the Sheriff?  I

11   don't know.

12         MR. FILIPOVIC:  No interaction with the Sheriff.

13         THE COURT:  What I'm saying that was --

14         MR. FILIPOVIC:  Yes.

15         THE COURT:  -- you know, my understanding there was

16   no interaction other than the posting on the doors or wherever

17   they posted it and maybe mailing it to them.  I don't know.

18   But I just -- my understanding was there was no personal

19   interaction in terms of face-to-face conversation other

20   than –

21         MR. FILIPOVIC:  That's my understanding as well,

22   Your Honor.

23         THE COURT:  So that's all I wanted to be clear.

24         MR. FILIPOVIC:  Sure.

25         THE COURT:  That's what happened.  So that, you know

```
 1    -- and if there was, I'm not saying you can't present

 2    testimony, but that's what I'm -- I understood the alleged

 3    violations was the actual posting and continuing efforts by

 4    posting.

 5            MR. FILIPOVIC:  He's going to give a little bit of a

 6    background about how this whole came about as well, if Your

 7    Honor permits.  Because it was a matter about --

 8            THE COURT:  How what came about?

 9            MR. FILIPOVIC:  Well the, you know, the underlying

10    this -- what was stipulated to the underlying case and why

11    they were at danger of losing their house.

12            THE COURT:  Okay.  I mean, to the extent you believe

13    that's relevant?  I'll let --

14            MR. FILIPOVIC:  We believe so.

15            THE COURT:  So the objects, I mean, I'm not there

16    yet.

17            MR. FILIPOVIC:  Okay.

18            THE COURT:  If you think I need some background, it

19    is what it is.

20            MR. FILIPOVIC:  I'm just going to lay the

21    foundation.

22            THE COURT:  Yeah.  Okay.  Unless the city stipulates

23    and then I don't have to hear it.  Or if they don't, then --

24    or they object, we'll get to that when we get to it.  I'm

25    sorry.  I interrupted you because I -- I just wanted to be
```

49

```
 1    clear.  Because I want to --

 2              MR. FILIPOVIC:  Sure.

 3              THE COURT:  -- head off at the pass, any idea that,

 4    "He's going to do some -- he told -- me or I would."  He

 5    can't --

 6              MR. FILIPOVIC:  No, no, no hearsay, Your Honor.

 7              THE COURT:  Well, he can't because he can't talk.

 8              MR. FILIPOVIC:  He can't talk, not from him.  Yeah,

 9    won't have to worry about that.

10              THE COURT:  I'm not worried about it.  If he could,

11    he would.  You know, it is what it is.  I can't -- you know, I

12    just simply want to avoid unnecessary delay.

13              MR. FILIPOVIC:  Sure.

14              THE COURT:  Do you believe that -- so Mr. Whyte's

15    going to testify regarding his observations of the impact of

16    the notices that were received.

17              MR. FILIPOVIC:  Served, posted.  Yeah.

18              THE COURT:  Okay.

19              MR. FILIPOVIC:  Correct.  All right.  And if I may

20    call now, Mr. Whyte, to the stand.

21              THE COURT:  Okay.  Hold on.  Who's administering the

22    oath here?

23              THE CLERK:  I will, Judge.

24              THE COURT:  Okay.

25              MS. HARPER:  Your Honor?
```

                    Opening Statement - Ms. Harper              50

1              THE COURT:  Yes, Ms. Harper?

2              MS. HARPER:  Would you like the city to reserve its

3    opening statement for its defense?

4              THE COURT:  Oh, I forgot.  Why don't you just go

5    ahead and give me your opening statement.

6              MS. HARPER:  And I -- and I did it there myself,

7    Your Honor.

8              THE COURT:  I noted -- I did write down first,

9    second, and then I got carried away as usual.  All right.  Ms.

10   Harper, what's the City's opening statement?

11             MS. HARPER: And we're both doing it, Your Honor.

12   I --

13             THE COURT:  The Sheriff, the Sheriff.  And Sheriff

14   we believe right now, is Ms. Bilal?

15             MS. HARPER:  Yes, Your Honor.

16             THE COURT:  Okay.

17             MS. HARPER:  And I apologize for doing that.  And if

18   I do it again, I apologize.

19             THE COURT:  And I apologize because you said the

20   city and I went right along with you when it was the Sheriff.

21   I know that's because we all know you typically represent the

22   City of Philadelphia.

23             MS. HARPER:  That's right.

24             THE COURT:  For the record, it's Ms. Harper and Mr.

25   Domer are here on behalf of the Sheriff of Philadelphia.

1   Well, whoever that name may be.  All right.  What's your

2   opening statement, Ms. Harper?

3          MS. HARPER:  Well, Your Honor, I don't expect the

4   Court's going to learn too much more from a factual

5   perspective than what -- what the court is already aware of.

6   With regard to the --

7          THE COURT:  Aware of from prior hearings, not –

8   there's no --

9          MS. HARPER:  Right, Your Honor.  I'm not suggesting

10  that these are -- these are facts admitted or in evidence or

11  anything like that.  But I think the court has a general sense

12  regarding the facts of the case and the allegations against

13  the Civil Enforcement Unit of the Sheriff's Office.  As -- on

14  May 8th of 2018, Mr. Abdeldayem Hassan brought a writ of

15  possession against unknown occupants for the property located

16  at 146 South 62nd Street, to the Civil Enforcement Unit of the

17  Sheriff's Office.

18         The Civil Enforcement Unit is tasked by law with the

19  duty to enforce Mr. Hassan's writ of possession.  And you'll

20  hear from Captain Sean Thornton, that in fact, the main focus

21  of the Civil Enforcement Unit is to enforce a variety of state

22  court orders.  Upon receipt of the writ of possession that was

23  brought by Mr. Hassan, Sergeant then Deputy, Sergeant Jetaria

24  Taylor was assigned to enforce Mr. Hassan's writ of possession

25  against unknown occupants at the property.  Sergeant Taylor's

52

1    testimony will affirm that all allegations of alleged state

2    violations against the Sheriff's Office arise from a lawful

3    enforcement of a facially valid writ of possession, issued by

4    the Court of Common Pleas of Philadelphia.

5          Your Honor, we'll also learn from Captain Thornton

6    that the Civil Enforcement Unit staff are trained to cease

7    enforcement when the unit is notified of a bankruptcy.  It's

8    not for purposes of suggesting that this -- this policy or

9    procedure gives a private cause of action to the plaintiff by

10   any means.  But it is for purpose of showing that the Sheriff

11   has a policy and procedure in place and evidence will

12   establish that on June 7th, 2018, when the C.E.U. received --

13   pardon me, when the Civil Enforcement Unit received notice of

14   Mr. Toppin's bankruptcy, all enforcement of Mr. Hassan's writ

15   of possession ceased.

16         MR. FILIPOVIC:  Your Honor.

17         THE COURT:  You do not get to interrupt --

18         MR. FILIPOVIC:  I'm sorry.

19         THE COURT:  -- her opening.

20         MR. FILIPOVIC:  No, I thought she was finished.  I'm

21   sorry.

22         THE COURT:  Are you not?

23         MS. HARPER:  I am, Your Honor.

24         THE COURT:  Okay.  Let's move on.  All right.  Now,

25   we'll start the testimony.

53

1        MR. FILIPOVIC:  Your Honor, just before we do that,

2    we did reach some stipulations in this case.  And we emailed

3    them to Ms. Godfrey before the trial.

4        THE COURT:  Okay.  So --

5        MR. FILIPOVIC:  It reached her late yesterday

6    afternoon and I can read them into the record, they're not

7    many.  Or we can -- you know we --

8        THE COURT:  So they are going to be -- there --

9    there's stipulations that will be entered into the record.

10   They can be marked as what?  What do you want to mark them as?

11       MR. FILIPOVIC:  Well, they're not really evidence.

12   They're stipulations, they can be marked --

13       THE COURT:  Well counsel, stipulations can be what's

14   agreed upon by the parties.  And those facts are deemed the

15   facts.  And the stipulated facts can be entered into the

16   record as opposed to being read into the record.  They're –

17       MR. FILIPOVIC:  Sure.

18       THE COURT:  -- both counsel, are they not?

19       MR. FILIPOVIC:  Yes, they are.

20       THE COURT:  Right.  So these are the stipulated

21   facts that the parties have agreed upon.

22       MR. FILIPOVIC:  Correct.

23       THE COURT: Ms. Harper do you think they need --

24   yeah, if you want to read them into the record or do you --

25       MR. FILIPOVIC:  I'll read them.  I think it's easier

54

```
 1    if I just read them.  I mean they're three sentences or four.
 2              THE COURT:  Okay.
 3              MR. FILIPOVIC:  Okay.  You'd just want to give me a
 4    second here.  I apologize.
 5              THE COURT:  Have they been filed -- you said you
 6    sent them.  Do we have those, John?
 7              THE CLERK:  We sent them to Ms. Godfrey this
 8    morning.
 9              THE COURT:  I know --
10              THE CLERK:  When they reached --
11              THE COURT:  Hold on.  John, do you have those?
12              THE CLERK:  A stipulations from this morning?  The
13    only thing I have from this morning is that motion in limine.
14    I mean, me personally anyway.  Is it on the docket or it's
15    just an email?
16              MR. FILIPOVIC:  It's not on the docket.
17              THE COURT:  Never mind, just read them.
18              THE CLERK:  Okay.  Okay.
19              MR. FILIPOVIC:  Sure.  One second, Your Honor.  I'm
20    sorry.  Okay.  Here we go.
21              THE COURT:  Can you just share them on the screen?
22    Do you know how to do that?  That's what I was talking about.
23              MR. FILIPOVIC:  I'm afraid I'm going to lose that.
24    But here they are, Your -- Your Honor, if I may.  "It is
25    hereby stipulated and agreed among parties, the Sheriff of the
```

1    City of Philadelphia and Plaintiff Lyndel Toppin, that the

2    following facts have been stipulated to and are conclusively

3    established for purposes of trial. A)  Abdeldayem Hassan filed

4    a complaint and ejectment against, {quote}{unquote} "unknown

5    occupants" pertaining to the 146th South 62nd Street,

6    Philadelphia, in the Court of Common Pleas, January in 2018,

7    docketed as 003400.  That was Plaintiff's Exhibit 2 hereby.

8    B)  The Abdeldayem Hassan procured a judgment by default for

9    possession which was entered against unknown occupants at the

10   property.  The same property on 146th South 62nd Street on

11   April 5th, 2018, in the Philadelphia Court of Common Pleas.

12   C)  Abdeldayem Hassan procured a writ of possession against,

13   {quote}{unquote} "unknown occupants" on May 7th, 2018.

14   D)  On May 8th, 2018, Plaintiff Lyndel Toppin filed a Chapter

15   13 bankruptcy in the Eastern District, Pennsylvania Bankruptcy

16   Court, that would be this court."  That's the end of the

17   stipulations, Your Honor.

18           THE COURT:  So the writ of possession was issued

19   when?

20           MR. FILIPOVIC:  On May 7th, 2018.

21           THE COURT:  And the petition was filed on May 8th?

22           MR. FILIPOVIC:  Petition was filed on May 8th,

23   correct.

24           THE COURT:  Okay.  Okay.

25           MR. FILIPOVIC:  All right.  Thank you.

```
 1              THE COURT:  And what -- that was 2018, right?
 2              MR. FILIPOVIC:  Yes.  2018.
 3              THE COURT:  Okay.  All right.
 4              MR. FILIPOVIC:  The plaintiff will now like to call
 5   Mr. Whyte to the stand.  Mr. Barrington Whyte.
 6              THE COURT:  Okay.  All right.  Swear him in.
 7              BARRINGTON WHYTE, PLAINTIFF'S WITNESS, SWORN
 8              THE CLERK:  Okay.
 9              THE COURT:  Counsel.  Where's Mr. Dunne?
10              MR. DUNNE:  I'm right beside Mr. Whyte, Your Honor.
11              THE COURT:  Okay.  I want to see you.  Don't --
12              MR. DUNNE:  Okay.
13              THE COURT:  No, no, no, no.  I want you in the
14   picture.
15              MR. DUNNE:  No problem.
16              THE COURT:  All right.  There we go.  All right.
17              MR. FILIPOVIC:  Okay.
18              THE CLERK:  Your Honor, usually, I would ask for the
19   witness to state and spell the name for the record.
20              MR. FILIPOVIC:  That's what I was going to ask.
21              THE CLERK:  Yeah.
22              MR. FILIPOVIC:  Go ahead.  And state and spell your
23   -- right.
24              THE COURT:  That's the job of the ESR, will swear
25   him in.
```

Whyte - Direct                              57

1          MR. FILIPOVIC:  Sure.

2          THE COURT:  Okay?

3          THE CLERK:  And Mr. Whyte, could you please state

4    and spell your name for the record?

5          MR. WHYTE:  Barrington Whyte, first name B-A-R-R-I-

6    N-G-T-O-N, my last name's White, W-H-Y-T-E.

7          THE CLERK:  And if you could please state your

8    address for the record?

9          MR. WHYTE:  146 South 62nd Street, Philadelphia PA,

10   19139.

11         THE CLERK:  Thank you very much.

12                   DIRECT EXAMINATION

13   BY MR. FILIPOVIC:

14   Q.  Mr. Whyte.  Good afternoon.

15         THE COURT: Wait a minute, we got to swear him in.

16         MR. FILIPOVIC:  I'm sorry.  I thought that already

17   happened.  Go ahead.

18         THE COURT:  Did he say, did I -- maybe I didn't hear

19   it but, "The truth, that the testimony you're about to give,"

20   did I miss that?

21         THE CLERK:  Yes, Your Honor.  I did --

22         MR. FILIPOVIC:  Yeah, you did.

23         THE CLERK:  I did state it, but we could repeat.

24         THE COURT:  Oh, my God.  All right, I missed it.

25   Never mind.  I was busy writing.  Okay.

Whyte - Direct                                    58

1          MR. FILIPOVIC:  That's fine.

2          THE COURT:  All right, go ahead.

3               DIRECT EXAMINATION (CONT'D)

4    BY MR. FILIPOVIC:

5    Q.  Mr. Whyte, good morning or good afternoon now.  Could you

6    please repeat your current address for the court?

7    A.  146 South 62nd Street, Philadelphia, Pennsylvania, 19139.

8          THE COURT:  Is that 52 or 62?

9    A.  146.  146 South 62nd, 62.

10         THE COURT:  62.  Okay.  I have 52nd.  Okay.  62nd

11   Street.

12   A.  Yeah.  62nd.

13         THE COURT:  Okay.

14   BY MR. FILIPOVIC:

15   Q.  And how long have you lived there, Mr. Whyte?

16   A.  I've been there about 10 years.

17   Q.  And so in the period between 2017, '18 and '19, is that

18   where you resided?

19   A.  Yes.

20   Q.  And who do you live with -- live there with?

21   A.  My uncle Lyndel Toppin.

22   Q.  And your uncle, is he a fully functioning individual?

23   Does he have any limitations?

24   A.  Yes, he can't -- he can't hear or talk.

25   Q.  Okay.  And is that the reason you're -- he's not

Whyte - Direct                              59

1   testifying for himself today?

2   A.  Yes.

3   Q.  Okay.  And now, did this court allow you to testify on his

4   behalf?

5   A.  Yes.

6   Q.  Okay.  Now, about his limitations, other than what you

7   stated.  Is he otherwise functional?  Does he work for a

8   living?

9   A.  Yes, he does.  He works.

10  Q.  Where does he work?

11  A.  He works at a restaurant of the name of Au Bon Pain, if

12  I'm pronouncing it correctly.

13  Q.  Okay.  And does he work full or part-time?

14  A.  Part-time.

15  Q.  About how many hours a week?

16  A.  I would say he works like 20 hours a week.

17  Q.  Okay.  And what, if anything, do you do for your uncle?

18  A.  Well, basically, I cook for him and I pay the utility

19  bills and things for the house.

20  Q.  And did you ever have any issue with utilities at the

21  house?

22  A.  Yes.  Recently the water just got cut off.

23  Q.  When you say recently, how long ago was that?

24  A.  Well, it fully stopped working about two weeks ago

25  actually.

1    Q.  Did you make all the -- do you know why that happened?

2    Did you make all the payments?

3              MS. HARPER:  Objection, Your Honor, as to relevance.

4              THE COURT:  Counsel, relevancy?

5              MR. FILIPOVIC:  Well, we're trying to establish more

6    about the residence and --

7              THE COURT:  That's post-bankruptcy.  What does that

8    have to do --

9              MR. FILIPOVIC:  Post-bankruptcy, right.

10             THE COURT:  What does that have to do with the

11   Sheriff, and their alleged violation of the state?  What does

12   that have to do with anything?  He pays the bills, the water

13   was shut off.  What am I going to do with that information?

14   How is that going to help me decide this?

15             MR. FILIPOVIC:  Okay.  Well --

16             THE COURT:  Sustained, irrelevant.

17             MR. FILIPOVIC:  -- if I may defer that her testimony

18   will reveal that there was really almost a vindictive action

19   by –

20             THE COURT:  Counsel.

21             MR. FILIPOVIC:  -- if there was no reason.  He tried

22   to pay the water --

23             THE COURT:  Did you allege anything about

24   vindictiveness or retaliation by the Sheriff?

25             MR. FILIPOVIC:  No, this occurred just recently,

Whyte - Direct                              61

1    Your Honor.

2              THE COURT:  So what does and --

3              MR. FILIPOVIC:  It's okay.  We can skip over that,

4    Your Honor.

5              THE COURT:  The last time, and the Sheriff

6    doesn't –

7              MR. FILIPOVIC:  We can skip over that.

8              THE COURT:  Okay.  The Sheriff doesn't have anything

9    to do with the water.  That's the city.

10             MR. FILIPOVIC:  Okay.

11   BY MR. FILIPOVIC:

12   Q.  Other than the water, other than the water bill, did -- do

13   you pay any -- were there any other bills in the house that

14   you pay?

15   A.  Besides the water bill, I was -- I was dealing with the

16   GBR Loan Company, a collection agency for the City.  And they

17   were, that's the only other bill that, you know, besides the

18   water, that was kind of like a problem.

19   Q.  Okay.  And can you tell what -- what was the problem?  Is

20   that the municipal tax bill?

21             MS. HARPER:  Objection again, Your Honor, relevance.

22             MR. FILIPOVIC:  Well, Your Honor, this is directly

23   why the bankruptcy was filed and why the property was sought

24   to be sold.  We're trying to get background as to why there's

25   a situation to force them to file a bankruptcy to begin with.

Whyte - Direct                    62

```
1              THE COURT:  Ms. Harper?

2              MS. HARPER:  It's not relevant to oppose bankruptcy

3    cause of action for a stay violation.  I don't find any

4    relevance to this.  I'm concerned that we're going down a road

5    that is going to be prejudicial to the Sheriff's Office

6    because we're now talking about tax bills and possibly leading

7    up to a Sheriff's sale of the property which is not relevant

8    to the alleged stay violations by the Sheriff's Office.

9              THE COURT:  I'll allow it for what it's worth.  If

10   he wants to, you know, he's getting two and a half hours,

11   that's it.  He wants to waste his time on matters that are not

12   going to help me resolve the issue, we know they filed.  We

13   know there was a Sheriff's sale of the property -- how the

14   heck Mr. Hassan got it.  It is what it is.  But if he wants to

15   put it, I'll allow it for what it's worth.  It's not going to

16   -- I mean, the whole idea is I need you guys to give me

17   testimony and facts that will help me decide the issue.  You

18   can spend your time on how you feel if you think that's

19   relevant.  I don't know how you think that's going to help me,

20   I already know what I -- I mean you guys in all the pleadings

21   have told me what happened.  It got sold as Sheriff's sale for

22   taxes.

23             MR. FILIPOVIC:  Okay.

24             THE COURT:  What else I can tell you.

25             MR. FILIPOVIC:  All right.  Well, if you will allow
```

Whyte - Direct                          63

1    it.  Then I will ask it, Your Honor.

2              THE COURT: All right.

3    BY MR. FILIPOVIC:

4    Q.  Again, Mr. Whyte, could you please tell the court more

5    about the -- how the tax issue arose and what you did in

6    connection with it, if anything?

7    A.  Well, I was going down to the GBR loan place, collectors

8    for the taxes, I was making my money payments, you know, on

9    time every time down there.  And one particular day when I

10   went down there, I had Lyndel with me, Lyndel Toppin, my

11   uncle.  I had him with me and one of the workers that was

12   there noticed that, you know, he was disabled, he couldn't

13   talk, you know, or hear.  And what she stated to me was that

14   she could, you know, help out our situation.

15             MS. HARPER:  Objection, Your Honor.  This is

16   hearsay.

17             THE COURT:  Counsel?

18             MR. FILIPOVIC:  You have to -- you -- you can't tell

19   me what she said to you, Lyndel.

20             THE COURT:  Sustained.  Hearsay.  And counsel, I'm

21   not quite sure, you know, although I said I'm going to allow

22   it for what it's worth.  I don't know what it has to do with

23   what the Sheriff's allegedly done.  I said I would allow it,

24   but you could get to the point of how this has anything to do

25   with the Sheriff's actions.  You know, I don't --

Whyte - Direct                           64

 1            MR. FILIPOVIC:  Okay.

 2            THE COURT:  -- GRBD and whatever they did.  They --

 3    if they got a claim against GRB or the city, take it up with

 4    them.

 5            MR. FILIPOVIC:  Sure.  Okay.

 6            THE COURT:  This would better just be, "We went,

 7    this is what happened, it got filed, it got sold."  I don't

 8    need to hear anything about some bad action on somebody else's

 9    part if that's the road you're going down.  I'm just --

10            MR. FILIPOVIC:  Okay.

11            THE COURT:  -- heads up. All right, go ahead.

12    BY MR. FILIPOVIC:

13    Q.  After your visit to GBR, and let's not talk about, you

14    know, anything that was said by GBR to you.  What happened

15    next?

16    A.  After that, I just received the letter that I was being

17    put out of my home.

18    Q.  And who was that letter from?

19    A.  The Sheriff's Department.

20    Q.  Okay.  And what did you do then?

21    A.  Well, that time I seeked out a lawyer, which was Mr. Dunne

22    that I wound up finding.

23    Q.  And what was done then, if anything, what was --

24    A.  Can you repeat the question?

25    Q.  What happened next?

Whyte - Direct                          65

```
 1   A.  Well, then after that, we -- he looked into the case and
 2   we filed the bankruptcy or the Chapter 13.
 3   Q.  Okay.  Do you know if anyone was notified of the
 4   bankruptcy in this case?
 5   A.  Well, from my knowledge of the bankruptcy, I was just
 6   assuming anybody that he owes money to, or you know, as far as
 7   like the house and things like that.
 8   Q.  Okay.  And once the bankruptcy was filed, did that -- did
 9   you receive any other notices?  Was there anything -- did you
10   have any -- did -- did -- did the letters stop?  Did the
11   notices stop?
12   A.  No, I had a -- a few more after that.
13   Q.  Okay.  When you say a few more, can you elaborate on that?
14   A.  Like three.
15   Q.  Okay.
16   A.  Three.
17   Q.  Okay.  Did you see?  Where did you find, how did you learn
18   about the notices?
19   A.  Well, I saw the notice --
20           THE COURT:  What notices?  He said he --
21           MR. FILIPOVIC:  Well, he said --
22           THE COURT:  -- more notices, what notices?
23           MR. FILIPOVIC:  Okay.  Yeah, that's -- please answer
24   Judge has asked you, what were the notices?
25           THE COURT:  He just said he got few notices after
```

Whyte - Direct                                          66

1    the filing.  What notices?

2    A.  The notice to --

3              MR. FILIPOVIC:  Yeah, what --

4    A.  -- get out of the home.

5              THE COURT:  Okay.

6    A.  We had to vacate.

7    BY MR. FILIPOVIC:

8    Q.  Okay.  And where did you see these notices?

9    A.  Well, they were inside my home at the time when I got

10   home.

11   Q.  Were they all inside your house?

12   A.  Yes.

13   Q.  And who were they directed to?

14   A.  Lyndel Toppin.  And well, from what the letter said

15   basically everyone in, you know, that household from how it

16   described on the paper.

17   Q.  Everyone in the household?

18   A.  Yes.

19   Q.  Okay.  Were all the notices inside your household or --

20             MS. HARPER:  Objection.  Asked and answered.

21             MR. FILIPOVIC:  Okay.  We'll move on.

22   BY MR. FILIPOVIC:

23   Q.  And you've already said that it -- it was pertaining to

24   all the members in the household, correct?

25   A.  Yes.

Whyte - Direct                    67

1    Q.  And you lived at the household?

2    A.  Yes.

3    Q.  So they pertained to you as well as your uncle, correct?

4           MS. HARPER:  Objection, leading.

5    BY MR. FILIPOVIC:

6    Q.  What do the notices pertain to?  Withdrawn.

7    A.  Well, it stated everyone just under basically that roof of

8    the household.

9           MR. FILIPOVIC:  Okay.  At this point, Your Honor,

10   I'd like to -- to direct the court's attention to the exhibit

11   that was pre-marked as C-14, it's City 14.

12          THE COURT:  Can you put that up on the -- thank you,

13   John.  Okay, C-14.  Okay.

14      (City's Exhibit-14 previously marked for identification)

15   BY MR. FILIPOVIC:

16   Q.  Mr. Whyte, I'm going to direct you to what is now featured

17   at the screen.  Is that one of the notices that you saw?

18   Have you seen that before?

19   A.  Yes.

20   Q.  And is that one of the notices that you saw at the house?

21   A.  Yes.

22   Q.  Okay.  And tell me, did the -- do you know if your uncle

23   saw any of these notices?

24          MS. HARPER:  Objection.  Objection to form.  Calls

25   for speculation.

  1   BY MR. FILIPOVIC:

  2   Q.  Okay.  Did anyone else in the house see these notices?

  3   A.  No, it's just me and my uncle that lives there.

  4   Q.  Right.  But besides you?  So you --

  5        MS. HARPER:  Again, objection, calls for

  6   speculation.

  7        MR. FILIPOVIC:  Well, I don't see how that -- I'm

  8   only asking who else saw the notice.

  9        THE COURT:  You assuming someone else saw it?

 10        MR. FILIPOVIC:  Well, I'm asking, did anyone else

 11   besides yourself or Mr. Whyte --

 12        THE COURT:  You didn't say that.

 13        MR. FILIPOVIC:  Okay.

 14        THE COURT:  So that's the question counsel you --

 15   A.  Just my -- my uncle.

 16        THE COURT:  Okay.

 17        MR. FILIPOVIC: Right.

 18   BY MR. FILIPOVIC:

 19   Q.  Right.  So, let me just -- did anyone else besides you

 20   see that notice that's now marked as C-14?

 21   A.  Just my uncle.

 22   Q.  Okay.  And how do you know that he saw it?

 23   A.  They were in the house.

 24   Q.  Okay.  What did you -- was that the only notice?  Was C-

 25   14 only notice?

1    A.  No, there were plenty other notices.

2          MR. FILIPOVIC:  Okay.  At this time, Your Honor, I'd

3    like to move to admit C-14 into evidence as being

4    authenticated by the addressee, Mr. Whyte, who is an occupant

5    of the house that the notice was addressed to.

6          MS. HARPER:  The Sheriff objects, Your Honor.

7          THE COURT:  And basis for objection?

8          MS. HARPER:  Your Honor, there is -- the document

9    hasn't he document hasn't been authenticated.  There is

10   handwriting that is not -- that is not original to the

11   document and --

12         MR. FILIPOVIC:  Well, that's not been in the

13   evidence.  I don't know -- well, Your Honor, we can have them

14   authenticated --

15         THE COURT:  Well, well.  She --

16         MR. FILIPOVIC:  I'm sorry.

17         THE COURT:  She needs to finish.  She says that you

18   are -- it's not authenticated because, first of all, it's the

19   City's evidence.

20         MR. FILIPOVIC:  But it's addressed to –

21         THE COURT:  It could be addressed, is it the

22   specific one he received?  He said he saw one like that.  I

23   don't know if his –

24         MR. FILIPOVIC:  Yeah.  He saw that exact notice.  He

25   said that was the notice he saw.

                              Whyte - Direct                    70

1            THE COURT:  He said he saw one like that.  He didn't

2       say exact, counsel.  I wrote my note -- my notes out.

3            MR. FILIPOVIC:  Okay.

4       BY MR. FILIPOVIC:

5       Q.  Mr.  Whyte, is this -- is this –

6            THE COURT:  Wait, whoa, whoa, whoa,  You moved to

7       admit it into evidence.  Ms. Harper has objected.  I gotta

8       rule on that before you start moving on.

9            MR. FILIPOVIC:  Sure.

10           THE COURT:  Ms. Harper, what's the basis for your

11      objection?

12           MS. HARPER:  There is a lack of foundation.

13      Document has not been authenticated yet.

14           THE COURT:  All right.  Counsel, now you get to lay

15      a foundation on how to authenticate it.  So I'm going to

16      sustain.

17         (Pause by The Court)

18           THE COURT:  What happened?  Sustain the objection

19      and allow you to try to authenticate it.

20           MR. FILIPOVIC:  Okay.  Sure.

21      BY MR. FILIPOVIC:

22      Q.  Mr.  Whyte, please refer your attention back to the

23      screen where you see Exhibit C-14.  Can you recall as you sit

24      here today, was that the exact notice that you saw, one of

25      the exact notices that you saw in your house?

Whyte - Direct                          71

1           MS. HARPER:  Objection to form.

2           THE COURT:  Counsel, respond.

3           MR. FILIPOVIC:  Your Honor, that is -- I don't know

4      what she means by the form.  I'm asking if that's the notice.

5      Is that a leading question?  If she says that it's a leading

6      question, that's another thing.  But objection to form in and

7      of itself is --

8           THE COURT:  Is what?

9           MR. FILIPOVIC:  -- too vague for me to -- too vague,

10     I mean is it a compound question?  What's -- there's

11     something wrong with --

12          THE COURT:  It wasn't compound.  It was objection to

13     form.

14          MR. FILIPOVIC:  Okay.  Miss, he's saying he doesn't

15     understand your objection.

16          MS. HARPER:  Right.  Okay.  I'm objecting to the

17     form because the use of the term exact notice that you saw,

18     it's assuming facts that hadn't been established but --

19          MR. FILIPOVIC:  What facts exactly haven't been

20     established?  He said that he saw this notice and I'm

21     asking –

22          THE COURT:  He saw -- he saw several --

23          MR. FILIPOVIC:  -- is that the exact -

24          THE COURT:  Listen, I'll allow it for what it's

25     worth.  Answer the question.

Whyte - Direct                        72

1   BY MR. FILIPOVIC:

2   Q.  So Mr. Whyte, I'll ask it again.  Is this the -- is what

3   you see on the screen now that's been pre-marked as City 14,

4   is that the exact notice that you believe that you saw at

5   your house?

6   A.  Yes.

7   Q.  Okay.

8          MR. FILIPOVIC:  And again, Your Honor, him being --

9   I'm going to move to admit it again as physical evidence

10  capable of being authenticated.  This time, I spoke to the

11  addressee.  He lives at the house.  He says that he saw this

12  exact notice at the house.  And so it's as if it was a letter

13  addressed to him.  He's the addressee, he can authenticate

14  that.

15         THE COURT:  And Ms. Harper's objection is, it's not

16  the exact because it has handwriting on it.  So it can't be

17  the exact that he saw.  Is that your objection, Ms. Harper?

18         MS. HARPER:  That is one of my objections, I can

19  just object as to authentication because this isn't –

20         MR. FILIPOVIC:  Well, Your Honor, but we haven't

21  heard anyone else say that there is handwriting or there's no

22  handwriting –

23         THE COURT:  I can -- counsel, it's the -- is he

24  saying that that was on there?  5/18/18?

25         MR. FILIPOVIC:  I didn't ask him that.  And I

Whyte - Direct                              73

1    don't –

2              THE COURT:  But you're saying it was the exact what

3    he has seen --

4              MR. FILIPOVIC:  Well, no, he's saying that.

5              THE COURT:  And Ms. Harper says, can he authenticate

6    it because it has this handwriting on it.  Did you ask him

7    did it have the handwriting on it when he saw it?  You didn't

8    ask him those questions.  I'm not saying you can't, but you

9    need to.  If he's --

10             MR. FILIPOVIC:  Okay.

11             THE COURT:  -- is exactly what was on there.  Other

12   than City-14.

13             MR. FILIPOVIC:  Okay.

14   BY MR. FILIPOVIC:

15   Q.  Okay.  Other than City-14, is this the exact notice that

16   was on there?  It was this handwriting that you see in the

17   bottom right -- left corner, was that on there?

18   A.  No.

19

20   Q.  Okay.  And do you know how that date came about to be on

21   that notice?

22   A.  Yes.  I wrote it there from my memory so I would remember

23   when it came.

24             MR. FILIPOVIC:  Okay.  Your Honor, I think we've

25   established the issue with the handwriting has been

26   addressed.  Ms. Harper --

Whyte - Direct                    74

1          THE COURT:  And so that we wrote this document.  So

2     this is a document that was produced by the plaintiffs and

3     given to the City.

4          MR. FILIPOVIC:  No, this document was produced by

5     the city as a trial exhibit, Your Honor, in connection --

6     both parties produced this document.  They're the same

7     documents.  We have combined exhibits.

8          THE COURT:  So you produced -- this is what I'm

9     trying to figure out.  The plaintiff produced this document

10    to the city and the city has marked it as City-14.

11         MS. HARPER:  That's correct, Your Honor.

12         THE COURT:  So the plaintiff gave you this with that

13    date on it?

14         MS. HARRIS:  The plaintiff produced the document

15    with the date on the bottom left corner.  Yes, Your Honor.

16         THE COURT:  Okay.  All right.

17         MR. FILIPOVIC:  We've established that you wrote --

18    that Mr. --

19         THE COURT:  So even though this is -- so even though

20    it's marked as City-14, this is really the plaintiff's

21    document that the plaintiff produced, correct?

22         MR. FILIPOVIC:  Well, the plaintiff produced it, but

23    it's not the plaintiff's document.  It's the city who created

24    this document, and we can --

25         THE COURT:  Counsel, counsel, we're not going to

1   play semantics about who produced -- who wrote it, who

2   didn't.  The bottomline is that this document was something

3   with the addition, because the plaintiff's nephew wrote on it

4   and you produced it and gave it to the city with the

5   alterations.  Is that the -- that's what I'm trying to figure

6   out.

7            MR. FILIPOVIC:  Yes, Your Honor.  Yes, Your Honor.

8            THE COURT:  All right.  Okay.  All right.

9            MR. FILIPOVIC:  Yes, Your Honor.

10           THE COURT:  Although it's marked as City-14, it was

11  actually a document produced by the plaintiff to the city

12  with the 5/18/18 written on it;,is that correct?

13           MR. FILIPOVIC:  That is correct, Your Honor.

14           THE COURT:  Okay.  All right, Ms. Harper.  Any other

15  objections as to why he hasn't authenticated as a document he

16  received and upon which he wrote on?

17           MS. HARPER:  No, Your Honor.  This is a document --

18  no, Your Honor.  I'll leave it at that.

19           THE COURT:  Okay.  All right.

20  BY MR. FILIPOVIC:

21  Q.  And at this point, let me ask this, Mr. Whyte, why did

22  you write that particular, it appears to be a date.  Why did

23  you write that date on there?

24           MS. HARPER:  Objection, because that's been asked

25  and answered.

Whyte - Direct                          76

1    BY MR. FILIPOVIC:

2    Q.  Mr. White, do you believe --

3              THE COURT:  Whoa, whoa, whoa.

4              MR. FILIPOVIC:  Withdrawn.

5              THE COURT:  Asked and answered, respond.

6              MR. FILIPOVIC:  Well, she is correct.  He did --

7    I'll withdraw the question, Your Honor.

8              THE COURT:  All right.  Then move on.

9              MR. FILIPOVIC:  Yeah.  He said that he wrote it for

10   his memory.

11   BY MR. FILIPOVIC:

12   Q.   Mr. Whyte, why did you write that -- those exact set of

13   numbers on this document?

14   A.  So I would remember.

15   Q.  Remember --

16             THE COURT:  He already said that.

17             MR. FILIPOVIC:  Correct.

18             THE COURT:  He already said that.

19   BY MR. FILIPOVIC:

20   Q.  Remember what?  Remember what, Mr. Whyte?

21   A.  The date I received it.

22   Q.  Thank you.  So this -- you wrote this as a date when you

23   received it, correct?

24   A.  Yes.

25   Q.  Okay, thank you.

                              Whyte - Direct                    77

1          MR. FILIPOVIC:  So at this point, Your Honor, we
2   would like to -- the plaintiff moves to admit this document
3   as having been authenticated by the plaintiff, who is the
4   addressee of the document.
5          THE COURT:  Ms. Harper?
6          MS. HARPER:  Your Honor, the city will allow the
7   document to be admitted at this point.  Okay.
8          THE COURT:  Being admitted, as the debtor said he --
9   I mean, the debtor's representative and Mr. Whyte, who is
10  testifying, I guess, on his own knowledge.  This is, you
11  know, his knowledge that it says what it says.  And he said
12  he received it, he produced, and he wrote on it.  He wrote
13  the date on it.  Okay.  All right.  It's admitted.
14     (City's Exhibit-14 admitted into evidence)
15         MR. FILIPOVIC:  All right.  Thank you.
16  BY MR. FILIPOVIC:
17  Q.  Mr. White, at this point, I'd like to direct your
18  attention to the document that's been pre-marked as C-15, if
19  we can put that up on the screen.  And I am going to -- Mr.
20  Whyte, do you see that document?
21     (City's Exhibit-15 previously marked for identification)
22  A.  Yes.
23  Q.  I'm going to ask you the same questions.  Have you seen
24  it before?
25  A.  Yes, I have.

Whyte - Direct                          78

1    Q.  And what is it?  Can you tell the court what that

2    document is?

3    A.  It's a letter to -- for me to vacate the premises, the

4    property.

5    Q.  Okay.  Does it have the same -- is that the same letter

6    that we saw at City-14 or is it a different -- is it a copy

7    of the same letter or is it two different notices?

8    A.  It's the same notice, yes.

9    Q.  Okay.  But, Mr. Whyte, there is also a handwritten --

10   what appears to be a handwritten notation on there, correct?

11   A.  Yes, correct.

12   Q.  Okay.  So it appears to have a different date on there,

13   correct?

14   A.  Yes, correct.

15   Q.  Okay.  So why did you put that particular date on there,

16   Mr. Whyte, and not --

17           MS. HARPER:  Objection.  Assuming facts not in

18   evidence yet.

19   BY MR. FILIPOVIC:

20   Q.  Okay.  Mr. Whyte, did you write -- withdrawn.  Mr. Whyte,

21   did you put that notation on the document?

22   A.  The date down there?

23   Q.  Yes.

24   A.  Yes, I did.

25   Q.  And why did you put that particular date down there?

Whyte - Direct                              79

```
 1   A.  So I would remember what date -- the day it came in.
 2   Q.  Okay.  So that notice came in on a different, later date
 3   than the first notice we talked about here today?
 4   A.  Yes.
 5   Q.  Correct.  Okay.
 6            MR. FILIPOVIC:  Your Honor, same procedure.  I would
 7   like to move to admit this document into evidence.  It's been
 8   marked as City-15, having been authenticated by the
 9   addressee, who admitted that he put the date.
10            THE COURT:  Ms. Harper?
11            MS. HARPER:  Your Honor, I -- this is going to be an
12   awfully long hearing.
13            MR. FILIPOVIC:  Well, there's only four more
14   notices.
15            THE COURT:  Whoa, whoa, whoa, Ms. Harper is talking.
16            MS. HARPER:  I'm going to continue to object to the
17   plaintiff's ability to authenticate a document that he did
18   not create and has not testified as to --
19            THE COURT:  He's authenticating that that's what he
20   received.  That's it.
21            MR. FILIPOVIC:  Yeah.
22            THE COURT:  Then he marked it up.  That's it.
23            MS. HARPER:  Correct.
24            THE COURT:  That's -- it's there for that purpose.
25   I guess you're not going to stipulate that -- I mean --
```

1             MR. FILIPOVIC:  We asked for that --

2             MS. HARPER:  No, Your Honor.

3             MR. FILIPOVIC:  Sorry, Your Honor.

4             THE COURT:  Well, they didn't and it is what it is.

5     All right, Ms. Harper.  Other than the creation of the

6     document was the debtor, which is -- all he's saying is he

7     received it and when he received it, he wrote on it.  That's

8     only for the purpose, "That's what I received."

9             MS. HARPER:  Uh-huh.

10            THE COURT:  "This is what I have in my records."

11            MS. HARPER:  Uhm-hum.

12            THE COURT:  Object on any other basis?

13            MS. HARPER:  Pardon me?

14            THE COURT:  Do you object on any other basis?

15    Debtor received that's what he received, and he wrote on it.

16    Okay?  That's what the purpose is.  He received it.  "This is

17    what I have, and I wrote on the date that I received it."

18    Any other basis for objection?

19            MS. HARPER:  Well, Your Honor.  No, Your Honor, the

20    lack of authentication is my basis for the objection.

21            THE COURT:  If your objection is that he didn't

22    create it, we know he didn't create it.

23            MS. HARPER:  Yes, Your Honor.

24            THE COURT:  Any other business record?  This is

25    records that he kept in his --

1          MS. HARPER:  Right.  I mean, he hasn't authenticated

2    -- he hasn't laid a foundation that this is a record -- it's

3    all tied together.

4        Again, this is going to make the hearing very long, but

5    he hasn't laid a foundation that this is a record that he

6    keeps in the ordinary course of his daily life or business,

7    and so it's not a business record.  It's not a business

8    record created by the plaintiff.

9          MR. FILIPOVIC:  Your Honor, if I may respond?

10          THE COURT:  Uhm-hum.

11          MR. FILIPOVIC:  Ms. Harper ended up having no

12    objection to the prior notice, which was City-14.

13          THE COURT:  She had an objection.  I overruled it,

14    counsel.

15          MR. FILIPOVIC:  Correct.  So we're talking about the

16    same exact type of document, and the same rationale should

17    apply.  Further, this is not being admitted as a business

18    record.  It's being admitted as physical evidence, capable if

19    authenticated by either the party who created it or the

20    addressee who received it.  And we're admitting it at this

21    time with testimony from Mr. Whyte, who has firsthand

22    knowledge that he received it in his house.

23          THE COURT:  So what rule are you -- what federal

24    rule of evidence you're relying on.  Let's go to the rules of

25    evidence, since we're going to be talking about physical

Whyte - Direct                          82

1    evidence.  What rule are you -- what federal rule are you

2    relying on?

3             MR. FILIPOVIC:  Sure.  Just one second, Your Honor.

4    901, Your Honor.

5             THE COURT:  Okay.  I'm already there.  Okay.

6             MR. FILIPOVIC:  Okay.  And this is for

7    authentication of evidence.  Testimony of witness with

8    knowledge that the item is what it claims to be 901(a)(1).

9             THE COURT:  (B)(1)?

10            MR. FILIPOVIC:  No.  Yeah, (b)(1).

11            THE COURT:  (B)(1).  Ms. Harper, authentication or

12   identifying evidence.  The following are examples only, but

13   not a complete list, of evidence that satisfy the requirement

14   of 901(a), which is that testimony that an item is what it is

15   claimed to be.

16            MS. HARPER:  Okay.  Well, the document --

17            THE COURT:  Is what it's claimed to be.  It's

18   claimed to be the notice that he received.

19            MS. HARPER:  Okay.  Your Honor, but -- okay.  Just

20   it's not necessarily the notice that was prepared by the

21   sheriff then.  And this -- I mean, that's --

22            THE COURT:  All that it is offered for is this is

23   what he said he received.  That's it.

24            MS. HARPER:  Okay, Your Honor.

25            THE COURT:  That's it.  Only that this is what he

Whyte - Direct                          83

1   says he got.

2          MS. HARPER:  Yes, Your Honor.

3          THE COURT:  You know, I don't know if it is what he

4   got.  Somebody may testify that we didn't even put this

5   notice.  I don't know what he's talking about, but that's his

6   position is that this is an item that he claims it to be what

7   it is.  I'll allow it solely for that purpose, that he claims

8   that this is what he got.

9          MS. HARPER:  Thank you, Your Honor.

10         THE COURT:  That's it.  So I'm not quite sure what -

11  - you know, who prepared -- this is simply, "This is what I

12  received and I wrote on it."

13         MS. HARPER:  Okay.

14         THE COURT:  That's it.  Okay.

15         MR. FILIPOVIC:  Thank you, Your Honor.

16         THE COURT:  Next.

17     (City's Exhibit-15 admitted into evidence)

18         MR. FILIPOVIC:  Your Honor, we next have City-16 and

19  for the purposes of if we can now -- we have 16, 17, 18, and

20  19.  These are all going to be the -- well, 19 is a little

21  different.  But if we can now (indiscern.) stipulation admit,

22  you know, just to skip the rigamarole.  The 19 is a little

23  different, but if we can admit, you know, the City-16, 17,

24  18, and then I'll do 19 separately at this time.

25         MS. HARPER:  Your Honor --

                        Whyte - Direct                    84

 1          THE COURT:  She doesn't have to stipulate to

 2     anything.

 3          MR. FILIPOVIC:  All right.  Then we'll go one at a

 4     time.

 5          THE COURT:  No, you can ask to rely on the -- never

 6     mind.

 7          MS. HARPER:  Your Honor, at this point, we have no

 8     testimony regarding -- no testimony regarding these

 9     additional documents at all.

10          MR. FILIPOVIC:  Okay, sure.

11          THE COURT:  We'll run through one -- let's start

12     with 16.

13          MR. FILIPOVIC:  Okay.

14          THE COURT:  What's 16, put up 16.  I can't make them

15     stipulate to anything.

16          MR. FILIPOVIC:  I understand.  Neither can I.

17          THE COURT:  All right.  Load 16.

18     BY MR. FILIPOVIC:

19     Q.  Mr. Whyte, can you observe the document that's been

20     premarked as City-16 and on the screen at this time?

21         (City's Exhibit-16 previously marked for identification)

22     A.  Yes.

23     Q.  Mr. Whyte, have you seen this document before?

24     A.  Yes.

25     Q.  And what is it -- can you tell the court what that is?

Whyte - Direct                          85

 1   A.  It's the same kind of eviction notice that I received

 2   before.

 3   Q.  Okay.  And so this is now the third notice that we're

 4   talking about in a row, correct?

 5   A.  Yes.

 6   Q.  Is that a yes?

 7   A.  Yes.

 8        MS. HARPER:  Objection.  Objection, leading.

 9   BY MR. FILIPOVIC:

10   Q.  Sorry.  So -- concluding with the --

11        MR. FILIPOVIC:  Your Honor, are you going to rule on

12   that objection or should I --

13        THE COURT:  Sustained.  There's nothing that was in

14   a row.

15        MR. FILIPOVIC:  Okay.  Okay.

16   BY MR. FILIPOVIC:

17   Q.  Mr. Whyte, the prior two notices that we have just seen

18   up on the screen here marked 14 and 15, now you're looking at

19   the 16, and it appears to have a date on there as well.

20   A.  Yeah.

21   Q.  On the bottom left corner.  Who wrote that?

22   A.  I wrote that date.

23   Q.  Okay.  And why did you write that particular date on

24   there?

25   A.  So I could remember what day that it came.

                              Whyte - Direct                    86

1    Q.  Okay.  And what date would that be?

2    A.  May 30th, 2018.

3    Q.  Okay.  And counting the first two notices that we talked

4    about here today, this particular document, can you tell the

5    court, you know, which occasion or did they -- does the date

6    that you wrote in correctly correspond to the date that you

7    received it?

8    A.  Yes.

9           MR. FILIPOVIC:  Thank you.  Your Honor, we would at

10   this time move to admit City-16 as -- into evidence as notice

11   authenticated by the plaintiff.

12          THE COURT:  As a document received by the plaintiff.

13          MR. FILIPOVIC:  Document that plaintiff claims he

14   received in his household, addressed to him, as a member of

15   the household.

16          THE COURT:  No, addressed to the debtor's household

17   and any occupants.

18          MR. FILIPOVIC:  Any occupants, of which he claims to

19   be one of.

20          THE COURT:  Okay.

21          MS. HARPER:  Your Honor, I have issues with the

22   characterization of who it was addressed to.  But setting

23   that aside, it's not addressed to anybody.

24          THE COURT:  Any named person.  It's addressed to

25   someone.  They sent it.

                        Whyte - Direct                    87

1          MS. HARPER:  Not on the document we're looking at

2     here, but --

3          THE COURT:  It says to judgment debtor.

4          MS. HARPER:  Right.

5          THE COURT:  It says the "Judgment debtor's household

6     and any occupants residing with the judgment debtor."

7          MS. HARPER:  Okay.

8          THE COURT:  What the judgment debtor is, I don't

9     know, because it says judgment debtor.

10         MS. HARPER:  Regardless, Your Honor --

11         THE COURT:  Right.

12         MS. HARPER:  -- we'll allow it for the purposes as

13    defined by the court.

14         THE COURT:  Right.  It's only admitted as a document

15    the debtor, Mr. Whyte, says that it was left in the house,

16    because he said they were all in the house, and that he

17    believes was addressed to him as an occupant.  And you wrote

18    on it on May 30th, which he says is the date he received it.

19    I'll allow it on that basis that he's authenticated it as a

20    document that he received, whether he did or didn't, I don't

21    know.  But you know, it is what it is.  I'm going to admit it

22    for that on the 901(b)(1).  Okay.

23      (City's Exhibit-16 admitted into evidence)

24         MR. FILIPOVIC:  Thank you, Your Honor.  We'll move

25    on to City-17.

Whyte - Direct                                88

1       (City's Exhibit-17 previously marked for identification)

2              THE COURT:  Okay.

3    BY MR. FILIPOVIC:

4    Q.  Mr. Whyte, I would like to direct your attention to

5    what's been put on the screen and identified premarked as

6    City-17.  Mr. Whyte, have you seen this document before?

7    A.  Yes.

8    Q.  And what does that document appear to be?  What is it?

9    A.  That's also a letter telling me to vacate the home -- my

10   home.

11   Q.  Okay.  And did you -- there is also a hand -- there

12   appears to be a handwritten notation in the left bottom

13   corner of it.  Do you know who placed that notation?

14   A.  I did.  I put the date on there.

15   Q.  There appears to be -- you put that date, and why did you

16   put that date on there?

17   A.  Just so I could remember the day I received it.

18   Q.  Okay.  Okay.

19              MR. FILIPOVIC:  Your Honor, again, I would like to

20   move to admit this.

21              THE COURT:  Well, there's two documents, counsel.

22   What about the second one?

23              MR. FILIPOVIC:  Okay.

24   BY MR. FILIPOVIC:

25   Q.  Mr. Whyte, there appears to be a sheet of paper

Whyte - Direct                        89

1    underneath this marked as City-17.  Do you know what that is?

2    A.  That was the paper that came with the notice.

3    Q.  Okay.  Did you write on that paper at all?

4    A.  On this paper?  No, that's not my handwriting at all.

5             MR. FILIPOVIC:  Okay.  So Your Honor, again we'd

6    move in to admit the entire City-17 as having been

7    authenticated by the plaintiff, who says that he received it

8    as his household.  We only have two more, Your Honor.

9             THE COURT:  Hold on.  Okay.  Ms. Harper?

10            MS. HARPER:  Yes, Your Honor.

11            THE COURT:  Any objection, other than for the --

12   other than authenticating it as a document that he received

13   and wrote on?

14            MS. HARPER:  I have no objection for the purposes

15   for which it will be admitted.

16            THE COURT:  Okay.  Admitted.

17       (City's Exhibit-17 admitted into evidence)

18            THE COURT:  Next document again?  What's the next

19   one, counsel?

20            MR. FILIPOVIC:  The next one is City-18.

21       (City's Exhibit-18 previously marked for identification)

22   BY MR. FILIPOVIC:

23   Q.  Same question, Mr. Whyte, have you seen this before?

24   A.  Yes.

25   Q.  And what does it appear to be?

Whyte - Direct                              90

```
 1   A.  An eviction notice.

 2   Q.  Okay.  And where have you seen it?

 3   A.  In my home.

 4   Q.  Okay.  There also appears to be two sheets of paper, so I

 5   will ask you about the same question that I asked you before.

 6   There appears to be a date adjunct to the long red line on

 7   the bottom of the document.  And can you read for the court

 8   what that date is?

 9   A.  That's June 5th, 2018.

10   Q.  Who -- do you know who wrote that in there?

11   A.  I wrote that, from my memory.

12   Q.  Okay.  To signify what?

13   A.  The date I received it.

14   Q.  Okay.  How about the piece of paper that appears

15   underneath?  Did you write anything else on the entire City-

16   18?

17   A.  No.

18           MR. FILIPOVIC:  Your Honor, we'll move to admit the

19   documents that have been premarked City-18 as exhibit

20   authenticated by the plaintiff, who says he received it in

21   his household.

22           THE COURT:  Ms. Harper?

23           MS. HARPER:  Objection, Your Honor.

24           THE COURT:  Same limit -- same objection, that it is

25   only admitted for the purposes that the debtor testified that
```

Whyte - Direct                          91

1    this is the document he received.

2              MS. HARPER:  Yes, Your Honor.

3              THE COURT:  All right.  Admitted for that limited

4    purpose.  Next.

5         (City's Exhibit-18 admitted into evidence)

6              MR. FILIPOVIC:  Okay.  We'll pull up City-19, Your

7    Honor.

8         (City's Exhibit-19 previously marked for identification)

9    BY MR. FILIPOVIC:

10   Q.  Mr. Whyte, have you seen -- now I direct your attention

11   to the screen here.  Have you seen what's on the screen here,

12   now marked as City-19?  Have you seen that before?

13   A.  Yes.

14   Q.  And what does that appear to be?  What is it?

15   A.  This is the envelope that the notice came in.

16   Q.  Okay.  So there is an envelope.  What else is there on

17   the screen, Mr. Whyte, aside from the envelope?

18   A.  The notice here.

19   Q.  Okay.  And, Mr. Whyte, if you will, there's some

20   handwriting on the envelope itself, starting with what

21   appears to be -- well, you read -- can you read the

22   handwriting that appears on the envelope?

23   A.  Yes.  That's my handwriting.  I dated it the date I

24   received it.

25   Q.  Okay.  And what about the address and the addressee?  Did

                          Whyte - Direct                    92

1    you write that?

2    A.  No, I did not write the address.

3              MR. FILIPOVIC:  Okay.  Your Honor, we'll move to

4    admit this exhibit as testified and authenticated by Mr.

5    Whyte as a document he received in his household.

6              THE COURT:  That he received on June 7th, 2018,

7    right?

8              MR. FILIPOVIC:  Correct.  Correct, Your Honor.

9              MS. HARPER:  Same objection, Your Honor.

10             THE COURT:  Admitted for the sole purpose of Mr.

11   Whyte's testimony that this is the letter, or the envelope,

12   that contained the notice that's the second page of City-19

13   that he received this and he noted it as being received on

14   June 7th, 2018.  And excuse me if I keep saying 2019, because

15   I know it's not and I apologize.  I'm trying to make sure I

16   say 2018.

17        (City's Exhibit-19 admitted into evidence)

18             MR. FILIPOVIC:  Yeah, that's fine, Your Honor.

19             THE COURT:  Okay.

20   BY MR. FILIPOVIC:

21   Q.  Okay.  Mr. Whyte, let's move on.  You testified earlier

22   that you did not bring in any of these notices in the house,

23   correct?

24   A.  No.

25             THE COURT:  He did not what?

1    BY MR. FILIPOVIC:

2    Q.  Did you bring these notices into the house, Mr. Whyte?

3    A.  No.

4    Q.  Mr. Whyte, who besides you could have brought these

5    notices inside a house?

6               MS. HARPER:  Objection.  Lack of foundation.

7               MR. FILIPOVIC:  Well, to address that, Your Honor, I

8    don't see how any --

9               THE COURT:  Assuming someone brought it into the

10   house.  Lay the foundation that it got in there some other

11   kind of -- that there was no other way it could get in there.

12              MR. FILIPOVIC:  Okay.

13   BY MR. FILIPOVIC:

14   Q.  Mr. Whyte, how did these -- do you know how these notices

15   ended up in the house where you saw them?

16   A.  My uncle, Lyndel Toppin.

17   Q.  What about him?

18   A.  He's the one that brought them inside the house.

19   Q.  And how do you know that?

20   A.  He's the only one that lives with me at the residence.

21   Q.  Okay.  Mr. Whyte, do you have a girlfriend?

22   A.  Yes.

23   Q.  And does she live at that residence with you guys?

24   A.  No.

25   Q.  And how do you know that she didn't bring them in?

Whyte - Direct                          94

1   A.  She only comes in when I come in.  She's never, you know,

2   at my house, you know, without me.

3   Q.  So it's correct to say that only you and your uncle could

4   have brought these notices in and you didn't do it?

5           MS. HARPER:  Objection.  Calls for speculation.

6           MR. FILIPOVIC:  Well, it's not speculation, Your

7   Honor.  It's deductive reasoning, and I'm allowed to ask --

8           THE COURT:  Ms. Harper, he says it's deductive

9   reasoning that he didn't bring it in, his girlfriend didn't

10  bring them in, so it must be Mr. Topping's.

11          MS. HARPER:  It's argumentative and it calls for

12  speculation because --

13          THE COURT:  Sustained.  Counsel, you can argue that

14  in argument.

15          MR. FILIPOVIC:  Sure.  Thank you, Your Honor.

16  BY MR. FILIPOVIC:

17  Q.  Okay.  So did you -- so your girlfriend, did she -- okay,

18  never mind.  Just to repeat that, no one besides you or your

19  uncle -- does anybody besides you and your uncle have the key

20  to the house?

21  A.  No, just us two.

22  Q.  Okay.  Thank you.  That's easy enough.  All right.  I'm

23  going to direct you to some questions.

24          MR. FILIPOVIC:  Your Honor, if I may, I apologize,

25  it's getting -- can I turn the light on in this room where I

Whyte - Direct                            95

1    am?

2              THE COURT:  Sure.

3              MR. FILIPOVIC:  All right.  Real quick.

4         (Pause in the proceedings)

5              MR. FILIPOVIC:  I apologize.  It took me a while to

6    find the switch.

7              THE COURT:  That's okay.  If I go look for mine, I

8    probably don't know where it is either.  Okay.

9              MR. FILIPOVIC:  Okay.  Back on the record.

10   BY MR. FILIPOVIC:

11   Q.  Mr. Whyte, I'll ask you now some questions about your

12   uncle.  And I'm going to direct you at the exact time when

13   these notices started arriving at your house.  How did those

14   notices affect your uncle, if at all?  From your own personal

15   observations?

16   A.  Well, from me seeing, you know, and knowing, and living

17   with him for so long, he's just -- he's been kind of like

18   distorted.  You know, he's always like looking at me when he

19   picks up the papers, just like to -- for me to give a good

20   response to him, you know, basically on it.  But I think -- I

21   can't really give a good response because I don't know a good

22   response.  I don't know how this situation is going to turn

23   out.  So and my stress, you know, leans off on him.  But on

24   top of that also, just been -- you know, he's been off.  He

25   hasn't been, like, 100%.  You know, he's been smoking

Whyte - Direct                          96

1   cigarettes more a lot.  He's been, like, not basically eating
2   the dinners that I, like, serve for him or, like, put out for
3   him to eat.
4   Q.  Well, let me ask you this, Mr. Whyte, and sorry to
5   interrupt, but I did want to ask you this.  Did you ever see
6   your uncle in the room, you know, with these notices?  And
7   did he take a note of them?  Did you notice that he took a
8   note of the notice, if you will?
9   A.  Well, actually, I have them downstairs.  All the
10  documentation from this case, I have all downstairs on my
11  dining room table.  So if you walk in, you would be able to
12  see it.  You can't miss any of it.
13  Q.  Well, I'm asking you if you saw him, your uncle, with
14  respect to these notices?
15  A.  Yes.
16  Q.  What did you see?
17  A.  Well, he's picked up the notices a couple times, and as I
18  say, he's just been looking at me to give him an answer, but
19  I can't really give him an answer.  You know, and that's when
20  --
21  Q.  Okay.
22  A.  -- he nods his head, shakes his head, and you know, we
23  can -- I can just -- I don't know, I just walk off at that
24  point.
25  Q.  Yeah.

Whyte - Direct                          97

1    A.  (Indiscern.) explain it to him.

2    Q.  Do you think that from your, I guess, experience with

3    your uncle, what kind of effect, if any, do you think that

4    they had on him and did that manifest itself somehow in his

5    behavior?  If you could tell the court.

6    A.  Well, as I said before, he hasn't been eating.  Like, his

7    normal routine, and he's been, like, smoking more Newports,

8    you know, now because, you know, I smell it more often now.

9    And like I say, he's like -- he's basically not what I'm used

10   to.  He's, like, kind of out of it.  He's been, like, missing

11   sleep and things like that.  Because I would notice when I

12   come in his, you know, light would be on in his room about

13   2:00, 3:00 in the morning.  Normally, you know, we're asleep

14   and the household is down by that time.

15   Q.  Do you believe upon your personal observations, did he

16   understand what the notice entails?  Do you know if he knows

17   what it means to vacate?

18   A.  Well, he doesn't -- he cannot read the notice at all, but

19   what he actually directly pointed out to me was, you know,

20   the big bold red letters and the little shield that's on

21   there.  That's mainly what he pointed out to me.

22   Q.  Okay.  And how is he now?  It's been some time since the

23   notices came in, how is he now?

24   A.  He's still not eating on, you know, on schedule as we

25   usually do.  He's still smoking a lot.  He's still doing

Whyte - Direct                              98

1    that.  And he's still just, like, sitting around in the

2    living room, you know, just there.  He's not -- like, with no

3    T.V. on or nothing.  He'll just be, like, there.

4    Q.  Okay.  And Mr. Whyte, now what I asked you, you haven't

5    gotten evicted yet.  You are still living there with your

6    uncle, correct?

7    A.  Yes.

8    Q.  Okay.  But what if you had gotten evicted --

9                MS. HARPER:  Objection.  Calls for speculation.

10               THE COURT:  Counsel?  The statement calls for

11   speculation.

12               MR. FILIPOVIC:  Right.  Well, to some extent it

13   does, Your Honor.  But --

14               THE COURT:  Sustained.

15               MR. FILIPOVIC:  Okay.

16               THE COURT:  Ask him something else.

17               MR. FILIPOVIC:  Okay.

18               THE COURT:  You're agreeing it calls for

19   speculation, why would you ask --

20               MR. FILIPOVIC:  Well, because we have a specific

21   situation here, somebody testifying on somebody else's

22   behalf.

23   BY MR. FILIPOVIC:

24   Q.  But let me ask you this, does your uncle have any other

25   place to go besides that house?

Whyte - Direct                              99

1   A.  No, he doesn't.

2   Q.  Does your uncle have anybody else caring for him besides

3   you?

4   A.  No, it's just me.

5   Q.  And, okay.  Do you believe, knowing your uncle, that he

6   would be able to survive on the street, from your personal

7   observations, without a home or reside as a homeless person?

8   A.  No, absolutely not.

9         MS. HARPER:  Objection.  Never mind.

10        THE COURT:  Okay.  He's homeless.  Ms. Harper, I

11  know what that objection is.  I'm going to -- you know.

12        MR. FILIPOVIC:  Okay.  All right.

13        THE COURT:  That's an assumption.  He can go into a

14  shelter.  He could do a lot of things, but it is what it is.

15  I'll allow (inaudible) worth.

16        MR. FILIPOVIC:  Thank you, Your Honor.

17  BY MR. FILIPOVIC:

18  Q.  Mr. Whyte, is there anything today about your uncle and,

19  you know, and the sheriff that maybe I didn't ask you and

20  you'd like to tell the court?

21  A.  Other than just, you know, the stress of going through

22  it, there's really nothing much, you know.  It's just, like,

23  basically just sitting on our hands, just waiting now to see

24  if we're going to have somewhere to live or what -- you know,

25  what the outcome is.  That's the only thing that I'm really,

1    you know, concerned and worried about.  And like I said, my

2    down energy, because this has had me depressed.  And my down

3    energy, you know, kind of goes when he looks at me.

4    Q.  Sure.  But, Mr. Whyte, did the notices keep coming or did

5    they stop?

6    A.  Well, after the last notice I received, I didn't receive

7    any more.

8    Q.  Okay.  So they did stop in some -- when do you think they

9    stopped?

10   A.  I want to say, the last one around June.

11   Q.  Of what year?  2018?

12   A.  Yeah.

13   Q.  Is that a yes?

14   A.  Yes.

15          THE COURT:  '18, '19?  What year?

16          MR. FILIPOVIC:  I think he said '18, Your Honor.

17          THE COURT:  All right.

18          MR. FILIPOVIC:  Okay.  If I could -- I know,  Your

19   Honor, that we're only supposed to be talking one at a time,

20   but I don't know if I'm allowed to ask.  I wouldn't have any

21   further questions for Mr. Whyte, unless I want to briefly

22   consult with Mr. Dunne if maybe I'm missing something, but I

23   wouldn't have any further questions for Mr. Whyte.

24          THE COURT:  Well, then consult with him and let me

25   know, because otherwise, we're going to move to cross

1    examine.

2              MR. FILIPOVIC:  Sure.

3              THE COURT:  (Inaudible) on redirect or something.  I

4    don't know.

5              MR. FILIPOVIC:  Yes, that's fine.  We don't have any

6    further questions at this time, Your Honor.  I don't see

7    Steve jumping up and down, so I think we're good.

8              THE COURT:  All right.

9              MR. FILIPOVIC:  Turning the records --

10             THE COURT:  Ms. Harper, cross examination.

11                        CROSS EXAMINATION

12   BY MS. HARPER:

13   Q.  Good afternoon, Mr. Whyte.  Again, my name is Megan

14   Harper and I represent the Sheriff of the City of

15   Philadelphia in this matter.  Can you hear me okay?

16   A.  Yeah.

17   Q.  Okay.  We met once before.  I have a few questions to

18   follow up on your earlier testimony.  You spoke of a letter

19   that you received from the sheriff's office.  I'm not clear,

20   and I would like you to tell me, what you know of the letter

21   that you received from the sheriff's office.

22   A.  Notices to vacate my premises, the home.

23   Q.  Okay.  So you misspoke when you were calling them a

24   letter?

25   A.  Well, a notice, a letter.

Whyte - Cross                                102

1    Q.  I just wanted to clarify that for the record, because

2    we're all concerned about getting a clear record here.  You

3    mentioned -- you testified earlier that when you saw these

4    notices that you have identified here, and I believe, and

5    correct me if I'm wrong, that there were six notices.  You

6    testified that they were in the house when you saw them, is

7    that correct?

8    A.  Yes.

9    Q.  All right.  I'm going to pull up -- have the City

10   Exhibit-22, please.  Actually, let me ask you, do you recall

11   earlier in this case giving your deposition testimony?

12        (City's Exhibit-22 previously marked for identification)

13   A.  Yes.

14   Q.  Okay.  If you could take a look at the first page of

15   what's been marked as City-22, we could go to the top of that

16   page.  That should be –

17             THE COURT:  Counsel, can you hold just one second

18   for me.

19        (Pause in the proceedings)

20             MR. DUNNE:  Mr. Whyte would like to take a short

21   restroom break.

22             MS. HARPER:  I think Your Honor has stepped away.

23   So I don't have any objection to that, but she's --

24             MR. FILIPOVIC:  I don't.  We'll let her know.

25   A.  Okay.  Thanks.

1            MS. HARPER:  Well, Mr. Dunne --

2            THE COURT:  I'm sorry.  I'm saying hold on and

3    nobody can hear me.

4            MS. HARPER:  The witness has just left, with his

5    counsel behind him.

6            THE COURT:  No, he was not to leave --

7            MR. FILIPOVIC:  No.

8            THE COURT:  -- be admonished --

9            MR. FILIPOVIC:  No.

10           THE COURT:  -- not to discuss his testimony.  Where

11   is he at?

12           MR. FILIPOVIC:  Your Honor, I'm right here.  He

13   asked a short restroom break a second ago, and Ms. Harper

14   said she had no objection, and then she started --

15           THE COURT:  Well, Mr. Dunne is to stay in the room.

16           MR. FILIPOVIC:  He has to let him –

17           MR. DUNNE:  He doesn't know where the bathroom is,

18   Your Honor.

19           MR. FILIPOVIC:  He has to let him in the bathroom.

20           MR. DUNNE:  It's locked.

21           THE COURT:  Mr. --

22           MR. DUNNE:  I have to get him a key, Your Honor,

23   because --

24           THE COURT:  -- Whyte, no, no, no.  Mr. Whyte, you're

25   not to discuss your testimony with Mr. Dunne.  You're still

Whyte - Cross                          104

```
 1    under oath.  And the first thing I'm going to ask you when
 2    you get back here is did you discuss your testimony, and I
 3    expect you to tell me if you did or you didn't.  So you can
 4    take him to the bathroom, I just want to, you know, put that
 5    on the record so there's no question, you cannot talk to him.
 6    You can talk to him about the weather, talk to him about
 7    anything you want, nothing relating to this case.  Okay?
 8    A.  Okay, thank you.
 9            THE COURT:  All right.  So we'll take a break and I
10    -- again, I don't know why, you know, today of all days, I
11    get all of these packages.  My house is the package delivery
12    for the family.  All right.  So I'm going to put everybody on
13    video stop first and then I'll be able to observe when they
14    come back into the room, and then, Ms. Harper, you can start
15    your cross examination.  I'm going to put you on mute so that
16    I can -
17            MS. HARPER:  I put myself on --
18            MR. FILIPOVIC:  Your Honor, may I ask a question
19    while I have your attention and we're off the record?
20        (Pause in the proceedings)
21            THE COURT:  All right.  It looks like everybody is
22    back.  Mr. Whyte, I'm assuming that you took -- you know,
23    that you understood my directions and you did not speak at
24    all or discuss at all with Mr. Dunne your testimony.
25    A.  No.
```

Whyte - Cross                              105

1          THE COURT:  Okay.  All right, Ms. Harper, you can

2     continue.

3          MS. HARPER:  Thank you, Your Honor.  Let me try and

4     pick up where we left off.

5          THE COURT:  City-22 you were referring.

6                    CROSS EXAMINATION (CONT'D)

7     BY MS. HARPER:

8     Q.  Yes, Mr. Whyte.  And you recall, I had asked you -- I

9     referenced your earlier testimony where you mentioned that

10    you had seen all of the notices in the house, is that

11    correct?

12    A.  Yes.

13    Q.  Okay.  So then I'd like you to refer to City-22, and the

14    first page.  We talked about how earlier in the case you

15    recall giving your deposition testimony, is that correct?

16    A.  Yes.

17    Q.  All right.  And did you take a look at what has been

18    marked as City-22, and look at the first page.  Do you see

19    where it says, "Oral deposition of Barrington Whyte?"

20    A.  Yes.

21    Q.  Okay.  So I'd like you to refer to your deposition

22    testimony and refer to page 41, please.

23          THE COURT:  41, counsel?  I don't know how we're

24    going to do that.  All right.  Oh, that was quick.

25          MR. FILIPOVIC:  There is a search button.

Whyte - Cross                              106

1          THE COURT:  Okay.  I was giving John a lot of
2     credit, John.
3          MR. FILIPOVIC:  Cheating.  It's cheating, yeah.
4          THE COURT:  Tells you how technology deprived I am.
5          MR. FILIPOVIC:  Well, no you're not, Your Honor.
6     You're doing this trial by Zoom.  I think it's great.
7          THE COURT:  This isn't my first trial, though.  I've
8     done it in -- I forget that I'm actually not in the
9     courtroom.  All right.
10          MS. HARPER:  Okay.
11          THE COURT:  Go ahead, Ms. Harper.
12          MS. HARPER:  All right.
13     BY MS. HARPER:
14     Q.  Mr. Whyte, looking at page 41, please refer to line 11.
15     And I'm going to read from that section of the deposition
16     which states -- do you see where I'm speaking of, where it
17     says, "When the first notice?"  Do you see that?
18     A.  Yes.
19     Q.  "When the first notice that you saw on the property, what
20     date is that?"  And the answer is, "May -- well, it was
21     around May 18th.  Around May.  {period}  Around the 18th,
22     around that time in May." Do you see that?
23     A.  Yes.
24     Q.  Okay.  And the next question is, "And where was the
25     notice that you observed?"  And the answer, "That one was on

                          Whyte - Cross                    107

1    the front door." {period}  Now, this was deposition

2    testimony.

3              MR. FILIPOVIC:  Objection.  Pursuant to Rule 106,

4    you have to read his entire answer to that question --

5              MS. HARPER:  Fine.

6              MR. FILIPOVIC:  -- and there is a little more.

7              MS. HARPER:  There is a little more.

8              THE COURT:  All right.  What does it say?

9              MS. HARPER:  Thank you, counsel.  It says --

10             MR. FILIPOVIC:  You're welcome.

11             MS. HARPER:  -- "There was one on the front door.

12   It was posted on the front door, inside of the screen door."

13   All right.  Let me go on, because that's a good follow-up

14   here, and you -- continuing to read, it states, "And you

15   observed one notice on May 18th?"  It says, "Yes."

16             THE COURT:  Okay.

17             MS. HARPER:  Okay.

18   BY MS. HARPER:

19   Q.  Now, earlier in your testimony you stated that all of the

20   notices that you saw, you observed in the house.  So looking

21   back on your deposition testimony where you stated that the

22   first one you saw was posted on the front door, which of your

23   testimonies is correct here?

24   A.  It was on the front door, then I took it in the house,

25   and that's why it was with the remainder of the other notices

Whyte - Cross                        108

1    in the house.

2    Q.  Okay.  So you're changing your testimony from earlier

3    where you stated that all of the notices were inside the

4    house when you first saw them?

5    A.  They were all inside the house, because I brought the

6    first notice inside the house.

7    Q.  Okay.  I'm going to also ask then to turn to City-13.

8         (City's Exhibit-13 previously marked for identification)

9              THE COURT:  City what?

10             MS. HARPER:  City-13, Your Honor.

11             THE COURT:  Okay.

12             MS. HARPER:  Yes.

13   BY MS. HARPER:

14   Q.  And please ignore that first page.  I apologize.  That

15   was a scanning error on my part.  But the document -- the

16   second page of this document is marked City-13, do you see

17   that?

18   A.  Yes.

19   Q.  And you see where it states the "plaintiff's responses to

20   defendant, the Sheriff of the City of Philadelphia's first

21   set of interrogatories."  Do you see that?

22   A.  Yes.

23   Q.  Okay.  And then if we can turn to Interrogatory #14,

24   please.

25             THE COURT:  No cheating on that one.

Whyte - Cross                        109

1   BY MS. HARPER:

2   Q.  All right.  I'm going to read Interrogatory #14.  It

3   states, "Do you claim to have experienced emotional distress

4   as a result of the Sheriff's alleged violations of the

5   automatic stay?"  Your response to Interrogatory #14 is

6   "Yes."  Looking at Interrogatory #15, "If the answer to

7   Interrogatory #14 was yes, please A) set forth the nature of

8   the emotional distress."  Now, with counsel's permission, I'd

9   like to turn to the response to 15(a).

10            MR. FILIPOVIC:  Permitted.

11   BY MS. HARPER:

12   Q.  And it states, "Amended A" -- pardon me -- "Armed

13   Philadelphia sheriffs appeared at my home and posted six

14   separate notices to vacate and eviction notices that caused

15   me a substantial amount of undue frustration, anxiety, and

16   mental anguish."  Do you see that, Mr. Whyte?

17   A.  Yes.

18   Q.  And when you were -- well, let me ask you this, did you

19   help to prepare these responses to interrogatories?

20   A.  Yes.

21   Q.  Where -- earlier in your testimony, again, let me just

22   reiterate, was that the notices were inside the house when

23   you first observed them.  Where does that information in

24   response to Interrogatory #15(a) come from?

25   A.  I don't understand your question.

Whyte - Cross                              110

1   Q.  Well, did you tell your counsel -- well, I shouldn't ask

2   that.  In preparing responses to these interrogatories, did

3   you state that "armed Philadelphia sheriffs appeared at my

4   home and posted six separate notices to vacate, and eviction

5   notices that caused me a substantial amount of undue

6   frustration, anxiety, and mental anguish?"  Did you provide

7   them the information there that states that armed

8   Philadelphia sheriffs --

9           MS. FILIPOVIC:  Objection.  Asked and answered.  You

10  asked him --

11          THE COURT:  No, he didn't.  He didn't answer about.

12  He said he didn't understand the question.

13          MR. FILIPOVIC:  Okay.

14          THE COURT:  She rephrased it.

15  BY MS. HARPER:

16  Q.  Did you provide the information that states, "Armed

17  Philadelphia sheriffs appeared at my home and posted six

18  separate notices to vacate and eviction notices?"  Did you

19  provide that information?

20  A.  Yes.

21  Q.  In your testimony here today, you were advised to testify

22  only as to your observations.  Did you observe armed

23  Philadelphia sheriffs, plural, appear at your home?

24  A.  Sheriffs?

25          MR. FILIPOVIC:  I'm sorry.  I'm sorry.  Counsel,

Whyte - Cross                              111

1   please read exactly what the interrogatory says if you are

2   going to --

3            MS. HARPER:  No, no, no.  I'm not --

4            MR. FILIPOVIC:  It doesn't say sheriffs, it's not

5   plural.

6            THE COURT:  Whoa, whoa, it says, "Armed Philadelphia

7   sheriffs appeared."

8            MR. FILIPOVIC:  But it doesn't say sheriffs, Your

9   Honor.  It's not plural.  There is a sheriff, apostrophe s.

10            THE COURT:  Armed Philadelphia sheriff.  Armed

11   Philadelphia sheriff appeared.

12            MR. FILIPOVIC:  Correct.

13            THE COURT:  Did he state that or not?

14            MR. FILIPOVIC:  Yes, he did.  But it doesn't say

15   sheriffs.

16            THE COURT:  Okay, well sheriff's, apostrophe.  I

17   don't know how to --

18            MR. FILIPOVIC:  Yeah, sheriff apostrophe.

19            THE COURT:  Okay.  So armed Philadelphia sheriff.

20   BY MS. HARPER:

21   Q.  Did you observe armed Philadelphia sheriffs at your

22   property?

23   Q.  Yes.

24   A.  When?

25   Q.  On the -- I would say May -- around the May time.  I

Whyte - Cross                                    112

1    would see it -- actually, my neighbors were calling me and

2    telling me that there was someone there.

3            MS. HARPER:  Objection.  That's hearsay.

4    A.  Okay.

5            MR. FILIPOVIC:  Well, objecting to your own -- you

6    can't object to his own --

7            MS. HARPER:  It's non-responsive.

8            THE COURT:  His answer is hearsay is what she's

9    saying.  Did he -- listen, we're not going to spend all day

10   playing semantics.  Did you actually see the armed sheriff?

11   A.  No.

12           THE COURT:  All right.  So when he said that answer,

13   it may not have been on personal knowledge.  But he said

14   armed appeared.  Okay.  Ms. Harper, follow up.

15           MS. HARPER:  Yes, Your Honor.  Yes, Your Honor.  One

16   moment.  Okay.

17           THE COURT:  I'm sorry.  Again, I am a little

18   impatient, but we're not going to spend the time fighting

19   over semantics.  You each are allowed to make your record.

20   Counsel, you were right.  It doesn't say sheriff, it says

21   sheriff's apostrophe, which clearly the error, because you

22   can't be apostrophe in that point.  And if -- you know, I'm

23   not quite sure what the intention was.  Maybe it was to say

24   plural, but it does say what it says, and it says, "At my

25   home."  So I'm assuming this is Mr. -- the debtor's answers.

Whyte - Cross                           113

1    I'm not quite sure why we're talking about what Mr. Whyte

2    observed, because he's, you know, does he -- and the point of

3    the matter is you're saying this is the debtor's response.

4    Nobody's telling me how even the debtor would have responded

5    to that.  Okay?

6        And so this is the problem as I see it.  This is all

7    about what Mr. Whyte is talking about.  Okay?  Nothing about

8    what the debtor reads, you know?

9            MR. FILIPOVIC:  Well, that's an unfortunate

10   situation we're in, Your Honor.

11           THE COURT:  Well, I don't know what the -- counsel,

12   it is what it is.  I'm not quite sure.  But all I know is I

13   can only go with what -- this is the debtor's claim, not Mr.

14   Whyte's claim.

15           MR. FILIPOVIC:  Correct.

16           THE COURT:  And all I'm hearing is Mr. Whyte.  So

17   I'm just going to put that out there.  Ms. Harper, proceed.

18           MS. HARPER:  All right.

19   BY MS. HARPER:

20   Q.  Mr. Whyte, you didn't -- Mr. Topping didn't express to

21   you that he saw armed sheriffs at the property, did he?

22   A.  No.

23   Q.  I'd like to refer to City-19.  All right.  Mr. Whyte, I'm

24   going to refer to the envelope that appears on City-19 with

25   the date of June 7th, 2018, do you see that?

Whyte - Cross                          114

1   A.  Yes.

2   Q.  Okay.  And I believe your earlier testimony is that you

3   put that date on the envelope?

4   A.  Yes.

5   Q.  Okay.  And it's your testimony that June 7th, 2018, was

6   the date that you received this -- the envelope and the

7   document that is also pictured there?

8   A.  Yes.

9   Q.  Okay.

10  A.  That was the date that I saw it, yes.

11  Q.  That's the date you saw it.  Okay.  If you look at the

12  top right-hand corner of the envelope, it may be difficult.

13  Maybe we can zoom in on that red stamp.  Can you read the

14  date that appears there on the red stamp, underneath the

15  postage amount of 47 cents.

16  A.  July 18th -- I mean June, I'm sorry.  June 7th, 2018.

17  Q.  Okay.  So your testimony is that the date that this

18  envelope was postmarked is the date that you received it?

19  A.  I see the date that it was posted, yes.  But I didn't see

20  it until this day here that I wrote on the envelope.

21  Q.  Okay.  So it's your testimony that you believe -- do you

22  believe that it's possible -- strike that.  Never mind.

23  Earlier you testified about some of Mr. Toppin's limitations.

24  A.  Yes.

25  Q.  There was a question posed to you regarding -- there was

Whyte - Cross                      115

1    testimony that he cannot read, is that correct?

2    A.  Yes.

3    Q.  Okay.  But then there was also testimony that he can

4    understand big, bold letters.  Can you -- do you recall

5    testifying the fact that you believe your uncle can

6    understand big, bold red letters?

7    A.  What I actually mean is that big, bold red letters in a

8    statement, in any type of paperwork, he wouldn't look at it

9    as anything good.

10   Q.  And how do you know that that's how he views it?  He

11   can't read, correct?

12   A.  No, he cannot.  But any other letters that we've received

13   to the house, he's never been as worried as when he seen this

14   letter here.

15   Q.  Okay.  I'm going to refer again to the depositions --

16   City-22, which is the deposition of Barrington Whyte.

17   A.  Okay.

18   Q.  And if we can turn to page 22.  Okay.  Pardon me, page

19   24.  Page 24, starting at line 8.  The question was posed,

20   "Have you tried to convey to Mr. Topping what this case is

21   about?"  And the answer is, "In bits and pieces, yes."  Next

22   question, "Do you think he understands what you're trying to

23   convey?"  Answer, "No."  How does that -- how does your

24   testimony from your deposition that you don't believe Mr.

25   Topping understands what this case is about, how is that not

Whyte - Cross                                116

1    a contradiction to your testimony here today that he gets

2    agitated by big, bold, red letters?

3            MR. FILIPOVIC:  I'm going to object to that, Your

4    Honor.  This is a little beyond -- I let it go at first, but

5    it's a little beyond the scope of direct examination.  It's

6    getting into --

7            THE COURT:  Beyond the scope?  He testified that he

8    was -- about big red letters, and so he's -- and that that

9    upset him.  And how does that --

10           MR. FILIPOVIC:  Right.  And --

11           THE COURT:  -- allow her to impeach his testimony

12   that he doesn't understand what's going on.  It's just for

13   impeachment.  She's allowed -- I'll allow it for what it's

14   worth.

15           MR. FILIPOVIC:  Yeah.  Okay.

16           THE COURT:  It may not mean anything.

17           MR. FILIPOVIC:  Sure.

18           THE COURT:  I'm sorry.  I should have let Ms.

19   Harper, but I'm -- I tend to just --

20           MR. FILIPOVIC:  That's fine.

21           THE COURT:  And that's not what I'm supposed to do.

22   I'm not supposed to say for Ms. Harper.  I apologize for

23   that, but I've also done Ms. Harper for the plaintiff and

24   jumped in.  I will try to refrain from that.  Okay, Ms.

25   Harper, go ahead.  I'll allow it.

Whyte - Redirect                    117

1          MS. HARPER:  Okay.

2    BY MS. HARPER:

3    Q.  So let me -- earlier in your testimony, you testified

4    that Mr. Topping has a reaction to bright red letters.  Now,

5    when you gave your deposition testimony, you testified that

6    he didn't -- you don't believe he understands what the case

7    is about.  So how can he understand the importance of bright

8    red letters, but he doesn't understand what this case is

9    about?  It just doesn't seem to jive.

10         MR. FILIPOVIC:  Objection, argumentative as far as

11   the portion that "it doesn't seem to jive."

12         THE COURT:  All right.  We'll strike that, Ms.

13   Harper.

14         MS. HARPER:  Fine, Your Honor.

15   BY MS. HARPER:

16   Q.  Is it your testimony that you think he understood what

17   these notices were?

18   A.  No, he doesn't understand exactly what they are, no.

19   Q.  Okay.  All right.

20         MS. HARPER:  I have no further questions for Mr.

21   Whyte, Your Honor.

22         THE COURT:  Any redirect?

23         MR. FILIPOVIC:  Yeah.  I'll just ask a few.

24                    REDIRECT EXAMINATION

25   BY MR. FILIPOVIC:

1    Q.  Mr. Whyte?

2    A.  Yes.

3    Q.  When -- I'll redirect you to the portion of your

4    testimony that said that all the notices, you know, you saw

5    inside the house.  Is it conceivable that, you know, when you

6    saw a notice on your door, you walked it in and you looked at

7    it when you were already in the house?  I mean --

8            MS. HARPER:  Objection, leading.

9            MR. FILIPOVIC:  Well, it's a redirect based on your

10   cross.

11           THE COURT:  It's leading.  It's direct.  Okay,

12   counsel?  It's direct.  It can't be leading.  You can't --

13           MR. FILIPOVIC:  Okay.

14           THE COURT:  I'll sustain.  Just rephrase it.

15           MR. FILIPOVIC:  All right.  Sure.

16   BY MR. FILIPOVIC:

17   Q.  Going with what Ms. Harper had asked about the notice, is

18   it possible that you found one of them just stapled to the

19   door?

20   A.  Taped to the door, actually.

21   Q.  Yeah, taped to the door.

22   A.  Yeah.  And it went inside the house.

23   Q.  Yeah.  Is that possible?

24   A.  Yes.  Yes.

25   Q.  Okay.  That's all.

                          Whyte - Redirect                    119

1            MR. FILIPOVIC:  I have nothing further, Your Honor.

2            THE COURT:  All right.  I'm going to refrain,

3    because I actually have my own questions, but I'm not going

4    to try to make anybody's case for them, because it's just

5    going to --

6            MR. FILIPOVIC:  Well, all right.  Then I have a few

7    more.

8            THE COURT:  No, no, no.  You don't have a few

9    anything, counsel.

10           MR. FILIPOVIC:  No, I do not.  All right.

11           THE COURT:  You fully limited on redirect to

12   questions that were asked on direct.

13           MR. FILIPOVIC:  I am.  And I did have another, if

14   Your Honor would allow it.

15           THE COURT:  Ms. Harper?

16           MR. FILIPOVIC:  It just occurred to me.  I'm sorry.

17           THE COURT:  He already said that was it.  Do you --

18           MS. HARPER:  He already said that was it, Your

19   Honor.

20           THE COURT:  That's it.

21           MR. FILIPOVIC:  Okay.

22           THE COURT:  No, counsel.  And, Ms. Harper, that's

23   going to be the same rule for you.

24           MS. HARPER:  Yes, sir.  Yes, ma'am.

25           THE COURT:  Done.  We're already at 1:30.  We're

                           Whyte - Redirect                     120

1    only on the first witness.  All right.  Mr. Whyte -- Ms.

2    Harper, are you planning on calling Mr. Whyte in your case?

3              MS. HARPER:  I am not, Your Honor.

4              THE COURT:  All right.  Mr. Filipovic?

5              MR. FILIPOVIC:  Yes, ma'am?

6              THE COURT:  I apologize if I'm not --

7              MR. FILIPOVIC:  No, you're not.  That's pretty good.

8              THE COURT:  All right.  Is he going to be, I guess,

9    rebuttal?  I don't know.  But what I'm saying is that, you

10   know, I don't want to keep him here if he doesn't have to be

11   here.  I mean, he has every right to stay.  I'm just going to

12   say, you know, you're fine.  We're going to move on to the

13   next witness.  He may want to, I don't know.  Okay, but I'm

14   just putting that out there because Mr. Offen left already

15   and --

16             MR. FILIPOVIC:  Yeah.  We may call him on rebuttal,

17   Your Honor.  So he can stay if he can stay.

18             THE COURT:  I'm not saying he can't.  I'm just

19   giving him that option.  That's all.

20             MR. FILIPOVIC:  Sure.

21        (Witness excused)

22             THE COURT:  All right, next witness.

23             MR. FILIPOVIC:  We'll call Lieutenant Thornton, Your

24   Honor.

25             THE CLERK:  Mr. Thornton?

Thornton - Direct                          121

1            MR. THORNTON:  Yes.

2             SEAN THORNTON, PLAINTIFF'S WITNESS, SWORN

3            THE CLERK:  Thank you.  Could you please state and

4    spell your name for the record?

5            MR. THORNTON:  Captain Sean Thornton, spelled S-E-A-

6    N, T-H-O-R-N-T-O-N.

7            THE CLERK:  And could you please state your address

8    for the record?

9            MR. THORNTON:  Work address or --

10           THE CLERK:  Yeah.

11           MR. THORNTON:  Okay.  All right.  100 South Broad

12   Street, Philadelphia, Pennsylvania 19110.

13           THE CLERK:  Thank you very much.

14                      DIRECT EXAMINATION

15   BY MR. FILIPOVIC:

16   Q.  Good afternoon, Mr. Thornton.

17   A.  Good afternoon.

18   Q.  Mr. Thornton, this being the second time that I'm

19   examining you, we'll try to make this as smooth as possible.

20   Mr. Thornton, what's your occupation, sir?

21   A.  I am a captain in the Philadelphia Sheriff's Office,

22   civil enforcement unit.

23   Q.  And how long have you been with the sheriff's office, Mr.

24   Thornton?

25   A.  A little over 13 years now.

Thornton - Direct                               122

```
 1   Q.  And can you describe general duties of your position,
 2   sir?
 3   A.  I'm the commander of the civil enforcement unit, which
 4   oversees the execution of writs, injunctions, PFAs, which is
 5   protection for abuse orders, and other civil processes.
 6   Q.  Okay.
 7   A.  We ensure that they are enforced and executed.
 8   Q.  Sure.  Mr. Thornton, when was the -- so you worked for
 9   the Office of the Sheriff for you said a little over 13
10   years, correct?
11   A.  That is correct.
12   Q.  Okay.  And, Mr. Thornton, have you ever held any other
13   positions within the Office of the Sheriff?
14   A.  Yes.  I did courtroom security, transportation, lobby
15   security, warrant unit, just to name --
16   Q.  Good for you, man.  It sounds like you've moved on up.
17   That's great.  Mr. Thornton, having been at so many units of
18   the Office of the Sheriff, can you tell the court what are
19   all the departments that the Office of the Sheriff comprises
20   of?
21   A.  We have CJC, Family Court, the warrant unit, civil
22   enforcement unit --
23           THE COURT:  Wait.  Slow down.
24   A.  Sorry.
25           THE COURT:  So CJC, which is the -- what's that?
```

Thornton - Direct                      123

1    A.  Criminal Justice Center.

2           THE COURT:  Okay.  The Criminal Justice Center.  So

3    these -- when he says positions, do you mean these are all of

4    the -- what does that mean?

5           MR. FILIPOVIC:  No.  I'm only asking now what

6    department of the Office of the Sheriff, what departments

7    does it comprise of.  So go ahead.

8    A.  Okay.

9           THE COURT:  That he knows of.  Ms. Harper.

10          MS. HARPER:  Pardon me?

11          THE COURT:  Never mind.  Is Mr. Dormer -- who's

12   doing this?

13          MS. HARPER:  I'm sorry.  Can you hear me, Your

14   Honor?

15          THE COURT:  All right.  Only one of you gets to

16   talk.  So I see Mr. Dormer's there, but I don't know what --

17          MS. HARPER:  I understand.  Do you have me on video

18   as well?  We switched seats, so (indiscern.).

19          THE COURT:  All right.  All right.

20          MS. HARPER:  Okay, Your Honor.  And yeah.

21          THE COURT:  Okay.  So he's -- the Department of the

22   Sheriff, he's asking him about the Department of Sheriff.  He

23   said --

24          MR. FILIPOVIC:  I'm not asking Department of the

25   Sheriff.  I'm asking Office the Sheriff, what departments

Thornton - Direct                    124

1    does it comprise of.

2              THE COURT:  Departments of the Sheriff.  What

3    departments is the Sheriff comprised of?  That was the

4    question.

5              MR. FILIPOVIC:  Yeah, Office of the Sheriff, what

6    department -- correct.  I'm sorry, Your Honor.  Correct.

7              MS. HARPER:  Your Honor, we would object as to

8    relevance.

9              MR. FILIPOVIC:  What?  No, that's --

10             THE COURT:  She's objecting as to relevance.

11             MR. FILIPOVIC:  That's a very low threshold for

12   relevance, and she's brought forth in her opening statement

13   of defense of some department receiving notice, not the

14   other.  I think I'm entitled to ask this witness about what

15   all departments Office of the Sheriff is comprised of.

16             THE COURT:  That he knows of.

17             MR. FILIPOVIC:  That he knows of.  Yeah, that he

18   knows of.

19             THE COURT:  That he knows of.

20             MR. FILIPOVIC:  He started to answer.  And he was

21   already in the middle of answering.

22             THE COURT:  Ms. Harper, it's that he knows of.  He's

23   your representative of the sheriff.  That's all I'm trying to

24   figure out who he's testifying for.  Look, I'm not going to

25   do you guys' job for you.  Answer the question.  I just want

1    to make sure when I go over this record I'm pretty clear

2    who's what.

3         So as far as you know, Mr. Thornton, what are the

4    departments of the Sheriff?

5    A.  We have different installations which include Criminal

6    Justice Center, Family Court, the Warrant Unit, Civil

7    Enforcement Unit --

8              THE COURT:  Hold on.  Warrant unit, Civil

9    Enforcement Unit.

10   A.  Real estate.

11             THE COURT:  Real Estate Unit?

12   A.  Yes.

13             THE COURT:  Okay.  And so Family Court Unit, Warrant

14   Unit, CJC Unit, or is that something different?  I just want

15   to make sure I've got the right definition.

16   A.  Well, it's just the building that we do security in.  We

17   house the custodies that are brought down from court.

18             THE COURT:  Hold on.

19      (Pause in the proceedings)

20             THE COURT:  All right.  All right.  Counsel, I

21   apologize.

22             MR. FILIPOVIC:  That's fine, Your Honor.

23             THE COURT:  Real Estate Unit, what else?

24   A.  CJC, Family Court, and that was pretty much it.

25             THE COURT:  So Warrant Unit, CJC, Family Court,

Thornton - Direct                    126

1   Warrant Unit, Civil Enforcement Unit, and Real Estate Unit.

2   A.  Right.

3           THE COURT:  Anything else?

4   A.  No.

5   BY MR. FILIPOVIC:

6   Q.  Okay.  So these departments are all a part of the Office

7   of the Sheriff, Philadelphia, correct?

8   A.  That is correct.

9   Q.  Thank you.  To your knowledge, Lieutenant Thornton, do

10  you know what happens with the sheriff finds out or gets

11  notice, if you will, that a debtor has filed for bankruptcy?

12  A.  Yes, I do.

13  Q.  And what is it?  What would it be?

14  A.  The policy -- I'm sorry?

15  Q.  Go ahead.

16  A.  The policy says that we're supposed to stop action, be

17  ordered to stop action any type of enforcement.

18  Q.  Would that include -- stop action, that include stopping

19  deliverance of any writs, service on any notices to vacate

20  properties, and such?

21  A.  That is correct.

22  Q.  Thank you.  Mr. Thornton, I'd like to bring forth what's

23  been premarked as C-26, City-26 exhibit.  It's identical to

24  Plaintiff-26.  There it is.  Okay.

25          (City's Exhibit-26 previously marked for identification)

Thornton - Direct                    127

1        THE COURT:  What are we looking at?

2        MR. FILIPOVIC:  This is City or Sheriff's Exhibit-

3   26, Your Honor.  Plaintiff's also 26 coincidentally.

4        THE COURT:  Okay.

5   BY MR. FILIPOVIC:

6   Q.  I'll give you a moment to review it, sir.  It's the same

7   exhibit we used at your -- do you see it?

8   A.  Yes, sir.

9   Q.  All right.  Mr. Thornton, I'm going to ask you to direct

10  your attention to the very top of the document of page 1.

11  And read for the record, please, the -- well, let me ask you

12  this -- strike that.  What is this document?  Sir, have you

13  seen it before?

14  A.  Yes, I have.

15  Q.  You just said that there are policies and procedures with

16  the sheriff, is that what you were referring to?

17  A.  Yes, sir.

18  Q.  Okay.  And what is the date that's listed on the top of

19  this page?

20  A.  The date says May 12th, 1988.

21  Q.  And then after that?

22  A.  It says, "Revised August 1st, 2014."

23  Q.  To your best knowledge, has it been -- is there another

24  policy or revision since then?

25  A.  I'm sorry, can you repeat that, sir?

Thornton - Direct                    128

1   Q.  Yeah.  Has there been another policy or revision since --

2   do you know of another policy besides the one you're looking

3   at?

4   A.  I don't --

5           MS. HARPER:  Objection.

6           MR. FILIPOVIC:  Based on what?

7           MS. HARPER:  There's no foundation as to what policy

8   -- other policies he's speaking of.  I don't know how --

9           MR. FILIPOVIC:  He's not speaking of any.  I'm

10  asking him if he knows of any.

11          THE COURT:  Whoa, whoa, whoa.  She gets to make her

12  statement and you get to respond.

13          MS. HARPER:  The form of the question was as to have

14  there been -- well, I'll let the witness answer.  The form of

15  the question is, "Has there been any other policy

16  amendments," like which policies are we talking about?  Are

17  we talking about all the policies in the sheriff's office?

18          MR. FILIPOVIC:  Okay.  I'll specify.

19  BY MR. FILIPOVIC:

20  Q.  This particular policy that you're looking at, Mr.

21  Thornton, the one that you just read was revised in August of

22  2014, do you know of any more recent revisions of the same

23  policy?

24  A.  I do not.

25  Q.  Thank you, sir.

Thornton - Direct                              129

1          THE COURT:  What?  You do not?

2    A.  I do not.  No.

3          THE COURT:  You do not know, okay.

4    BY MR. FILIPOVIC:

5    Q.  Okay.  And can you read for me where it says --

6          MS. HARPER:  Objection.  I'm sorry.  I just have to

7    make sure you're categorizing that as he does not know as in

8    N-O, not know as in K-N-O-W, because I think that was the

9    characterization of his testimony.

10          THE COURT:  He said he do not know.  I thought it as

11    K-N-O-W of any other revisions to that document.  He does not

12    know.  Is that what you're saying, Mr. Thornton?

13    A.  No, I'm saying is I don't think there's no updates to or

14    revision to this particular policy.

15          MR. FILIPOVIC:  Thank you.

16    A.  This is the (indiscern.) policy that we go by.

17          THE COURT:  Okay.

18          MR. FILIPOVIC:  Thank you.  Thank you, sir.

19    BY MR. FILIPOVIC:

20    Q.  Subject line right under where it says, "Directive," can

21    you read that for the record, please, sir?

22    A.  Where it says, "Purpose?"

23    Q.  No, but where it says, "Subject," and then there's more

24    on what you --

25    A.  Okay.  Subject, it says, "Enforcement."

1   Q.  And then in the parentheses.

2   A.  "Stay order."

3   Q.  Okay.  All right.  And then if you could read, please,

4   the purpose.

5   A.  "The purpose of this directive is to establish a policy

6   of receiving, recording, and handling of stay order,

7   bankruptcy petitions, and appeals when received by the

8   sheriff's office."

9   Q.  Thank you, sir.  And then if you could read for us where

10  it says Roman Numeral II, underlying policy and then where it

11  says "bankruptcy."  Could you read it starting with

12  "bankruptcy?"

13  A.  Yes.  "Number one, when received by the sheriff's office,

14  all legal action is to stop.  Detail" --

15  Q.  Thank you, sir.  You don't need to read any further.

16          MR. FILIPOVIC:  Your Honor, I'd like to --

17  BY MR. FILIPOVIC:

18  Q.  And is this policy kept on file in the regular course of

19  the business of the sheriff?

20  A.  Yes.

21  Q.  And is it a regular course of business of the sheriff to

22  promulgate such policies and maintain them on file?

23  A.  I'm sorry.  Can you repeat that?

24  Q.  Is it a regular course of business of the sheriff to put

25  together this policy?  In other words, did the sheriff of

Thornton - Direct                    131

1    Philadelphia or its attorneys put this policy together?

2    A.  Yes.

3             MR. FILIPOVIC:  Thank you.  Your Honor, I'd like to

4    move to admit this policy into evidence, this document, and

5    that would be City-26.

6             THE COURT:  Ms. Harper?

7             MS. HARPER:  I have no objection to that.

8             THE COURT:  Okay.  Admitted.

9         (City's Exhibit-26 admitted into evidence)

10   BY MR. FILIPOVIC:

11   Q.  Lieutenant Thornton, sir, going back to --

12            THE COURT:  Who dropped off?

13            MR. FILIPOVIC:  I'm sorry.  No, no, we went back to

14   -- I'd like if -- I still have a few more questions on this

15   particular document.  I know it's --

16            THE COURT:  No, no.  Ms. Godfrey left already.  I

17   know she had to leave for an emergency doctor's appointment.

18   I just think she's not on here anymore.  Somebody did drop

19   off.  I can --

20            MR. FILIPOVIC:  Okay.

21            THE COURT:  Okay.

22            MR. FILIPOVIC:  Your Honor, if we could pull up the

23   sheriff's policy again, because I'd like to ask this witness

24   a few more questions about it.

25   BY MR. FILIPOVIC:

Thornton - Direct                          132

1    Q.  Sir, under -- I'm going to direct you to the policy of

2    bankruptcy that you read, and the first sentence, "When

3    received by the sheriff's office."  Do you see that?  Mr.

4    Thornton?

5    A.  Yes.

6    Q.  Okay.  Now, do you agree or not agree that it doesn't

7    specify any particular department in the sheriff's office, it

8    just says Sheriff's Office, correct?

9              MS. HARPER:  Objection as to relevance.

10             MR. FILIPOVIC:  Well, Your Honor, we believe it's

11   very relevant, because Ms. Harper, one of her defenses that

12   you heard in the opening statement and throughout this case

13   is that, you know, this department received notice but not

14   the other department.  And now we have a policy, which is up

15   to date --

16             THE COURT:  It says the sheriff's office.  Okay.

17             MR. FILIPOVIC:  Yeah, it says the sheriff's office.

18             THE COURT:  It doesn't say department.

19             MR. FILIPOVIC:  It doesn't say a department.  Okay.

20             THE COURT:  Okay.

21             MR. FILIPOVIC:  That's all.  All right.  Good.

22             THE COURT:  Do you agree, Mr. Thornton, it doesn't

23   say which department.  It says when received by the sheriff's

24   office.

25   A.  That is correct.

Thornton - Direct                    133

1          THE COURT:  Okay.

2    Q.  Thank you.  Thank you.

3          MR. FILIPOVIC:  And at this point, Your Honor, if we

4    could pull up Plaintiff's 23 and these are -- Your Honor,

5    Plaintiff's-23 through Plaintiff's-34 are really all a part

6    of -- it's just -- it's the request for admission -- it's the

7    responses to the request for admissions in this matter that,

8    you know, we've asked them to admit certain things.  They

9    filed their answer under oath and the purpose of these

10   requests are sort of in the same facts don't have to be -- we

11   don't have to bring witnesses.  We will move to admit these -

12   - this should be one exhibit, but we could move to admit them

13   in the bulk.  It's really all just the responses to the

14   request for admissions.

15        And at this time, we would like to move to admit the --

16        THE COURT:  Wait a minute, wait a minute, wait a

17   minute, whoa, whoa, whoa.

18        MS. HARPER:  Objection, Your Honor.

19        THE COURT:  Whoa, whoa, whoa.

20        MR. FILIPOVIC:  Okay.

21        THE COURT:  What does that have to do with this

22   witness?  Are you finished cross examining him?

23        MR. FILIPOVIC:  I'm not cross examining him.  I'm on

24   direct with this witness, Your Honor.

25        THE COURT:  So you're finished direct testimony with

Thornton - Direct                    134

1   him?

2          MR. FILIPOVIC:  Well, no, I'm not, Your Honor, but

3   I'd like -- at this point, I'd like to ask him some questions

4   on this and I would like to avoid an objection that says

5   asking from items not in evidence, request for admissions.

6   Responses are automatically evidence.

7          THE COURT:  That all say the Philadelphia Law

8   Department.  What does that have to do with him?

9          MR. FILIPOVIC:  I'm sorry?

10          THE COURT:  I mean, I'm not understanding.

11          MR. FILIPOVIC:  Well, this is only P-20.  Whatever

12   it is, we've sent these requests.  If you look at page --

13          THE COURT:  I get it, counsel.  And you're going to

14   ask him questions about admissions that were admitted by the

15   law department?

16          MR. FILIPOVIC:  No, not department.  We sent this to

17   the Philadelphia Office of the Sheriff that this is for the

18   Plaintiff.

19          THE COURT:  Okay.  And the --

20          MR. FILIPOVIC:  That party is who filed these

21   answers.  So his responses --

22          THE COURT:  He didn't file them.  Are you saying

23   he's the representative of the sheriff and he's -- and those

24   answers are binding on him as the representative of the

25   sheriff?  Is he here as a representative of the sheriff or as

Thornton - Direct                    135

1    an employee?

2              MR. FILIPOVIC:  Your Honor --

3              THE COURT:  Which one?

4              MR. FILIPOVIC:  -- notwithstanding this witness, I'm

5    going to -- we have -- the parties are entitled to admit the

6    request for admission.  That's for their admissions.

7              THE COURT:  You are, counsel.  My question is you

8    are cross examining Mr. Thornton.

9              MR. FILIPOVIC:  I'm not cross examining him, Your

10   Honor.  I'm on direct.

11             THE COURT:  I apologize.  You called him as a direct

12   witness.  And you want to admit these so that you can ask him

13   questions about admissions that were admitted by the sheriff?

14             MR. FILIPOVIC:  Correct.  Yes.

15             THE COURT:  And he is a representative of the

16   sheriff or he's here as his own capacity as an employee?

17             MR. FILIPOVIC:  He was produced in the deposition as

18   a representative of the sheriff, Your Honor.

19             THE COURT:  Okay.  So he's the sheriff's

20   representative with respect to these answers?

21             MR. FILIPOVIC:  That is correct.  We asked for a

22   representative --

23             THE COURT:  Right, Ms. Harper?  Is this the

24   sheriff's representative?  That's what he's produced as.  I'm

25   just asking.

Thornton - Direct                    136

1              MR. FILIPOVIC:  He's a 30(b)(6) witness, Your Honor.

2              THE COURT:  Okay.

3              MS. HARPER:  For purposes of a trial, Your Honor.

4    But he is a --

5              THE COURT:  All right.

6              THE COURT:  -- representative of the sheriff's

7    office available to testify today.  There's no basis to move

8    THESE -- this document into evidence.

9              MR. FILIPOVIC:  No basis?  We don't need basis.

10   These are requests for admissions.  The rules --

11             THE COURT:  Whoa, whoa, whoa.  Ms. Harper, why do

12   you think there's no basis for their admission?

13             MS. HARPER:  It's my understanding that if these --

14   if he wants to move these requests for admissions into

15   evidence for some purpose -- it has to be for some purpose.

16   We haven't established a foundation for them.  We haven't

17   established --

18             MR. FILIPOVIC:  Your Honor, rule --

19             MS. HARPER:  (Indiscern.) --

20             MR. FILIPOVIC:  -- 36 admissions are admissible.

21             THE COURT:  Rule 36 says, hold on.  Let's see what

22   Rule 36 says.  Can be admitted as an admission, right, is

23   that what it says?

24             MR. FILIPOVIC:  That's right.

25             THE COURT:  Okay.  Hold on.  Evidentiary Rule 36.  I

Thornton - Direct                    137

 1    mean, I don't know what to tell you, Ms. Harper.  I mean Rule

 2    36 -- let me go to the rules of evidence in here.  Okay, come

 3    on now.  I'm in the wrong.  I've got to go to 7036.

 4        Okay.  Rule 7036, a party may serve, blah, blah, blah.

 5    Okay.  So a matter admitted is conclusively established.

 6                MR. FILIPOVIC:  There we go.

 7                THE COURT:  That they were conclusively established

 8    that the -- I'm looking at 17 that says the Philadelphia Law

 9    Department received it.  Okay.

10                MR. FILIPOVIC:  That's a matter of argument, Your

11    Honor, that's 17.  There's 1 through way many numbers.

12                THE COURT:  Counsel, I only said 17.  I didn't say

13    anything else.

14                MR. FILIPOVIC:  Okay.

15                THE COURT:  All of these -- whatever they said they

16    admit.  Okay?

17                MR. FILIPOVIC:  Correct.

18                THE COURT:  Okay, Ms. Harper, why can't they be

19    admitted?  You admitted that 17, the Philadelphia Law

20    received it.  They admitted that it went to whatever it is.

21    It is admitted only that -- whatever the answer was, you said

22    is admitted only that, a (indiscern.) was sent to the Civil

23    Enforcement Unit and that it had whatever it had on it.  They

24    qualified their answer.  So that's what the answer is.  Is 18

25    -- I'm sure it goes down further.

Thornton - Direct                           138

1           MR. FILIPOVIC:  Sure.

2           THE COURT:  Okay, Ms. Harper?  They were admitted

3    with those answers only and you can't make them general

4    because that was what they were admitted only.

5           MR. FILIPOVIC:  Sure.

6           THE COURT:  Okay?

7           MR. FILIPOVIC:  Yes, so we'd like to --

8           THE COURT:  All right.  So those are admitted

9    because they're admissions, and that's --

10          MR. FILIPOVIC:  So we --

11          THE COURT:  P what?

12          MS. HARPER:  (Indiscern.) objections that they're

13   not -- they're objections.

14          MR. FILIPOVIC:  P-20?

15          THE COURT:  Wait.  What is your objection, Ms.

16   Harper?

17          MS. HARPER:  Well, I'm saying that the document that

18   they're seeking to admit is only a portion of a document that

19   includes --

20          MR. FILIPOVIC:  We're going to -- right.  So we seek

21   to admit P-20 for -- P-23 to P-34, which is the entire

22   document.

23          THE COURT:  Okay.

24          MR. FILIPOVIC:  It should never have been separated

25   into that many exhibits.  That's our mistake.

Thornton - Direct                        139

1           THE COURT:  Well, who separated it?

2           MR. FILIPOVIC:  Well, we did, Your Honor.  I'm

3    sorry, but we move to --

4           MS. HARPER:  Apparently, there's a --

5           MR. FILIPOVIC:  We could move to admit each one, or

6    either one, but they're all -- P-23 through P-34 are all

7    numbered requests for admissions and the parties defendant's

8    responses thereto.  And we're entitled to admit them.

9    They're only being admitted to what they say, nothing else.

10          THE COURT:  Okay, Ms. Harper?

11          MS. HARPER:  Your Honor, my concern is that the

12   actual responses to the requests for admissions have general

13   objections that are not depicted in any of the exhibits.

14          THE COURT:  So we need -- well, it would be in the

15   general objections.  He's saying he wants to put the entire

16   ones.

17          MR. FILIPOVIC:  Yeah, the entire responses with all

18   of the --

19          THE COURT:  Where's the general reservations?  Where

20   are they at?  I can't see them.

21          MS. HARPER:  They're not included on the document

22   that counsel seeks to admit.

23          THE COURT:  Well, he said 23 through 34 has

24   everything.

25          MS. HARPER:  It's -- my review of those documents,

Thornton - Direct                    140

1    Your Honor, and perhaps counsel can take a moment to take a
2    look, but these are pages -- pages, they're not the entire --
3    there's no signature page.  There's nothing.
4              MR. FILIPOVIC:  Okay.  Well, if you, you know, we
5    have the document that has.
6              THE COURT:  Well then, you need to give it to me.
7    What am I supposed to do with it?  If you don't have the
8    entire --
9              MR. FILIPOVIC:  Yeah, but --
10             THE COURT:  -- entire exhibit, I need to look at
11   what they generally -- because if I'm going to find they
12   made an admission, I have to see what their reservations was
13   and I have to --
14             MR. FILIPOVIC:  Sure.
15             THE COURT:  -- find it.
16             MR. FILIPOVIC:  Sure.
17             THE COURT:  So she has a valid objection.  It's not
18   the entire document.  Where --
19             MR. FILIPOVIC:  Sure.  So we'll send the entire
20   document, Your Honor.
21             THE COURT:  Oh, no, no, no, send nothing.  It needs
22   to be here now.  This is the trial.  You don't send anything
23   later.  It's a trial.  Now, maybe Mr. Dunne over there can
24   figure out how to get it to you but --
25             MR. FILIPOVIC:  I have it.  I have it, Your Honor.

Thornton - Direct                    141

1    I have it and I can just send it to -- Dave admitted it and

2    it's been shared among us.  The only thing missing before you

3    is maybe the first page and I have it in a binder marked --

4              THE COURT:  And she said there is no signature page.

5              MR. FILIPOVIC:  Well, she should have verified them.

6              THE COURT:  She don't have to -- your -- it's your

7    exhibit, you're supposed to produce it.  She should have

8    nothing.  If you're producing it as your exhibit, it was

9    incumbent upon you to make sure you had the entire amount,

10   just like you objected to her talking about the deposition

11   and not having the entire document.  So I'm sure you're all

12   familiar with the entire document and the fact that you

13   didn't put the first page or the signature page.  How is that

14   her fault?  That's your exhibit.  She's objecting that it's

15   not the entire document.  Mr. --

16             MR. FILIPOVIC:  The only way that we wouldn't have

17   it is if they never sent it but --

18             THE COURT:  What do you mean they didn't send it?

19   Your -- your position is --

20             MR. FILIPOVIC:  We have the file that's -- we have

21   the file --

22             THE COURT:  -- your position is she sent you an

23   answer that didn't include the first page and the signature

24   page?

25             MR. FILIPOVIC:  No, no.  We definitely have the

Thornton - Direct                     142

1    first page, Your Honor, and I have that.  As for the

2    signature page, the City knows they should have verified

3    their responses.

4           THE COURT:  The City knows anything.  I don't know

5    what you have or don't have.  You didn't object and if

6    they're not verified, how the heck they even admitted then if

7    nobody signed.

8           MR. FILIPOVIC:  They were.  They were verified.  I'm

9    sure there is --

10          THE COURT:  They why didn't you just say the City

11   should have verified, if now you're saying they actually did

12   verify, which one is it?

13          MR. FILIPOVIC:  No, I didn't say they didn't verify

14   them, Your Honor.  I'm sure that there is a page like I

15   said --

16          THE COURT:  And they should have verified what?

17          MR. FILIPOVIC:  We split these up and, you know, we

18   shouldn't have split them up but the binder --

19          THE COURT:  That's not her job to tell you that you

20   shouldn't have split them up.  It's not Ms. -- the Sheriff's

21   or the counsel's job to tell you that you didn't have the

22   entire document.  They don't tell you how to run your case.

23   The same --

24          MR. FILIPOVIC:  No, you're right.  And I --

25          THE COURT:  So, why are you saying --

Thornton - Direct                    143

1          MR. FILIPOVIC:  -- I have the entire --

2          THE COURT:  -- so but you didn't -- so Ms. Harper,

3   do you -- do you object to him now trying to submit it when

4   he didn't give it to us in advance?

5          MS. HARPER:  I do, Your Honor.  I mean, this is not

6   how -- this is not how it's done.  You can't -- this isn't

7   being used for impeachment.  He is trying to admit this on

8   direct and it's an incomplete document.  It is not the best

9   evidence.

10         MR. FILIPOVIC:  Okay.  And you don't want the

11  complete document in, right, because I have it.

12         THE COURT:  But it's -- that's not the point, Mr.

13  Filipovic, it was your responsibility to produce it and now

14  you want to shift Ms. -- to Ms. Harper that she is asserting

15  her right to object because you fail to do something and now

16  I'm supposed to say what?  She has a right to object.  You

17  were obligated to produce the entire document that you wanted

18  to put into evidence, you failed to do that.  And now she's

19  saying he didn't do it and I'm not agreeing to him doing it.

20  So now what?

21         MR. FILIPOVIC:  Your Honor --

22         THE COURT:  Now what?

23         MR. FILIPOVIC:  -- I see the predicament that we're

24  in.

25         THE COURT:  No, the predicament you have me in

Thornton - Direct                    144

1   because you didn't do what you were supposed to do.  Ms.

2   Harper is not agreeing.  How am I supposed -- what am I

3   supposed to do with that?

4             MR. FILIPOVIC:  So what exactly is her objection

5   that the page --

6             THE COURT:  It is not the entire document.  It's not

7   the best evidence because you failed to include the entire

8   document and therefore --

9             MR. FILIPOVIC:  Okay.

10            THE COURT:  -- objecting to entry for your failure

11   to produce the entire document.

12            MR. FILIPOVIC:  We didn't fail to produce it, Your

13   Honor.  Let's make that clear.

14            THE COURT:  You're producing --

15            MR. FILIPOVIC:  They're the one who produced it.

16            THE COURT:  -- counsel, counsel.  When you listed

17   your documents that we're going to be introduced into

18   evidence, you did not include the entire document, okay.

19   So --

20            MR. FILIPOVIC:  Right, but that's different from

21   failing to produce it in discovery.

22            THE COURT:  Did I say discovery?  Did I mention the

23   word discovery?

24            MR. FILIPOVIC:  No, you said produce, okay.

25            THE COURT:  Produce in connection with the trial.

                          Thornton - Direct                    145

1          MR. FILIPOVIC:  Okay.

2          THE COURT:  The fact you tried to clarify it as

3   discovery that's on you.  Don't put words into the Court's

4   mouth.  I never said produced in discovery.

5          MR. FILIPOVIC:  You're right.

6          THE COURT:  You failed to produce it in connection

7   with this trial as an exhibit that you intended to admit into

8   evidence.  You didn't.  And so now she's objecting and I got

9   to figure out what to do with it because you didn't comply

10  with what I told you to do, which was to produce everything

11  And now, you didn't produce the full document.  And she has

12  every right to object because that's not the entire document.

13  And so you're asking to supplement.  She's objecting because

14  she said you didn't do it right.  Now, what am I supposed to

15  do now?

16         MR. FILIPOVIC:  If I may, just one -- one --

17         THE COURT:  Sure.

18         MR. FILIPOVIC:  -- if I may, okay.  Thank you.  This

19  isn't extrinsic document.  This is a set of requests for

20  admissions that are governed by its own rule.  And those

21  documents are both -- parties are privy to them.  They're the

22  ones who responded to them.  They know what they are.

23  There's no prejudice whatsoever that they could claim by

24  supplementing -- just produce -- you know, producing at the

25  trial, what the rule say is conclusively immediately

Thornton - Direct                    146

1    established by us now putting this document together.

2    They're the ones who sent it, they know about it.

3                 THE COURT:  So what?  You're now saying I should --

4                 MR. FILIPOVIC:  There's no prejudice.  There's no

5    prejudice --

6                 THE COURT:  Ms. Harper, he's saying you're not

7    prejudiced because he can now supplement it.

8                 MR. FILIPOVIC:  Because this is not an external

9    document.

10                THE COURT: He's asking me to -- he wants to now add

11   the papers.  I mean, are you prejudiced if he does that?  Is

12   that the -- first of all, is that the standard?  What rule

13   that you're referring to as prejudice as the basis for my

14   determination to now supplement the document or replace

15   because now you want to put a different document in?

16                MR. FILIPOVIC:  Well, I believe, Your Honor, that

17   the rule would be only as far as it pertains to your trial

18   order 140, that mandates that we produce all exhibits.

19                THE COURT:  No, counsel, it's more than 140.  My

20   rule is more than that.  I told you to produce what you

21   wanted to, you didn't give it to them in advance and so

22   now —

23                MR. FILIPOVIC:  They had it all along.  They had

24   this all along.  They had --

25                THE COURT:  The fact that they had it all along

Thornton - Direct                    147

1    doesn't mean that they don't --

2              MR. FILIPOVIC:  And we had 11 exhibits of the same

3    exact responses that they were served with.

4              THE COURT:  Ms. Harper, what are -- are you going to

5    continue objection, or you're going to -- what do you want to

6    do?

7              MS. HARPER:  Your Honor, I must raise the objection

8    but in reality, it is your order, but.

9              THE COURT:  It's more than my -- my order said to do

10   certain things.  If you don't comply, then I have the option

11   of not allowing you to then put in the evidence.

12             MS. HARPER:  And Your Honor, that is the Sheriff's

13   request that they request to supplement the record or to

14   change the record be denied.

15             THE COURT:  All right.  Why?

16             MS. HARPER:  Because, Your Honor, rules matter for a

17   reason.  We're trying to prepare for trial.  It's difficult

18   enough as it is under these circumstances to prepare for

19   trial.  When parties do not comply with the court's orders,

20   it makes it additionally difficult.  These documents were not

21   produced accurately or completely and now they're being moved

22   into admission.  And what happens if the document that's

23   supplemented isn't accurate or there is some other additional

24   problem?  Is there a new trial?  Is there a new hearing as to

25   the admission of that document?

Thornton - Direct                    148

1          THE COURT:  I guess the question is do you -- you

2     didn't say let me do and you get some time to look at it?  I

3     mean, that's what I would have typically say, okay.  Look,

4     give her what you now want to admit, take a look at it and

5     tell me do you still believe you're prejudiced or you still

6     believe it shouldn't?

7          Yes.  When you prepare for trial and Mr. Filipovic, it

8     appears to me that you're very conversant with the rules.

9     You know what they're supposed to say, you know what the

10    entirety document is because you use it when Ms. Harper was

11    using the deposition.  So I'm not quite sure what the basis

12    for you even telling me why you failed to do it.  That's

13    number one.  So it has to be excused.  It's not just

14    prejudiced.  Why didn't you do it and they're not prejudiced.

15    You know, what I don't appreciate and what I have seen

16    throughout this is that it's always the City's fault.  They

17    didn't do something.  They wouldn't agree to dismissal.  They

18    wouldn't agree to continue to trial.  They didn't so this.

19          I'm not going to assess, you know, if the City does

20    the -- the City on -- Ms. Harper on behalf of the Sheriff.

21    We're talking about the City on behalf of the Sheriff does

22    something, I'm going to call her on it.  But at the same

23    time, I'm going to treat you the same way I'm treating her.

24    And if she keeps trying to say, well, it's the plaintiff's

25    fault.  It's the plaintiff's fault and something she did.

Thornton - Direct                    149

```
 1    I'm not going to let that fly.  So the fact that you didn't

 2    do it doesn't mean that I may not let you do it now.  But

 3    please don't say, "Well, Ms. Harper should have known."

 4    That's not Ms. Harper's responsibility.  It is yours as the

 5    plaintiff to have all of your documents available that you

 6    want to introduce into trial.  And I said that for a couple

 7    of reasons, not only because it's my order, it's my standard

 8    order for a trial for the same reason that I don't like us to

 9    have discovery in the middle of trial because somebody

10    inevitably jumps up and says, "Oh, I never saw this before."

11    So to avoid all of that, everybody is on notice what

12    everybody's putting in.  It wasn't her job to call you and

13    say. "Hey, you know, you didn't put the entire document in

14    here and I'm going to object to that."  You should have

15    anticipated that.

16        So Ms. Harper, what I am proposing is that Mr. Filipovic

17    shares with you what he intends to introduce us the entire

18    document.  You take a look at it, he has to explain to me why

19    he thinks, you know, he'd be excused for not complying and

20    then you're going to have to tell me how you prejudiced.

21    Other than, you know, he didn't comply with my rule.  I get

22    that.  You know, I get that.  But you know, I'm not always

23    going to, "Oh, you didn't comply therefore strictly out."

24    That's not how I do it.  I try to be fair to everyone.  So,

25    does that in your -- even though you may -- do you think that
```

Thornton - Direct                    150

1   that would in some way if you want to look at it, or you're

2   not prepared to address that and then if that's an issue,

3   you're not prepared?

4           MS. HARPER:  No, I just want to be certain, Your

5   Honor, that we have an opportunity to review whatever is

6   going to be supplemented or replaced for what is currently at

7   this

8    -- I mean, this trial, there -- this exhibit has been --

9   this document has been broken down in a numerous pages.

10  Let's make sure when it gets on the record, it gets on there

11  accurately, completely and correctly.

12          MR. FILIPOVIC:  Absolutely.  We already have it

13  ready.  In fact, I could email it like now to the joint link

14  that we -- or I could maybe file share it.

15          THE COURT:  I'm not going to see, you could share it

16  with Ms. -- Ms. Harper and Mr. Domer or whoever.

17          MR. FILIPOVIC:  Okay.  Here we go.

18          THE COURT:  But she's going to have to, you know,

19  but Counsel?

20          MR. FILIPOVIC:  Yes, Ma'am.  Yes, Your Honor.

21          THE COURT:  You don't blame Ms. Harper because you

22  didn't do it right.  I mean, that --

23          MR. FILIPOVIC:  No, absolutely, absolutely.  If I

24  were in --

25          THE COURT:  That's not accepted.

Thornton - Direct                            151

```
 1              MR. FILIPOVIC:  -- if I were in her shoes, I
 2     would --
 3              THE COURT:  You will be doing the same thing.
 4              MR. FILIPOVIC:  -- I would.
 5              THE COURT:  And now we're wasted some more time.  If
 6     not, I'm telling you, if we don't finish today, you guys are
 7     going to have to come back and I don't know what to tell you.
 8     So, how much time you think you need, 10, 15 minutes.  Ms.
 9     Harper, I'm not going to -- how much time?  Twenty minutes to
10     look at this?  Hi, Mr. Hassan, welcome back.  I don't know
11     where his counsel is, he'll probably show up at 2:30.
12     But you're going to show up for us to take a break.  This
13     what I think we're going to do.  Mr. Thornton, you cannot
14     discuss your testimony with Ms. Harper or Mr. Domer or with
15     anything else in that room.  And I'm going to ask you, when
16     you come back, did you.  Same rules for everybody.
17         Mr. Filipovic, you got to figure out how to get it to
18     Ms. Harper.  Ms. Harper, you take what time you need and then
19     when you're done, I guess you email or it says, "Host for
20     MDC."  Send a message to the host that says I'm ready to go
21     back on.
22              MS. HARPER:  Yes.
23              THE COURT:  And they'll email, text me or email me
24     or something so that I can know to come back on, okay?
25              MS. HARPER:  Thank you, Your Honor.
```

Thornton - Direct                    152

1          MR. FILIPOVIC:  Thank you, Your Honor.

2          THE COURT:  All right.  So we're going to -- I'm

3     going to mute and stop the video.

4          (Off the record; 03:14:27 to 03:17:04)

5          THE COURT:  Mr. Offen, we're on -- we're on a break.

6          MR. OFFEN:  Thank you, Judge.

7          THE COURT:  Okay.  All right.  Bye.

8          (Off the record; 03:17:11 to 03:41:04)

9          THE COURT:  Okay.  We're back.  It looks like it.  I

10    don't need Skype.  I don't know if coffee was a good move.

11    Okay.  Are we ready?

12         MS. HARPER:  Yes, Your Honor.

13         MR. FILIPOVIC:  Yes, Your Honor.

14         THE COURT:  Okay.  So what did we -- what -- what's

15    the City's -- I mean, the Sheriff's position at this point,

16    Ms. Harper?

17         MS. HARPER:  Well, we -- we've seen a document that

18    was emailed to us that has the request for admissions, yes.

19    And it has my signature page, as well as our general

20    objections.  What the City have done -- what the Sheriff had

21    done was done a combined document in terms of responding to

22    discovery requests, such that the responses to

23    interrogatories would have also been included in that

24    document as with the responses to requests for production.

25    But for purposes of the trial if this -- if the plaintiff is

Thornton - Direct                      153

1    seeking to admit the requests for admissions into the record,

2    we are okay with the way they are -- they are presenting that

3    document.  Meaning we acknowledged it's missing the responses

4    to requests for interrogatories and responses to requests for

5    production, but it encapsulates our general objections as

6    well as a missing signature so.

7           THE COURT:  So you want the general objections and

8    the request for admissions with the signature page to be the

9    document that would be admitted?

10          MS. HARPER:  In replace of, yes, what we've been

11   looking at here.

12          THE COURT:  Admissions and signature page, right?

13          MS. HARPER:  Yes, Your Honor.

14          THE COURT:  Okay.  So the request for admission so

15   that would then be, we would replace what was marked as D --

16   P-22 to P --

17          MR. FILIPOVIC:  23, Your Honor.

18          THE COURT:  -- to 34 --

19          MS. HARPER:  Correct, Your Honor.

20          THE COURT:  -- we would (inaudible) that as 23 only

21   or you want it to still be broken down?

22          MR. FILIPOVIC:  No, it can be just 23 only.

23          THE COURT:  Okay.  And then what --

24          MS. HARPER:  Your Honor, you make a good point

25   because we noted that too so what the -- what -- the document

Thornton - Direct                    154

1    we've seen suggests that they're just replacing P-23 and P-24

2    but they have requests for admissions pieced out between P-23

3    and -- what is it?

4                 MR. FILIPOVIC:  We put them together in one

5    document?

6                 MS. HARPER:  No, I know.  But as it is now, we're

7    talking about replacing it.  Everything from P-23 to P-34 is

8    parsed out requests for admission so the document should be

9    replacing P-23 to P-34.

10                THE COURT:  That's what I said.  That's what I said.

11                MR. FILIPOVIC: That's what I said.

12                MS. HARPER:  Counsel's -- counsel, but no, no.  Your

13   cover page to the document you're going to show or submit or

14   show, this is P-23, P-24 only.  It's not P-23 through P-34.

15                THE COURT:  No, I want the entire, what we

16   understand is going to be your general objections.  You're

17   not going to have the response to interrogatories.  You're

18   not going to have the response to production of documents.

19   You're going to have the general objections, the request for

20   admissions with the signature page.

21                MS. HARPER:  What --

22                THE COURT:  Not going to include the interrogatories

23   and request for documents.

24                MS. HARPER:  I'm just trying to clarify what -- what

25   that is replacing.

Thornton - Direct                    155

1          THE COURT:  That is replacing anything related to

2     the request for admission.

3          MS. HARPER:  Thank you, Your Honor.

4          MR. FILIPOVIC:  Correct.

5          THE COURT:  23 to 34.

6          MS. HARPER:  Right.

7          THE COURT:  Correct?  All right.

8          MR. FILIPOVIC:  Correct.

9          THE COURT:  Now that has to now be -- John, can

10    they, I mean because this is being, typically it's emailed to

11    Ms. Godfrey who emailed it to John and she's not on the line.

12    So, how do we propose we get it so that it gets put on the

13    shared and everybody's on the same page?

14          THE HOST:  Could we have the document ready to roll

15    right now?  Because in the Zoom chat box at the bottom,

16    there's an option to send a file to me.

17          MR. FILIPOVIC:  Okay.

18          THE COURT: "Send the file to the host."

19          THE HOST:  Yes.  So if you click on -- or whoever is

20    sending it, if you click on chat menu, make sure you see the

21    group chat on the bottom right.

22          MR. FILIPOVIC:  Yes.

23          THE HOST:  Find host for MDC in that drop down box

24    so you send it to me.  You see what I'm talking about?

25          MR. FILIPOVIC:  Yeah.

Thornton - Direct                    156

1          THE HOST:  And then that little square to the right
2     of that it says file, I think, if you click on --
3          MR. FILIPOVIC:  Yes.
4          THE HOST:  -- somewhere around there, it will give
5     you the option to upload a file and --
6          MR. FILIPOVIC:  Sure.  I'm already there.
7          THE HOST:  -- and when I get, I guess, I'll have to
8     take it and save it and then figure out and then you want me
9     to share it on the --
10          THE COURT:  Right.  Because that would have happened
11     is when the documents came through, they were put into a file
12     so that the that the ESR, who's the host for this is --
13          MR. FILIPOVIC:  Yes.
14          THE COURT:  -- has access to them.  So now we've got
15     to put them in -- add them to the file.  Can you add them to
16     the file that you're going to or do you?  I don't know.
17          THE HOST:  I don't know about on the spot.  I'm sure
18     I could ultimately.
19          THE COURT:  I know.  Just put them so that you have
20     them, save them and then we can figure out how to add them to
21     -- because you're going to have -- those are admitted into
22     evidence and so they're going to be -- whatever is admitted
23     into evidence we've already previously admitted some
24     documents.  Your records are going to have those and then
25     they'll just -- I'll just get a copy of those when I do my --

Thornton - Direct                    157

1   my -- when I review the evidence for a decision.  I'll have

2   everything that was admitted because I don't know what's in

3   those files.  I don't look at those.  I have no clue what you

4   guys sent to my courtroom deputy.  Because I haven't seen

5   them yet.  We haven't had a trial.  So, but I do look at, you

6   know, the notices that were filed like the witness list and

7   those things, I get to look at that.  But the actual

8   evidence, no way.  I'm not looking at that.  So that's how I

9   knew who the witnesses were and what they were going to

10  testify.  So that I could figure out well, that's stuff that

11  you typically would file with the court anyway.  But as to

12  the actual evidence, huh-huh.  So, I will get from whatever

13  you submitted, whatever you use will get put in and I'll get

14  to see that.  And so this will replace P-23, the present P-23

15  to 34 will now be replaced with the new P-23 and there will

16  be no 24 through 34, because they will not be considered,

17  correct?  Are we all on the same page?

18              MR. FILIPOVIC:  Yes, correct.

19              THE COURT:  Did you send that to the host?

20              MR. FILIPOVIC:  I'm sending it right now, Your

21  Honor.  And, okay.  I just did.  All right.  Network.  Send,

22  network disconnected, re-send.  Okay.  It went through.  It

23  looks like it went through on my end, Your Honor.

24              THE COURT:  Well, we have to see.

25              THE HOST:  Yeah.  I think I'm seeing it.  Okay.

Thornton - Direct                    158

```
1              THE COURT:  Okay.  So, it's still saying 23 to 24.
2    Are we --
3              MR. FILIPOVIC:  23 to 34, it says.
4              THE COURT:  Right.  So that's going to be replaced
5    with --
6              MR. FILIPOVIC:  There it is, it says 23 to 34.
7              THE COURT:  Right.  But it has everything in it, the
8    entire --
9              MR. FILIPOVIC:  Yes, the entire --
10             THE COURT:  All right.
11             MR. FILIPOVIC:  Yes, it does.
12             THE COURT:  Okay.  So are we going to label this 23
13   to 34 or we're going to just label it 23?
14             MR. FILIPOVIC:  That's whatever the court finds
15   easier, we could label it 23.  It's easier probably to label
16   it 23.
17             THE COURT:  Right.  So that P-23 is going to replace
18   23 through 34.  Because it's different than what you --
19   it's --
20             MR. FILIPOVIC:  Yes.
21             THE COURT:  -- some additional.  Okay.
22             MR. FILIPOVIC:  Yes.
23             THE COURT:  John, for the record, we're going to
24   list that is P-23 replacing 23 to 34.
25             (Plaintiff's Exhibit-23 marked for identification)
```

Thornton - Direct                    159

1         THE HOST:  Correct.  So 24 through 34 don't exist

2    anymore.

3         THE COURT:  They don't exist anymore.

4         THE HOST:  Okay.

5         MR. FILIPOVIC:  Correct.

6         THE COURT:  Okay.  And all we have is 23.  Okay?

7         MR. FILIPOVIC:  That's perfect.

8         THE COURT:  All right.  So we have the request for

9    admissions.  Is the general -- I can't -- can I scroll down

10   on this?  No, I can't.  John?

11        THE HOST:  I have to do it, what page do we want?

12   We don't want.  Well, keep going.  We're looking to make sure

13   we have the general objections.  She has, okay, and all that.

14   And then the next thing we should have is the request to sign

15   and then, then we have next, what's after that?

16        THE HOST:  That's it.  12 pages.  There's the

17   signature page technically.

18        THE COURT:  Is the admissions in there?

19        MR. FILIPOVIC:  Yeah.  The admissions are -- all in

20   there, Your Honor.

21        THE COURT:  Okay.  Hold on.  Okay.  I see them.

22   Keep going up, John.  Okay.  Well, we don't have the

23   interrogatories and we don't have the -- are they in there

24   too, and we just ignore?

25        MR. FILIPOVIC:  No, they're not in there, Your

Thornton - Direct                          160

1    Honor.

2              THE COURT:  Okay.  All right.  Now, Ms. Harper, with

3    that being said, do you object to the request for admissions

4    being admitted at this point so --

5              MS. HARPER:  Not now.

6              THE COURT:  Yes or no?

7              MS. HARPER:  No, Your Honor.

8              THE COURT:  Okay.  So P-23 is admitted as the

9    Sheriff's response to requests for admissions which are

10   deemed admitted to the extent whatever their admissions are

11   in their response.  Okay.  All right.  Now all of that, to go

12   back to Mr. Thornton and I'm hoping I'm pronouncing the right

13   name.  You want to ask him some questions with respect to

14   those requests for admissions, correct, Mr. Filipovic?

15        (Plaintiff's Exhibit-23 admitted into evidence)

16             MR. FILIPOVIC:  That is correct.  Since he's being

17   produced as the 30 B6 witness, yes.

18             MS. HARPER:  Objection, Your Honor.  He's not

19   (inaudible) for trial as a 30(b)(6) witness.

20             MR. FILIPOVIC:  Well, he was deposed as a 30(b)(6)

21   witness.

22             THE COURT:  Well, that doesn't mean anything.

23             MR. FILIPOVIC:  I think it does, Your Honor.  We

24   don't have an opportunity to request a 30(b)(6) witness,

25   other than through the deposition and we did that.

Thornton - Direct                    161

 1           THE COURT:  No, you could have -- Ms. Harper, you

 2    heard what he said that that's what you produced and that's

 3    how he's appearing at trial.  Ms. Harper?

 4           MS. HARPER:  He certainly represented the Sheriff's

 5    Civil Enforcement Unit of the Sheriff's Office, Your Honor.

 6    And we did not -- when we identified him as a witness which

 7    Plaintiff's counsel did not identify him as a witness but we

 8    identified him as a witness.

 9           MR. FILIPOVIC:  Yes, we did.  We identified Mr.

10    Thornton.  We (indiscern.).

11           THE COURT:  When we identified him as what?

12           MR. FILIPOVIC:  Witness list.  We have --

13           THE COURT:  John, can I see the witness list from

14    the plaintiff?

15           MR. FILIPOVIC:  Okay.  No, she's correct.  We have

16    him as -- yeah.  We have Office of the Sheriff, custodian of

17    records.

18           THE COURT:  Well, he's definitely not the custodian

19    of records.

20           MR. FILIPOVIC:  And they didn't -- they didn't bring

21    one, Your Honor.

22           THE COURT:  Well, did you ask them to?

23           MR. FILIPOVIC:  Yes, we did.  We put in the request

24    in the -- in the list.  We didn't issue a subpoena.

25           THE COURT:  Wait a minute.  Wait a minute.  You sent

Thornton - Direct                    162

1    them a subpoena saying -- did you send them a subpoena --

2              MR. FILIPOVIC:  No, we didn't send them a subpoena,

3    Your Honor.  We operated under the impression that your

4    procedure circumvents, there's no way to subpoena people for

5    this kind of event.  We don't know when they're going to

6    be --

7              THE COURT:  No way.  No way.  Counsel, I don't know

8    how you did a trial, but if I wanted somebody, subpoena them.

9    I don't know what to tell you.

10             MR. FILIPOVIC:  All right.  Well, that's fine.  We

11   don't need him, Your Honor.  We can proceed with -- with

12   these being admitted as they are.  I just have a few more

13   questions for Mr. Thornton.  That's all.  Okay.

14             THE COURT:  Okay.  So -- okay.  Right.  Go ahead

15   then, so --

16             MR. FILIPOVIC:  Okay.

17             THE COURT:  All right.  Go ahead.

18                  DIRECT EXAMINATION (CONT'D)

19   BY MR. FILIPOVIC:

20   Q.  All right.  Mr. Thornton, are we back?

21   A.  Yes.

22   Q.  I don't see you.

23   A.  Yes, I'm here.

24             THE COURT:  All right.  Flip back off, take the

25   documents off.  We're not using them.  So let's go back to

Thornton - Direct                              163

1    the full screen.  No longer -- okay.  Now, we're back.  All

2    right.  And Mr. Thornton, during this time period, you did

3    not discuss your testimony with Ms. Harper or Mr. Dormer,

4    right, Mr. Thornton?

5    A.  That is correct.  I did not.

6              THE COURT:  Okay.  All right.  Just want to make it

7    clear.

8         (Audio interruption)

9              THE COURT:  Somebody came back?  Never mind.  Oh,

10   hi, Eileen.  Thank you.  All right.

11   BY MR. FILIPOVIC:

12   Q.  Okay.  I'd like to bring forth the -- on the screen, I

13   believe, that would be City's exhibit, it's the deposition

14   testimony of Mr. Thornton.  I think it's City 29.  Pull that

15   up.

16        (City's Exhibit-29 previously marked for identification)

17        (Background talking)

18              THE COURT:  Somebody, please go on mute.

19   BY MR. FILIPOVIC:

20   Q.  Yeah.  Here we go.  Mr. Thornton, do you recall having

21   your deposition taken in this matter earlier this year or

22   yeah, it was this year?

23   A.  I thought it was last year.

24   Q.  Was it last year already?  Yeah.  Well, it was in January

25   or February of this year, wasn't it?

Thornton - Direct                    164

1           THE COURT:  It says on -- counsel, look at what it

2      says on the top.

3           MR. FILIPOVIC:  It's fine.

4      BY MR. FILIPOVIC:

5      Q.  You recall, obviously, you do recall?

6      A.  I do recall that I am deposed.  Yes, I do.

7      Q.  Okay.  That's fine.  And I asked you at that time, sir,

8      that if you believe that, Sheriff's -- you know what, I'll

9      read it.

10          THE COURT:  What page we're on?

11          MS. HARPER:  I'm going to object.  Well, I better

12     object now, Your Honor, because I think this looks like

13     impeachment testimony but it's improper impeachment.  I don't

14     -- what was he using this document for?

15          THE COURT:  Well, he's direct, on the direct.  Can

16     you impeach your own witness on direct?  What do are you

17     telling him, you can't?  I mean, you didn't call him as of

18     cross, so I don't know.

19          MS. HARPER:  I know, I know.

20          MR. FILIPOVIC:  All right.  That's fine.  That's

21     fine.  We'll pull, you know, we don't have to do it that way.

22     City's Exhibit 2.

23          (City's Exhibit-2 previously marked for identification)

24     BY MR. FILIPOVIC:

25     Q.  And sir, I'm going to direct your attention, Mr.

1   Thornton, to this document that's been pre-marked as City-2

2   and take a minute to review it, please.  It should be the

3   same document that was used in your deposition marked PS- 2.

4   A.  Okay.

5   Q.  Sir, have you seen this document before?

6   A.  Yes, it looks familiar.

7   Q.  Okay.  What does it purport to be, sir?

8   A.  Appears to be a bankruptcy.

9   Q.  A bankruptcy.  Could you elaborate?

10  A.  A notice of bankruptcy.

11  Q.  Okay.  And whose name appears on page one of this notice

12  of bankruptcy?

13  A.  Lyndel Topping.

14  Q.  Okay.  And what's the address there after his name?

15  A.  146 South 62nd Street, Philadelphia PA 19145.

16  Q.  Okay. And there is a -- a cover ups (phonetic) up above

17  that that shows something else.  It says, "To and company,"

18  could you read that?

19  A.  It says, "To Sheriff, company Sheriff."

20  Q.  Okay.  And then there's fax number, right?

21  A.  That is correct.

22  Q.  Do you recognize that number, sir?

23  A.  I do not.

24  Q.  Okay.  Do you know with your 13 years in -- in the, you

25  know, in various departments at the Office of the Sheriff, do

Thornton - Direct                        166

1   you know what fax number pertains to the Real Estate Unit?

2   A.  I do not.

3   Q.  Okay.  What about Civil Enforcement Unit?

4   A.  I do.

5   Q.  Okay.  And is, is that the number that you see up there

6   on the screen?

7   A.  For which unit?

8   Q.  For Real Estate Unit.

9   A.  I'm not sure exactly what that number is.

10  Q.  Okay.  But you do recall seeing this document, right?

11  You said that.  Okay.  So now I will, to refresh your

12  recollection if you don't know -- you just said that you --

13  you just testified that you've seen the document before and

14  that it's a notice of bankruptcy of Lyndel Topping, but you

15  do not recognize the number.  So to refresh your memory, sir,

16  I'm going to now pull up your deposition.

17  A.  Okay.  And I'm not looking to introduce your deposition.

18          MR. FILIPOVIC:  I'm only using this as to refresh

19  witness' recollection, Your Honor.

20          MS. HARPER:  Objection.

21          THE COURT:  Objection?

22          MS. HARPER:  He isn't remembering.  Have you

23  established that he's not remembering something?

24          MR. FILIPOVIC:  Yeah, he just said that he doesn't

25  remember that, what number is.  So he said --

Thornton - Direct                    167

1           THE COURT:  No, he said he doesn't recognize it.  He

2    said he doesn't recognize it.  He doesn't say he doesn't

3    remember.  He doesn't recognize the number.  So --

4           MR. FILIPOVIC:  Okay.

5           THE COURT:  -- can you use it to refresh his

6    recollection to help him recall if he recognizes.  Ms.

7    Harper, can he do that?

8           MS. HARPER:  Well, if he's able to with the

9    deposition testimony, maybe he can.

10          THE COURT:  I mean, all it means is he shows it to

11   him, he reads it and then he asked him the question again.

12          MR. FILIPOVIC:  Yes.

13          THE COURT:  I don't know.  All right.  What do you

14   want him to look at?

15          MR. FILIPOVIC:  Okay.

16   BY MR. FILIPOVIC:

17   So let's take a look at the page -- let's see here, page 19.

18          THE COURT:  Of his deposition?

19          MR. FILIPOVIC:  Oh, I'm sorry.  It will be page --

20   let's start with 17.

21          THE COURT:  Okay.  It's page 17 of the -- well, this

22   isn't his -- no, no, no.  We're talking about his deposition,

23   right?

24          MR. FILIPOVIC:  Yeah.

25          THE COURT:  So that was -- as exhibit what?

Thornton - Direct                    168

1            MR. FILIPOVIC:  That's City-29, I believe.

2            THE COURT:  Okay.  Okay.  Get us to page what 17?

3            MR. FILIPOVIC:  17.  Yes.

4            THE COURT:  Okay.  I don't get to see it because

5    this doesn't come into evidence.  He gets to read it to

6    himself.  Then you ask if that -- that refreshes.  I don't

7    need to see that because it won't come into evidence.

8    BY MR. FILIPOVIC:

9    Q.  Okay.  Sir, page 19.  If you, please would you mind?  It

10   says the question is. "Lieutenant Thornton, you --

11           MS. HARPER:  Objection.

12           THE COURT:  Uh-uh, uh-uh, uh-uh.  That's not how a

13   refresh recollection works.

14           MR. FILIPOVIC:  Okay.  He can read it himself.

15           THE COURT:  Refresh recollection means he reads it

16   himself.  You show him the document.  He reads --

17           MR. FILIPOVIC:  I was just -- you're right, Your

18   Honor.  You're correct.

19           THE COURT:  No.

20           MR. FILIPOVIC:  I just wanted to point him --

21           THE COURT:  No.

22           MR. FILIPOVIC:  -- just to where to start reading.

23           THE COURT:  If you want him to -- just tell him the

24   line and the page.  You don't have to put it in the record.

25   It doesn't go in the record.

Thornton - Direct                          169

1   BY MR. FILIPOVIC:

2   Q.  Page 19, sir, line 1, all the way through line 25.

3           THE COURT:  So you're going to have to tell the --

4   John, when you need him to move it up you know when he finish

5   the page say next keep --

6           MS. HARPER:  Your Honor, we have a hard copy we can

7   review, so.

8           THE COURT:  Okay.  And I don't need to read it.

9   BY MR. FILIPOVIC:

10  Q.  And then also, sir, read page 20.  And that's it.

11          (Witness reviews document)

12  A.  Done.

13  Q.  Okay.  Sir, having had the chance to review your

14  deposition testimony relevant portion I direct you to, do you

15  now have -- are you now able to tell me whether or not you

16  recognize the number 215-686-3971 as any particular fax

17  number within the Sheriff's Office?

18  A.  Yes, that fax number is the Real Estate Division.

19  Q.  Okay.  And according to -- back to C-2 now.

20  A.  Yes.

21  Q.  I'll ask you the same question.  I asked you at the -- at

22  the deposition, according to the C-2 document does it appear

23  that what you described was this a notice of bankruptcy of

24  Lyndel Topping was transmitted to that number?

25  A.  Yes.

Thornton - Direct                    170

1    Q.  And what's the date of such transmission and the time,

2    sir, if you will?  It's in the top of the document.

3    A.  It says 5/18 -- 5/8/2018 22:25 which is 10:25.

4    Q.  Okay.  I'm sorry, is that May 8th?

5    A.  May 8th, 2018.  Correct.

6    Q.  Thank you.

7            MR. FILIPOVIC:  Your Honor, at this time, I'd like

8    to move this into evidence.  This is a Plaintiff's Exhibit --

9    I don't know where up to now, but when it starts back from

10   twenty -- 24.

11           THE COURT:  What did you mark as it is what it is?

12   What did you mark it as?

13           MR. FILIPOVIC:  Well, this is particularly City's

14   Exhibit.  But we -- we have it as our own but we can enter it

15   as -- as you know, City-2, but it's a Plaintiff's Exhibit.

16           THE COURT:  Okay.  It doesn't -- it --

17           MS. HARPER:  Objection, Your Honor.

18           THE COURT:  Yes.

19           MS. HARPER:  There's no foundation.  The document

20   hasn't been authenticated.  This is not a document that Mr.

21   Thornton prepared.  It's not a document he said he received.

22   It's not a document that -- that the Sheriff's Office

23   received.  It's --

24           MR. FILIPOVIC:  He just said it was the document

25   that was transmitted to the Sheriff's Office and he read the

Thornton - Direct                    171

1    date.  He said he knows the fax number, what he said all

2    that.  And he said in his deposition.  I'm not sure what --

3    how -- how she can make that claim?

4            THE COURT:  Ms. -- Ms. Harper, can you believe

5    there's no foundation?

6            MS. HARPER:  I believe there's no foundation.

7    Moreover, we have to be careful because he was testifying as

8    to a document at his deposition.  I'm not sure if it's the

9    same document.

10           MR. FILIPOVIC:  Well, you're not sure but he said

11   it's the same document.

12           THE COURT:  Well, did we show him to see it was the

13   same document?

14           MR. FILIPOVIC:  Your Honor, the deposition has now

15   nothing to do with it.  He now said at trial, we used it to

16   refresh his recollection as to the number.  And he now said

17   today at trial, that that's the number to the Real Estate

18   Unit.  I then asked --

19           THE COURT:  Does -- is that the document that he saw

20   before you asked him would have probably made sense would

21   have been, have you seen this?  When have you seen it?  Did

22   he see it when it came?  Did he see it in connection with

23   litigation?  When did he see this?  That would help me figure

24   this out.  But I guess Ms. Harper can ask him that.

25           MS. HARPER:  Yeah.

Thornton - Direct                    172

1          THE COURT:  So -- so you're saying there's no
2     foundation because he doesn't -- you know, it says received?
3     Does he have any way of knowing if it was or wasn't?
4          MR. FILIPOVIC:  He said it was received, Your Honor.
5     What we're doing --
6          THE COURT:  Based on what?
7          MR. FILIPOVIC:  Well, that's -- that's not up to --
8     that's not my job to -- to decide.  He said he'd seen it.
9     And we're talking about a fax cover sheet.  It's very simple
10    document.  It says where it was sent, when it was received --
11    it says when it was received, the date, the time.
12         THE COURT:  So he's acknowledging that's when it
13    says is?
14         MR. FILIPOVIC:  Yes.
15         THE COURT:  If not, if you're offering the document
16    to say this is what the -- you've seen it and that's what it
17    says.  Only that that's what it says.  He doesn't have --
18         MR. FILIPOVIC:  You know, I'm offering it, Your
19    Honor.  Okay.  No, we're offering it, he said it was a notice
20    of bankruptcy.  We're offering it as a notice of bankruptcy
21    that the Sheriff's Real Estate Unit received.  And that's
22    according to that man's testimony.
23         THE COURT:  No, that man's testimony is that that's
24    what it says and that's the fax number.  And it says what it
25    said at the top.  What personal knowledge does he have that

                        Thornton - Direct                    173

1    they actually received it?  That's what you --

2              MR. FILIPOVIC:  He said it was received.  I asked

3    him when -- could you read the record?  He said it was

4    received.

5              THE COURT:  He said on the -- based on what was at

6    the top of the document is what you asked him to read across

7    on the top when it was --

8              MR. FILIPOVIC:  Okay.

9              THE COURT:  -- received and he read it on that.

10   So --

11             MR. FILIPOVIC:  Okay.

12             THE COURT:  -- based on the document.  So that's all

13   it if I'll admit it for the purpose that he read -- he saw

14   the document, the document says x and that's what it says.

15   As for proof, if he didn't actually get it, or he doesn't

16   have actual knowledge (inaudible) that to him.

17             MR. FILIPOVIC:  Okay.  I'm sorry.  Your Honor, sorry

18   -- is it this court's position that -- that -- this any fax

19   should have been received personally and directly on Mr.

20   Thornton's desk?  I mean, he's -- he's here as a

21   representative of the Office of the Sheriff.  What are we

22   talking about here?  He said that it was received, he

23   identified the fax number.

24             THE COURT:  He never.  Counsel, back up.  He said

25   based on what it said at the top of the document.  It appears

Thornton - Direct                    174

1   to have been on that --

2          MR. FILIPOVIC:  I don't really care based on what he

3   said what he said.  He said it.

4          THE COURT:  It is based on what he said.  You asked

5   him to, absent reading that on the top of the document, what

6   knowledge --

7          MR. FILIPOVIC:  Okay.

8          THE COURT:  -- that it was received.  And you want

9   me to do something with it that is not what I'm supposed to

10  do with it, counsel.  He acknowledged that this is the

11  document.  He acknowledged that that was the number.  And he

12  acknowledged that at the top of the document, it said it was

13  received by the Sheriff on that date.  That's what he's

14  acknowledging.

15         MR. FILIPOVIC:  Okay.  That's all I'm asking him to

16  acknowledge that --

17         MS. HARPER:  I object to the characterization of the

18  testimony there.

19         MR. FILIPOVIC:  -- I have nothing more besides that.

20         THE COURT:  What Ms. Harper what --

21         MS. HARPER:  I object to the characterization of the

22  testimony there.  The testimony will stand as versus received

23  versus transmitted.

24         THE COURT:  I'm sorry, what?

25         MR. FILIPOVIC:  He never said transmitted.

Thornton - Direct                    175

1          MS. HARPER:  The terms characterization of the

2     testimony as received versus transmitted.  I've lost the

3     thread here, but I'm -- I'm not sure that there was testimony

4     that that was received by the Sheriff's -- by the Sheriff's

5     Real Estate Unit.

6          THE COURT:  I mean, the document says what it says

7     and it means what it means.  Now, that's all I can give to

8     it.  He can't say anything else.

9          MR. FILIPOVIC:  Okay.

10         THE COURT:  You wanted the representative of the

11    Sheriff.  What else is he going to say?  This is what the

12    document is, that's what the document says.

13         MR. FILIPOVIC:  Okay.

14         THE COURT:  I mean --

15         MR. FILIPOVIC:  So let's --

16         THE COURT:  -- any.  I don't know what to tell you.

17         MR. FILIPOVIC:  That's fine, Your Honor.

18         THE COURT:  Well, I do not know --

19         MR. FILIPOVIC:  We're just creating a record here.

20    The record will speak for itself.

21         THE COURT:  Right, exactly.  So we don't need to

22    character -- look, he acknowledges he saw the document.  He

23    acknowledges that that's the fax number.  And he acknowledged

24    that at the top of the document, it says something.

25         MR. FILIPOVIC:  Right.

Thornton - Direct                    176

```
 1                THE COURT:  That's --
 2                MR. FILIPOVIC:  He said -- he said it was received.
 3     He said it was received.
 4                THE COURT:  He said the document, counsel.
 5                MR. FILIPOVIC:  Yeah, the document, yeah.
 6                THE COURT:  He said ask him to read the top of the
 7     document.
 8                MR. FILIPOVIC:  That's right.  I did.
 9                THE COURT:  That is it.  You didn't actually say, do
10     you know if they received it?  He's only talking about the
11     document.  I'm not going further than that and that's what
12     you want me to do.  That doesn't mean that they didn't --
13                MR. FILIPOVIC:  I don't want you, Your Honor, to do
14     anything besides admit it into evidence.  It's been
15     authenticated with the testimony that he's already provided.
16     That's all I'm asking.  We were moving -- we were moving to
17     admit --
18                THE COURT:  Ms. Harper was objecting to your
19     characterization of how you and why you wanted this admitted?
20     And I'm talking --
21                MR. FILIPOVIC:  As substantive evidence.
22                THE COURT:  Substantive evidence of this document
23     saying x, that's it.
24                MR. FILIPOVIC:  Okay.
25                THE COURT:  And it may be sufficient to get you
```

Thornton - Direct                    177

1    where you want but we need to be careful.

2              MR. FILIPOVIC:  Okay.  Sure.

3              THE COURT:  He never said I acknowledged they

4    received it.  He's saying that that document said that and

5    that's what you asked him.  And then you re-characterized

6    what he said.

7              MR. FILIPOVIC:  I don't mean to put words in

8    anyone's mouth, Your Honor.  We have plenty of other --

9              THE COURT:  But that's not the point, counsel.  The

10   point is don't re-character.  She was objecting to your re-

11   characterization of his testimony and his testimony was

12   simply as to what the document said.  That's it.  I can

13   admit --

14             MR. FILIPOVIC:  Yeah, that's fine.

15             THE COURT:  -- it for that purpose.

16             MR. FILIPOVIC:  That's fine.

17             THE COURT:  So she has a right to object to your re-

18   characterization of his testimony.  And I want to be clear

19   what I'm admitting.  I'm admitting that he said he saw it.

20   I'm admitting that he knows that that's the fax number, and

21   he's admitted that that's what it says at the top which I

22   can't see and I'm assuming I'll look at it.  That's it.

23             MR. FILIPOVIC:  That's fine.

24        (City's Exhibit-2 admitted into evidence)

25   BY MR. FILIPOVIC:

Thornton - Direct                           178

1   Q.  Let's move to C-3, if you will.  There it is.  Mr.

2   Thornton, I apologize for delay.  Are you still with us?

3   A.  Yes, I'm still here.

4   Q.  Okay.  Sorry, I can't see you there.  Sir, we have up on

5   the screen this document that's been pre-marked as City-3.

6   Do you know what that document is, sir?

7   A.  It looks like a document from Real Estate.

8   Q.  Okay.

9   A.  I'm not familiar with it.

10  Q.  Okay.

11          THE COURT:  You are or are not?

12  A.  I am not familiar.  This looks like different chains of

13  events that happened.  And what --

14  BY MR. FILIPOVIC:

15  Q.  Well, what does it say on the top letters that -- you

16  know, can you -- can you elaborate on -- on the -- the big

17  bold words there underneath the parenthesis and the case

18  number?

19  A.  It says -- where it says parenthesis?  The numbers in the

20  parenthesis?

21  Q.  All right.  Where it starts, "Sheriff's."

22  A.  I'm sorry.

23  Q.  Okay.  Does -- it say, "Sheriff's return of service,"

24  sir?

25  A.  Yes.

Thornton - Direct                         179

1    Q.  Okay.  And then below that which case does this appear to

2    pertain to, sir?

3    A.  Which case?

4    Q.  Yeah, there's a case number on the right above the

5    Sheriff's return of service.

6    A.  I can give you the numbers.  Do you want me to say the

7    numbers?

8    Q.  Do you see the number?

9    A.  I see it.

10   Q.  Okay.  And is that -- you see the number in the

11   parenthesis that starts with 1707-, you see that?

12   A.  Yes.

13   Q.  Okay.  And now, moving back to the -- the exhibit that

14   was just admitted, which was C, we were just talking about

15   it.

16            THE COURT:  C-3.

17            MR. FILIPOVIC:  C-2.  C-2.

18            THE COURT:  Oh, C-2?  C-2.

19            MR. FILIPOVIC:  Yeah, C-2.

20   BY MR. FILIPOVIC:

21   Q.  You see in the middle of the page, sir, where it says,

22   "Book Writ, Book/Writ and that number?

23   A.  I see it.

24   Q.  Okay.  Now is that the same number, sir, that is on -- on

25   C-3, that's in the parenthesis?

Thornton - Direct                                    180

1    A.  Yes, it's the same one.

2    Q.  And what, okay.  What does that mean, do you know Book

3    and Writ?

4    A.  I'm not familiar with the Real Estate Division.  It's --

5    Q.  Okay.

6    A.  I guess, it pertains to a property.

7    Q.  Okay.  Going back to C-3, sir.  Does anyone outside of

8    Office of the Sheriff have the ability to enter data into

9    this particular type of document?

10            MS. HARPER:  Objection.

11            MR. FILIPOVIC:  To -- as to what?

12            MS. HARPER:  What -- it lacks a foundation.  I don't

13   know (inaudible) what is the -- he hasn't --

14   BY MR. FILIPOVIC:

15   Q.  Has anybody else -- okay.  Sir, is this document created

16   by the Sheriff's -- the Office of the Sheriff of

17   Philadelphia?

18   A.  Yes.

19   Q.  Philadelphia County?  Yes, it is.  Is that your answer?

20   A.  Well, I don't work in the Real Estate Division.  So I

21   don't know --

22   Q.  It's fine.  I'm not asking you about any division.  I'm

23   sorry to cut you off, but Sheriff of the Office of

24   Philadelphia, is this the entity that created this particular

25   document?

Thornton - Direct                    181

1   A.  Again, I don't work for the Real Estate Division.  I

2   don't know who will put this information in.

3   Q.  I'm not asking you who put it in?  Did I ask you that?

4   No, I did not.  Please answer the question asked.  I'm

5   just --

6           THE COURT:  Counsel -- counsel, his question is --

7   counsel, let's cut to the chase.  He doesn't know.  He said,

8   I don't work for the Real Estate, so I don't know.  But you

9   want him to say he knows when he told you three times, I

10  don't know.

11          MR. FILIPOVIC:  No -- no, I do not want him to say

12  anything.  I just want to know, does he know --

13          THE COURT:  His answer was, I don't know.

14          MR. FILIPOVIC:  That's not even what he said, Your

15  Honor.  But --

16          THE COURT:  I don't know what you want him to say?

17  He doesn't know.

18  BY MR. FILIPOVIC:

19  Q.  Well, I'm just -- I just want an answer to the question.

20  And the question is, did somebody, anybody from entire Office

21  of Philadelphia County Sheriff create this particular doc --

22  document to your best knowledge?  Yes, or no?

23  A.  I don't know, counsel.

24  Q.  You don't know.

25  A.  I don't work for the Real Estate Division.

Thornton - Direct                    182

1   Q.  So did it --

2   A.  I don't know any of the operations of the Real Estate

3   Division.

4   Q.  Okay.  Is Real Estate Division within the Office of the

5   Sheriff of Philadelphia County?

6   A.  Yes.

7   Q.  Okay.  Okay.  All right.  Can you read, please, below

8   middle of the page underneath the -- where it says -- well,

9   let's go by the date.  There's dates on the left-hand side

10  and then five 5/8/18, 5/9/2018.  Can you see what it says

11  there?

12  A.  Yes, sir.

13  Q.  What does it say?

14  A.  "5/8/2018 defending attorney.  5/9/2018 bankruptcy filed

15  in Sheriff's Office."

16  Q.  All right.  Is there any way that anybody who does not

17  work for the Office of Philadelphia Sheriff in any division

18  or whatsoever could have created that document?

19  A.  Could have created the document?

20  Q.  Yeah.

21         MS. HARPER:  Objection.  Calls for speculation.

22  BY MR. FILIPOVIC:

23  Q.  I'm sorry.  Okay.  Calls for speculation.  Okay.  Who

24  signed this document?  Whose signature appears there on the

25  bottom?

Thornton - Direct                    183

1  A.  Jewell Williams, Sheriff.

2  Q.  Okay.  And so all these divisions are -- were -- at that

3  relevant point in time, they were all reporting to Mr. Jewell

4  Williams, correct?

5  A.  That is correct.  That is correct, sir.

6  Q.  Thank you.  All right.

7             MR. FILIPOVIC:  Your Honor, I would move to admit

8  this, he's brought here.

9             THE COURT:  Admit what?

10            MR. FILIPOVIC:  Admit this document into evidence.

11 And the basis for admission is just that the witness who's

12 here in his capacity as the representative of the

13 Philadelphia Sheriff has testified that this was signed by

14 the Sheriff.

15            THE COURT:  And?

16            MR. FILIPOVIC:  And right.  And so him being the

17 representative of the Sheriff's Office, that the document is

18 authenticated.  So I move to admit that.

19            THE COURT:  He doesn't recognize the document.  So

20 how's he going to authenticate it?

21            MR. FILIPOVIC:  He doesn't have to recognize

22 every --

23            THE COURT:  Do you care, Ms. Harper?

24            MR. FILIPOVIC:  He doesn't have -- Your Honor, he

25 doesn't have to recognize.  A representative of the entity

Thornton - Direct                    184

1    doesn't have to recognize every single document that exists

2    in that entity individually.  All he has to do is say that,

3    yeah, this document was signed by the Sheriff.

4              THE COURT:  It could have been something you

5    created.  Counsel, that's --

6              MR. FILIPOVIC:  I created?

7              THE COURT:  Counsel, that's not the point of the

8    matter.  In order for it to be authenticated, he has to

9    recognize it.  I'm not saying that you would have created it,

10   but somebody could create a document, put the Sheriff's

11   signature and say, oh, therefore, because it's got his

12   signature, it gets admitted.  They have to recognize, say

13   this is part of it.  Yes, it's ours and yes it's our

14   signature.  He's already said he doesn't recognize and he

15   doesn't know anything about it, other than it has the

16   Sheriff's -- what personal knowledge, and we're going to go

17   back to the rule that you were relying on.  It has to be that

18   the person and the evidence is something that the person

19   recognizes and is -- and in supporting that document in

20   support of what they recognize.  He doesn't recognize this.

21             MR. FILIPOVIC:  Okay.  I understand, Your Honor.

22   Fair enough.  This is, however, non-physical evidence, this

23   is a business record.  So --

24             THE COURT: A business?  Well, then who's

25   establishing the business record?  What's the basis for their

Thornton - Direct                              185

1   business record?

2   BY MR. FILIPOVIC:

3   Q.  Lieutenant Thornton, do --

4           THE COURT:  He just said he does not recognize it,

5   counsel.  And if -- even if you --

6           MR. FILIPOVIC:  All right.

7           THE COURT:  -- custodian of record from the

8   Sheriff's Office, and they said, I don't recognize this.  I

9   don't know what this is.  I have no familiarity with it.  How

10  would he get it other than you said it's got his signature on

11  it?  You still have to establish a foundation.  You can't

12  just say --

13          MR. FILIPOVIC:  And foundation -- Your Honor, let's

14  not forget that we did identify the book and the writ number

15  in the caption of the document it being the same as what he

16  did recognize.

17          THE COURT:  That doesn't mean, you could give me any

18  document that has in the record.

19          MR. FILIPOVIC:  All right.

20          THE COURT:  He said he does not have personal

21  knowledge.  He hasn't seen it.  And even if he's in the

22  representative of the Sheriff -- if the Sheriff was there,

23  it's his self.  And he would say I never saw this.  I don't

24  know what this is.  How would he --

25          MR. FILIPOVIC:  Sure.

Thornton - Direct                    186

1          THE COURT:  -- (inaudible)?  Somebody has got to

2    authenticate it.  And based on the testimony, I don't see any

3    authentication.  Nobody's saying I recognize this document.

4          MR. FILIPOVIC:  Uh-huh.  Okay.

5          THE COURT:  You were trying to get it in on to the

6    business record, somebody's got to say I recognize this

7    document.  And yes, it's the documents we keep.  And this is

8    -- he doesn't know anything about the Real Estate.  There's

9    no way I can admit that from -- based on his testimony.  Or

10   maybe the next witness can -- can authenticate it for you.

11   But he can't.

12          MR. FILIPOVIC:  Sure.  That's fine, Your Honor.

13   Understood.

14          THE COURT:  I'm not saying that -- I'm just saying

15   based on this -- this witness, I can't oh, what the heck

16   happened here?  Based on this -- oh, my goodness – based on

17   this witness I can't do it.  I mean, I --

18          MR. FILIPOVIC:  Okay.

19          THE COURT:  -- to tell.

20          MR. FILIPOVIC:  That's fine.

21          THE COURT:  All right, next?

22          MR. FILIPOVIC:  We're going to -- let's see here.

23   There's another one I'm just quickly searching for it.

24          THE COURT:  Yeah.  I mean, there may be another way

25   to do it.  I'm just saying this is not the document.

Thornton - Direct                187

1           MR. FILIPOVIC:  Well, if we had the custodian of the

2    records here.

3           THE COURT:  Well, did you tell them to bring him?

4    Did you --

5           MR. FILIPOVIC:  No, we -- we didn't subpoena him.

6    But we, you know --

7           THE COURT:  Then --

8           MR. FILIPOVIC:  -- we thought -- Your Honor, we

9    thought that your order for the emergency trial procedure,

10   you know --

11          THE COURT:  Did I say my order tell them to produce

12   -- to just -- with to -- did I say you don't have to comply

13   with the rules for a trial?  Did I suspend those?  Counsel,

14   even in a regular trial if you want somebody to be produced,

15   you subpoena them?

16          MR. FILIPOVIC:  Well, no, that's what you do in the

17   regular trial.  But in a trial like this --

18          THE COURT:  No, this is a regular trial.

19          MR. FILIPOVIC:  Okay.

20          THE COURT:  This is a regular trial.  The only -- I

21   think, I asked you to do ahead of time was to produce -- to

22   give me a list of your witnesses and a list of the documents

23   so that -- because we were doing this by Zoom.

24          MR. FILIPOVIC:  Okay.

25          THE COURT:  You think because we're doing this via

Thornton - Direct                    188

1   Zoom that the rules go out the window?  No.

2              MR. FILIPOVIC:  No, I do not, Your Honor.  I do not.

3              THE COURT:  Then you didn't subpoena them.  I don't

4   know what to tell you.

5              MR. FILIPOVIC:  Yeah.  That's fine.

6              THE COURT:  I don't know what to tell you.  I mean,

7   I --

8              MR. FILIPOVIC:  That's fine.  I'll request for

9   admissions.

10             THE COURT:  Don't cut me off.

11             MR. FILIPOVIC:  That were admitted.  Sorry.  I'm

12  sorry.

13             THE COURT:  Do not cut me off when I'm talking.

14             MR. FILIPOVIC:  I apologize.

15             THE COURT:  Okay?

16             MR. FILIPOVIC:  I apologize, Your Honor.

17             THE COURT: So, I'm getting -- I'm back to getting

18  annoyed that you didn't do something and now it's the City's

19  fault that they didn't -- the Sheriff's fault that they

20  didn't have the custodian of record -- what you got, you

21  know, I --

22             MR. FILIPOVIC:  That's fine.  That's fine.

23             THE COURT:  All right, next.

24             MR. FILIPOVIC:  Okay.  I have only one more just for

25  this particular witness.  This is notices -- notices I just

Thornton - Direct                    189

1   want to go on.  I'm sorry.  Notices.  Can we pull up P-11,

2   please?

3   BY MR. FILIPOVIC:

4   Q.  Mr. Thornton?

5   A.  Yes, sir.

6   Q.  Sorry.

7          MR. FILIPOVIC:  I'll just ask the Court to scroll up

8   a bit, please.

9          THE COURT:  What page?  Okay.

10  Q.  There it is, P-11.  Okay.  Mr. Thornton, you had earlier

11  testified that you were with the Civil Enforcement Unit and

12  that there is a particular fax number, that's particular to

13  faxing for -- to that unit.  And I'm going to direct you to

14  take a look at the screen here.  This is P-11.

15          THE COURT:  That's P-10.

16          MR. FILIPOVIC:  P-10.  Okay, then it can be P-10.

17  It's fine.  We can stay on P-10.

18  BY MR. FILIPOVIC:

19  Q.  Sir, the fax number to the Civil Enforcement Unit, do you

20  see it on the screen now?

21  A.  Yes, I do.

22  Q.  Okay.  And could you read it for the Court, please?

23  A.  1-215-686-3555.

24  Q.  Okay.  And what does -- does it -- does the document that

25  you're looking at -- and how many page is that to this

Thornton - Direct                    190

1   document?

2   A.  It looks like two.

3   Q.  Two?  Okay.  So sir -- so since this is a number to your

4   unit, are you more familiar with the faxes that -- that come

5   in to your unit?

6   A.  Am I more familiar with the faxes that come into my unit?

7   Q.  Yeah, correspondence that comes to your unit?

8   A.  Familiar as into?

9   Q.  Familiar as in you may have seen it before.

10          MS. HARPER:  Objection.  He's calling for

11  speculation.

12  BY MR. FILIPOVIC:

13  Q.  Well, have you seen this document before?

14  A.  This here document?

15  Q.  Yes.

16  A.  Only during this period of the trial.

17  Q.  Okay.  Fair enough.  What do you -- what does it

18  represent?  Can you tell the Court what -- what it is?  What

19  does it look like to you?

20  A.  It looks like a bankruptcy.

21  Q.  How many notices of bankruptcy have you seen in your --

22  in your line of work in the Civil Enforcement Unit?

23  A.  A lot, can't give you the nomination.  I'll say at least

24  a 100, maybe.

25  Q.  At least a 100.  Okay.  And how many hat were faxed or

Thornton - Direct                    191

1    submitted by facsimile?

2    A.  I really can't tell you the nomination.

3    Q.  Okay.  More than 10?

4    A.  Yeah, I would say than 10, yes.

5    Q.  Okay.  And is this what they look like, sir, as this P-

6    10?

7    A.  Yes.

8    Q.  Okay.  So do you have any reason in the universe to

9    believe that this particular document P-10 was not, in fact,

10   sent and received by the Real Estate or by the Civil

11   Enforcement Unit?

12          MS. HARPER:  Objection.  Again, calls for

13   speculation.

14          MR. FILIPOVIC:  No, I'm asking him if he has cause

15   to believe that -- that -- that it wasn't received.  Cause to

16   believe so he can say specifically yeah, I doubt it because

17   I've seen so many of them and this one is missing this or

18   there is no that, that's what I'm asking.  There's no

19   speculation there.

20          THE COURT:  Ms. Harper?  He said based on what it

21   looked like, what he caused him to believe he didn't -- they

22   didn't receive it.

23          MS. HARPER:  Okay.  I guess he can answer.

24          THE COURT:  Answer the question.

25   A.  Now, can you just repeat the question to make sure I'm

Thornton - Direct                    192

1   answering correctly?

2   BY MR. FILIPOVIC:

3   Q.  Sure.  Based on all of your experience that you've just

4   told us about, do you have any cause in the universe to

5   believe that this particular document was not sent and

6   received by the Office of the Sheriff Civil Enforcement Unit?

7   A.  There shouldn't be a reason it's -- it was sent and

8   received to the office.

9           THE COURT:  So what was that, a yes or no?

10  A.  Yes.  Yes, counsel.  Yes, sorry, Your Honor.  Sorry.

11          THE COURT:  Yes, what?

12  A.  Yes, it was received.

13          THE COURT:  Yes, it was received, okay.

14  BY MR. FILIPOVIC:

15  Q.  Okay, thank you.  And can you tell me the date that the -

16  - that it appears to have been received on?

17  A.  May 10, 2018.

18  Q.  Thank you.

19          MR. FILIPOVIC:  Okay, Your Honor, I'm going to move

20  to admit this into evidence now for a substantive evidence of

21  notice -- of Notice of Bankruptcy to Civil Enforcement Unit

22  received on the date that the witness has just testified to.

23          THE COURT:  And -- never mind.  Ms. Harper, what's

24  your position?

25          MS. HARPER:  Objection, Your Honor.  He testified

Thornton - Direct                193

1    that he's only seen this in the context of trial.  I don't --
2    we've established that he's -- he's just testified that -- it
3    looks like it was received, but he -- he's only testified
4    that he's seen this in the context of trial, but I guess --
5              MR. FILIPOVIC:  Again, Your Honor, Ms. Harper
6    elevates this burden to anyone in the sheriff's -- or him
7    having to see every single notice in order to authenticate
8    it, that's not how authentication works.  He -- he --
9              THE COURT:  Authentication is based on his -- the
10   witness's knowledge.
11             MR. FILIPOVIC:  Correct.  And he just said that --
12             THE COURT:  And he acknowledges that -- okay, you
13   came or use the --
14             MR. FILIPOVIC:  Yeah.  It was received.
15             THE COURT:  All he said was he's -- he's saying in
16   the context of what he's looking at, appears to have been
17   received.
18             MR. FILIPOVIC:  That's right.  Of context that he's
19   looking at is --
20             THE COURT:  So only that -- so it only -- it's not
21   based on his personal knowledge.  It just says, this is the
22   -- this is the fax number, but it says, based on that must
23   have been received, that's the only --
24             MR. FILIPOVIC:  Yeah.
25             THE COURT:  I'm going to give to it.  He hasn't seen

Thornton - Direct                194

1    it before that.  I don't know what you want me to do with it,

2    counsel.  You want me to give him some, just like your

3    witness personally said, I got.  I saw this.  I handled this.

4    He's --

5              MR. FILIPOVIC:  Your Honor, it -- I'm sorry to

6    interrupt.

7              THE COURT:  So let me go what authentication says.

8    Let's look at the Rule 9 or was it 901?

9              MR. FILIPOVIC:  Yeah, person with knowledge doesn't

10   have to be -- person with knowledge --

11             THE COURT:  It has to be personally acknowledged

12   that he -- counsel, you're trying to -- you're trying to say

13   person with knowledge.  He saw this for the first time.  All

14   he's saying is this document says what it says, based on my

15   review of this for a trial, not had he not been shown this

16   document before trial, how would he authenticate it?  So

17   you're --

18             MR. FILIPOVIC:  By having seen, by having knowledge,

19   Your Honor, a knowledge would be all the many, many notices

20   that he's seen and he said that there is -- he has no reason

21   in the universe to believe that this particular Notice of

22   Bankruptcy wasn't received.

23             THE COURT:  Counsel?

24             MR. FILIPOVIC:  Yes, Your Honor.

25             THE COURT:  Not all -- all it says is that I've seen

Thornton - Direct                        195

1   it.  I don't -- based on what I'm seen, I -- I don't believe

2   it wasn't received.  That's the thing.

3            MR. FILIPOVIC:  Correct.

4            THE COURT:  He's not saying this is the exact

5   document because I saw it before or I would -- all he can say

6   is, yes, the document you showed me says what it says, and I

7   don't believe it should saying anything else.

8            MR. FILIPOVIC:  He said that I don't believe that it

9   wasn't received.  He says it was received.

10           THE COURT:  How does mean -- counsel, I will give

11   the weight which is, I saw this document in connection with

12   trial.  He never saw it before.

13           MR. FILIPOVIC:  That's fine, Your Honor.  The --

14           THE COURT:  So the whole point of the matter is, you

15   want him to say and you want me to find that this is a

16   document received by the sheriff and that they -- it is what

17   it is and it said what it said.  I can only say that he's

18   saying, yes, you showed me this based on what you showed me.

19   It appears that the sheriff, this is went to the sheriff.

20   That's the -- and that's not what -- let's see what 901 says,

21   Rule 901.  Let's go to 901.

22           MR. FILIPOVIC:  Your Honor, the representative of

23   the -- again, of the corporate entity or an entity, any

24   business entity doesn't have to have seen every single

25   document, the custodian of records doesn't have -- hasn't

Thornton - Direct                196

1    seen every single document.

2          THE COURT:  Well, the custodian of record goes and

3    assembles it and says, "This was in our records.  I can

4    testify that this was in our records and this is what we kept

5    in the ordinary course.  We have it."  Okay?  This thing, you

6    showed me a document, this what it looks like.  (Indiscern.)

7    he knows you made it up.  I mean, that's the point of the

8    matter.  That's why we want authentication that the document

9    is testimony of a witness with knowledge.  The only knowledge

10   he has is what you showed him.  And you kind of --

11         MR. FILIPOVIC:  No, he has a little more knowledge

12   than that.  He recognized the fax number as his unit.

13         THE COURT:  Okay.  But counsel --

14         MR. FILIPOVIC:  He can read that it was received

15   successfully.

16         MS. HARPER:  He didn't create the document.  He has

17   only seen the document in the context of this trial.  I don't

18   see how he could have authenticate a document and that it's

19   not his duty to do so.  There's nothing -- we talked about

20   this records custodian.  That's not.  Not presenting him as

21   the records custodian, what he -- what he --

22         THE COURT:  Even as a representative, let's back

23   off.  As a representative of the sheriff, or even if the

24   sheriff was here.  Let's back off.  If the sheriff was here

25   and you'd asked the sheriff, "Did you see this?"  And the

Thornton - Direct                    197

1    Sheriff says, "I've never seen this.  I don't even know what

2    it is.  But I saw it in connection with preparation for

3    trial.  It looks like something that was sent to my office."

4    Does that mean that it was sent to his office and they

5    actually can authenticate it?

6              MR. FILIPOVIC:  No, no.

7              THE COURT:  But saying so.  So I'm --

8              MR. FILIPOVIC:  Then I lay more foundation, I'm

9    sorry.  I lay more foundation --

10             THE COURT:  The foundation is that he's --

11             MR. FILIPOVIC:  -- by asking him how many -- how

12   many Notices of Bankruptcy has he seen.  He said over a 100.

13             THE COURT:  That doesn't mean that -- does that mean

14   he saw this one?

15             MR. FILIPOVIC:  It doesn't have to be this one.  I

16   asked him another way, Your Honor.  I asked him another way.

17             THE COURT:  Counsel --

18             MR. FILIPOVIC:  But that's fine.

19             THE COURT:  He has not seen -- there is no testimony

20   that if we had the sheriff here today, that you can

21   authenticate this with the sheriff because the sheriff would

22   have to say, "I've seen this, got it, I recognized it."  Now

23   you can have it in first.  You can argue that, you know, you

24   can make your argument that, you know, this -- this is what

25   it is.

Thornton - Direct                         198

1      But for me to authenticate it, I don't see how I do

2   that.  All he said was -- and you can use that was, you know,

3   he said he saw a document.  I don't see how I authenticate

4   that, because again, if the sheriff was here, if the sheriff

5   represent and you asked the sheriff, "Have you ever seen

6   this?" and the Sheriff said, "No, I've never seen this.  Yes,

7   it says, it went to my office.  I think it was sent,

8   appears," how then would that authenticate the document if

9   the sheriff said I never saw it other than in preparation of

10  trial.  Authentication is to say, this document is what it

11  says it is.  That's why you authenticate.  And this guy is

12  only saying, I saw it at trial.  The document says what it

13  says, okay, that's not authentication.

14          MR. FILIPOVIC:  That's fine, Your Honor.

15          THE COURT:  I think (indiscern.) saw it.

16          MR. FILIPOVIC:  That's fine.

17          THE COURT:  So I mean, I don't know what you want me

18  to do.  I --

19          MR. FILIPOVIC:  Admit into evidence, Your Honor.

20          THE COURT:  I'm not admitting it because it's not

21  authenticated.

22          MR. FILIPOVIC:  Okay.  We'll move on.

23          THE COURT:  I can take his testimony.  You can say

24  that he testified that he recognized something, and this is

25  the number and then you can put your witness on to say I sent

Thornton - Direct                    199

1    it there.  There's a way to get there, but you can't ask me

2    to circumvent the rules.

3            MR. FILIPOVIC:  I'm not asking you to do that, Your

4    Honor.

5            THE COURT:  It's not authenticated.  He doesn't

6    recognize it.  It's something he only saw in trial.  He

7    doesn't know if the sheriff has it.  He doesn't know any of

8    that other than what this document says.  And he agrees that

9    it says what it says.  That's not authentication.

10        Again, if the sheriff was there testifying, you couldn't

11   get him to authenticate it because he never saw it and

12   doesn't even know if it came there.  He can admit what it

13   says.  That's not authentication.  Denied.  Next.

14           MR. FILIPOVIC:  Okay.

15   BY MR. FILIPOVIC:

16   Q.  Mr. Thornton, just to cut to he chase here.  Did you

17   personally see any of the -- do you -- did you ever

18   personally see -- well, let me strike that.  Did you

19   personally review any of the notices of the bankruptcy in the

20   Civil Enforcement Unit?

21   A.  Did I personally review the notice of bankruptcies?

22   Q.  Yeah, the notices of the bankruptcy.

23   A.  When they come through?

24   Q.  Yeah.

25   A.  Yeah, look at them, yes.

Thornton - Direct                          200

1   Q.  Okay.  But you didn't look at this particular one,

2   correct?

3   A.  No, I did not.

4   Q.  Okay.  Mr. Thornton, is there -- in the -- let's just see

5   this, sorry.  What would be the -- are you familiar with

6   Officer Taylor, Jetaria Taylor?

7   A.  Yes.

8   Q.  Okay.  Are you familiar at all with any of her work in

9   connection with serving any notices on the particular

10  property that's in question here today?

11              THE COURT:  What -- who -- Ms. -- who?

12              MR. FILIPOVIC:  What does Ms. Taylor do --

13              THE COURT:  I'm familiar with Ms. Taylor.

14              MR. FILIPOVIC:  Yeah.

15  A.  So the first question you ask, do I -- am I familiar

16  with, I just want to be clear exactly what are you asking me,

17  counsel?

18  BY MR. FILIPOVIC:

19  Q.  Okay.  Sure.  I'll rephrase that.  In fact, let's strike

20  that.  Are you familiar with Officer Jetaria Taylor within

21  the sheriff's office?

22  A.  Yes.

23  Q.  Okay.  And do you know if she had any connection with

24  serving any writs or any notices, any notices in this

25  particular matter at this particular property, 142 South 62nd

                        Thornton - Direct                    201

1    Street?

2    A.  Yes, based on -- yeah, the information received in

3    preparation for trial, yes.

4    Q.  So when did you receive this information in preparation

5    for trial?

6              MS. HARPER:  Objection.  Objection.  I think that'd

7    be attorney-client privilege.

8              THE COURT:  She's asserting client privilege.

9              MR. FILIPOVIC:  Attorney-client privilege as to when

10   -- he -- he's saying that he's only seen it in preparation

11   for the trial.  I'm -- how long before the trial?  I mean,

12   you know, do we have to go back to his deposition?

13             THE COURT:  I don't know you -- her answer is

14   attorney-client.  Are you saying this yes or no.  I -- I

15   don't know what to tell you.

16             MR. FILIPOVIC:  I don't think it's attorney-client,

17   Your Honor.  He --

18             THE COURT:  Ms. -- Ms. Harper, why is it attorney-

19   client privilege?

20             MS. HARPER:  No.  Mrs. -- Captain Thornton just

21   testified that he learned about Ms. Taylor -- Sergeant

22   Taylor's connection to this service of documents in

23   preparation for trial.  Now, the next question was when did

24   he learn about it.

25             THE COURT:  He said in preparation for trial.

Thornton - Direct                      202

1          MS. HARPER:  Wait, I mean, I think it's a asked and

2     answered.  Objection, asked and answered.

3          THE COURT:  Counsel?

4          MR. FILIPOVIC:  Okay.

5     BY MR. FILIPOVIC:

6     Q.  Mr. Thornton, let's go back to your -- were you in

7     preparation for this trial before you took your deposition?

8     A.  Yeah.

9     Q.  Yeah.  Like in February or in --

10    A.  Yeah, sorry, yes.

11    Q.  Okay.  Yes?  You were preparing for the trial and --

12    A.  That I'm not sure.  I'm clear exactly --

13         THE COURT:  Okay.  Wait, wait, wait a minute, wait a

14    minute.  Wait a minute.  One, you both can't talk.  So maybe

15    you'd might ask him what does he mean as preparation for

16    trial, counsel, that might make it easy for everybody.

17    BY MR. FILIPOVIC:

18    Q.  Yeah, what do you mean by preparation for trial?

19    A.  Well, it was understanding to me that Sergeant Taylor was

20    involved with something with this particular property and

21    there was a bankruptcy and then there was a suit against the

22    Philadelphia Sheriff's Office and there were multiple

23    attempts to the property.  So that's what my knowledge of

24    Jetaria Taylor and this particular property, multiple notices

25    were sent to the property, things of that nature.

Thornton - Direct                        203

1   Q.  Okay.  That's what I want to ask you about.  So I believe

2   that you took your deposition on December 19th, 2019, correct

3   me if I'm wrong.

4   A.  Yes, it was at -- sometime in the end of last year.

5   Q.  Okay.  So I ask you then, I'm going to ask you now, do

6   you know which deputy went out to serve the -- the writs and

7   notices to vacate on this property?

8   A.  Yes, it was Sergeant Taylor, Jetaria Taylor.

9   Q.  Okay.  Do you know how many times?

10  A.  Two times.

11  Q.  Two times.  When you say two times, you mean on two

12  occasions or two -- two notices?

13  A.  It was two occasions that she would, had been at the

14  property.

15  Q.  Okay.  And do you know when the first occasion that she

16  was in the property?  No, strike that.  What is it -- what --

17  do you know what the -- Deputy Taylor did when she got there?

18  How many notices did she serve?

19          MS. HARPER:  Objection.  This is -- we have – we

20  have Jetaria Taylor here.  Sergeant Taylor is here.

21          MR. FILIPOVIC:  Right.

22          MS. HARPER:  Calling for speculation because, you

23  know, hearsay, I mean, (indiscern.).

24          MR. FILIPOVIC:  No, it's -- it's not hearsay to ask

25  what she does -- how many times she served the notice.

Thornton - Direct                        204

1          THE COURT:  The next question is, what she did when
2   she got there.
3          MR. FILIPOVIC:  Yeah.  Which -- that's right.
4          THE COURT:  How would he know if he wasn't there and
5   that's what objecting to, calls for speculation.
6          MR. FILIPOVIC:  Well, he did know in his deposition,
7   Your Honor.  Did you mean you'd like him to read?
8          THE COURT:  Well, then ask him at his deposition.
9   You know --
10         MR. FILIPOVIC:  Ask him at his deposition?
11         THE COURT:  I mean, just use his -- counsel, we're
12  not going to play games here.
13         MR. FILIPOVIC:  No, I'm not.
14         THE COURT:  Refresh his recollection.  He said he --
15         MR. FILIPOVIC:  He hasn't said he didn't know yet.
16  I can't do that.
17         THE COURT:  Counsel, she's objecting because you
18  said speculation and the fact that --
19         MR. FILIPOVIC:  I didn't say speculation.
20         THE COURT:  She's --
21         MR. FILIPOVIC:  She said speculation.
22         THE COURT:  You know what, I'm going to take a break
23  right now.  We're going to take a break because I already see
24  what's going on and I'm getting ( inaudible) --
25         (Off the record)

Thornton - Direct                                    205

1          THE COURT:  All right.  Counsel, we're back on the

2    record.  I think where we left was, Ms. Harper, you were

3    objecting to something.  I don't recall what.  Oh, is that

4    where we were?  My last thing says, objection, calls for

5    speculation.

6          MS. HARPER:  I think we're talking about Sergeant

7    Taylor's activity in the house, yes.

8          THE COURT:  Okay.  And the question is, if I recall,

9    do you know what Ms. -- Sergeant Taylor did when she was at

10   the premises.  And you are objecting on the ground that is

11   calls for speculation, correct?

12         MS. HARPER:  Yes, Your Honor.

13         THE COURT:  Sustained.  Let's move on.  You can ask

14   him questions regarding Sergeant Taylor that continue with

15   that line of questioning and if you chose -- so chose.

16         MR. FILIPOVIC:  Okay.  And I apologize to the court.

17         THE COURT:  Counsel, there is no need to apologize.

18   There's --

19         MR. FILIPOVIC:  Okay.

20         THE COURT:  You know --

21         MR. FILIPOVIC:  I have.

22         THE COURT:  It is what it is.  I should not be as

23   easily frustrated.  I'm -- I'm fine now.  Okay.

24   BY MR. FILIPOVIC:

25   Q.  Lieutenant Taylor -- oh, Lieutenant Thornton, sorry.  You

1    said that Sergeant Taylor went out there twice, correct?

2    A.  That is correct, sir.

3    Q.  What leads you to believe the Civil Enforcement Unit.

4    Q.  And could you elaborate on that practice?

5    A.  Sure.  Once we receive a writ of possession, the deputy

6    assigned to a particular area where that property is, they

7    will go to that property to give notice to the occupant.  And

8    then a second occasion is when we have a final eviction

9    notice or a final date that the eviction is going to occur,

10    the deputy will return to that property.

11    Q.  Okay.  And each time that the officer goes out, how many

12    notices in total are actually served upon property or the

13    occupants?

14    A.  When we go out, two.

15    Q.  Okay.  And do they send the notice by mail at all?

16    A.  That is the third time, you're correct.

17    Q.  So each visit to the property entails at least three

18    letters or notices, if you will, to the -- the occupant?

19    A.  Yes, one each occasion, yes.

20    Q.  Okay.

21            THE COURT:  Oh, so let me -- that's three documents

22    that are left on each occasion?

23            MR. FILIPOVIC:  I think he said, two are left and

24    one is mailed out.

25    A.  But it's the same document, Your Honor.

Thornton - Direct                        207

```
 1            THE COURT:  Okay.  So -- but I just want to know how
 2   many documents.  I know it's the same one.
 3   A.  Yes, ma'am.
 4            THE COURT:  Documents are left at the property and
 5   one's mailed out?
 6   A.  That is correct, yeah.
 7   BY MR. FILIPOVIC:
 8   Q.  Now, Lieutenant Thornton, you said the same documents but
 9   same document is only -- is that same document both occasion
10   that she goes out or did you make a distinction between the
11   first time and the second time?
12   A.  Well, it's two different reasons and it's -- it's the
13   document is a little different.  The first document is notice
14   to, I believe, it says notice of vacate and then it says the
15   eviction -- the eviction date were -- with the actual date
16   that we'll come out and do the eviction.
17   Q.  Okay.  So the second one is somewhat more imperative or
18   more strenuous, if you will?
19            MS. HARPER:  Objection.
20   BY MR. FILIPOVIC:
21   Q.  The eviction note -- the eviction notice is, contains the
22   actual date when sheriff will come to seize the property,
23   correct?
24   A.  I heard an objection.
25            MS. HARPER:  Yeah, objection.
```

Thornton - Direct                    208

1        THE COURT:  What is the objection, Ms. Harper?

2        MS. HARPER:  He finished it.  I don't know if we're

3   still on the same question or he moved on, but I was

4   objecting because it was a leading question that assume facts

5   not in evidence and it was already --

6        THE COURT:  But I think he corrected it by

7   rephrasing it.  I can say it was more -- he rephrased it

8   because --

9        MS. HARPER:  Yeah.

10       THE COURT:  -- something and then he said, well,

11  it's different.  It has date of the eviction.  So I think

12  that may have -- so the question is, is the first document is

13  different from the second and how is it?  I think that that's

14  what he was asking.

15       MR. FILIPOVIC:  Yeah, that's the question.

16  A.  The first document is letting the occupant know that they

17  have to leave the property, give them notice, has information

18  on it, and let them know they have to leave the property.

19  The second document is stating that this is the date you have

20  to leave the document, you have to leave the premises, the

21  property.

22  Q.  Okay.  And each of these arrives or is delivered three

23  times, correct?

24  A.  I didn't say -- no, I didn't say that, counselor.

25  Q.  Okay.  I thought you said that when -- when the officer

Thornton - Direct                              209

1    goes out, they bring the same notice and they post one on the

2    door and then what did they do?

3              MS. HARPER:  Objection, mischaracterization.

4              THE COURT:  He never said, they post it on the door,

5    counselor.  He said that --

6              MR. FILIPOVIC:  Okay.  I'm sorry.

7              THE COURT:  So come on.  Let's -- let's --

8              MR. FILIPOVIC:  I thought he did.

9    BY MR. FILIPOVIC:

10   Q.  Mr. Thornton, let's start with the initial time that the

11   officer go out.  What did -- what would she do?

12             MS. HARPER:  Objection.  Asked and answered.

13             MR. FILIPOVIC:  Well, we can -- without the ability

14   to redirect.

15   BY MR. FILIPOVIC:

16   Q.  Does the officer ever post any notice on the door?

17   A.  It can happen, yes.

18   Q.  It can happen?

19   A.  Yes.

20   Q.  Isn't it procedure that you just said that they -- you

21   just testified that they post one on the door, they mail one

22   out, correct?

23             THE COURT:  He never said post.  I'm looking --

24             MR. FILIPOVIC:  Okay.

25             THE COURT:  Can we read that back.  This is why I

211

Thornton - Direct                    210

1    wrote.  Maybe I, you know, a little bit today I'm not hearing

2    things what he says.  The deputy goes to the property and

3    they go out on the first and they notice that there's a

4    notice of -- of the eviction.  Two documents are left at the

5    property and one is mailed.  He said left.  He did not say

6    post, he said two left at the property.

7              MR. FILIPOVIC:  Okay.

8              THE COURT:  And the second time they go out, the

9    notice has the date of the eviction.  Nowhere in my notes do

10   our record reflect that he used the word posted at any time.

11             MR. FILIPOVIC:  Okay.  Fair enough.  Thank you, Your

12   Honor.

13   BY MR. FILIPOVIC:

14   Q.  When you say left at the property, do you know how they

15   leave them at the property?

16   A.  They can hand deliver -- yes, I do.

17   Q.  Please elaborate?

18   A.  They can hand deliver it to the occupant, knock on the

19   door, occupant comes to the door, the deputy identify who

20   they are and why they're there.  Hand them the document and

21   let them know that is a writ of possession and they will have

22   time to leave the property and leave the document.  If the

23   occupant does not answer the door, at that time, they will

24   post it on the property and leave it in the mail slot.

25   Q.  Oh, so they leave on at the mail slot, they post one on

Thornton - Direct                              211

1    the property.

2    A.  Right.

3    Q.  When you say post one on the property, where on the

4    property do they post most often?

5    A.  On the door.

6    Q.  Oh, so they do post it on the door?  Okay.  Thank you.

7    And meanwhile, they've already mailed one out United States

8    Postal Service as well, correct?

9            MS. HARPER:  Objection.  This is just argument, Your

10   Honor.

11           MR. FILIPOVIC:  No, I'm asking if they -- if I heard

12   him correctly to clear this up.

13   BY MR. FILIPOVIC:

14   Q.  That there is one they put in the mailbox, one they post

15   on the door and one is mailed through the post office or via

16   -- via mail, correct?

17   A.  That is correct.

18   Q.  Thank you.  Do you have any reason to believe that Deputy

19   Taylor did not follow this procedure that you just described

20   in -- in the two occasions that you said she went out?

21   A.  Do I have any reason that she didn't do that?

22   Q.  Correct.

23   A.  I don't -- I do not.

24   Q.  Okay.  Fair enough.

25           MR. FILIPOVIC:  Your Honor, I don't have and I'm

Thornton - Direct                    212

1    sorry for the prolonged back and forth, Mr. Thornton, I -- I

2    don't have any more questions for -- for this witness.

3            THE COURT:  Any cross examine, Ms. --

4            MS. HARPER:  Yeah, Your Honor, I'm going to reserve

5    the right to call Captain Thornton back to the stand in the

6    sheriff's case-in-chief, if need be.

7            THE COURT:  Okay.  So no cross examine.  Reserved

8    for your case-in-chief.  All right.  What time is it?  4

9    o'clock.  Do we think we can get --

10           MR. FILIPOVIC:  What time?

11           THE COURT:  -- sergeant, is it sergeant and I

12   apologize if I got the wrong description.

13      (Witness leaves stand)

14           MS. HARPER:  I think it's Sergeant Taylor now --

15           THE COURT:  Yes.

16           MS. HARPER:  -- just at the moment.

17           THE COURT:  We think we can get through her for an

18   hour?

19           MR. FILIPOVIC:  Honestly, you know --

20           THE COURT:  Let's --

21           MR. FILIPOVIC:  -- Your Honor --

22           THE COURT:  Well, how long do you --

23           MR. FILIPOVIC:  -- to be honest --

24           THE COURT:  I don't know how long you think is going

25   to take, Ms.-- been an hour?

214

```
 1              MR. FILIPOVIC:  Well, we have only 50 minutes left
 2     and --
 3              THE COURT:  Fifty minutes, 4:10.  We got 50 minutes.
 4     Let's start.
 5              MR. FILIPOVIC:  Yeah.  Okay.
 6              THE COURT:  Ms. Harper, let me ask you a question.
 7     Do you have to pay the witness overtime if we go past 5
 8     o'clock?
 9              MS. HARPER:  You know, that's -- yes, apparently we
10     do, Your Honor.
11              THE COURT:  Right.  I don't have to worry about
12     paying the Marshall's overtime.  They left.  I used -- they
13     have to worry about 6 o'clock, letting them leave and I was
14     cognizant.  We shall see.  Let's -- let's start.
15              MR. FILIPOVIC:  We'll call Ms. Taylor to the stand,
16     Officer Taylor.
17              THE COURT:  John, do we have to pay you overtime?
18              MR. JOHN:  Oh, I was --
19              THE COURT:  And Ms. Eileen?
20              MR. JOHN:  I was making sure she's ready.  I saw
21     somebody moving paperwork away from --
22              MS. HARPER:  That's us.  I mean, if I may ask, may
23     Captain Thornton safely be dismissed for the day as the day's
24     winding down?
25              THE COURT:  Right.  Because you didn't cross
```

214

1    examine.  There's no redirect.

2            MS. HARPER:  No.

3            THE COURT:  Mr. Filipovic?

4            MR. FILIPOVIC:  Well, I don't see where I already

5    said that I was finished questioning Mr. Thornton.

6            THE COURT:  Okay.

7            MR. FILIPOVIC:  I don't mind at all.

8            THE COURT:  All right.  Then you can leave.  It was

9    nice, a pleasure to have you in my courtroom.

10           MR. THORNTON:  Thank you, Your Honor.  Have a good

11   evening.

12           THE COURT:  You too.  So at least we only have one

13   witness, we have to pay overtime if we go past 5:00.

14           MS. HARPER:  That's what I'm thinking and thank you

15   for raising that issue.  Sorry -- sorry Captain Thornton.

16           MR. THORNTON:  All right.  Thank you.  You have to

17   pay me?

18           THE COURT: No over time for you, I'm sorry.

19           MS. HARPER:  All right.

20           THE COURT:  Mr. Filipovic, you can -- oh, wait a

21   minute, do we swear her in?  Did I miss that part?

22           THE CLERK:  We didn't do it yet.  Mr. Domer, can you

23   unmute the -- that computer?

24           MR. DOMER:  This one?

25           THE CLERK:  Yes, please?

```
 1            MR. DOMER:  Well, actually, because our computers
 2   are side by side.  If I was to unmute for --
 3            THE CLERK:  It doesn't matter, okay.
 4            THE COURT:  All right.  So put her next to Ms. --
 5            MS. HARPER:  Yeah.  Would you like us to
 6   (indiscern.)
 7            THE COURT:  Just let her -- there we go.
 8            MS. HARPER:  Okay.
 9            THE COURT:  Okay.
10            MS. HARPER:  All right.  And move around, then I'll
11   be out of the picture.
12            THE COURT:  Okay.
13            MS. HARPER:  I'll move to the back seat.
14            THE COURT:  Okay.
15            JETARIA TAYLOR, PLAINTIFF'S WITNESS, SWORN
16            THE CLERK:  Thank you.  Could you please state and
17   spell your name for the record?
18            MS. TAYLOR:  Jetaria, J-E-T-A-R-I-A, last name
19   Taylor, T-A-Y-L-O-R.
20            THE CLERK:  And could you please state your address
21   for the record?
22            MS. TAYLOR:  1501 Arch Street, Philadelphia, P.A.
23   19110, I believe.
24            MS. HARPER:  I think we're 102.
25            MS. TAYLOR:  102.
```

Taylor - Direct                    216

1          THE CLERK:  102, sounds good.  Thank you.

2                      DIRECT EXAMINATION

3    BY MR. FILIPOVIC:

4    Q.  Good afternoon, Ms. Taylor.  Ms. Taylor, what is your

5    current occupation?

6    A.  I'm a sergeant with the Philadelphia Sheriff's Office.

7    Q.  And how long have you been with the sheriff's office?

8    A.  I'm at the sheriff's office for almost seven years.

9    Q.  And what unit are you currently assigned to?

10   A.  I'm currently assigned to family court.

11   Q.  Okay.  And do you recall the time between April and July

12   of 2018 as your time within the sheriff's office?

13   A.  Yes.

14   Q.  And were you with the Family Unit at that time?

15   A.  I was assigned to the Civil Enforcement Unit.

16   Q.  So during this time, you were with the Civil Enforcement

17   Unit?

18   A.  Yes.

19   Q.  And what are your duties that are associated with that

20   position?

21   A.  We're responsible for enforcing court orders which

22   includes writ of possessions, writ of executions,

23   attachments, any type of court orders.

24   Q.  Okay.  So do you go to the field then to serve them?

25   A.  Yes, that's a part of the writ of possessions which

Taylor - Direct                          217

1    includes evictions.

2    Q.  Okay.  You were in the room when Lieutenant Thornton

3    testified, just to cut to the chase, and he described the

4    procedure for the service of notices to vacate and such, do

5    you recall that?

6    A.  Yes.

7    Q.  Since you're testifying now, could you tell us in your

8    own words as far as what do you do any particular time

9    there's a writ of possession to be served?

10   A.  Sure.  So we go out to the home.  The first time that we

11   go out to the home, we put up a notice to vacate which is a

12   21-day notice, informing the occupant that they have a 21

13   days before an eviction.  We leave two notices at the

14   physical property and then one notice gets mailed.  We go out

15   a second time where we do the actual eviction notice which

16   gives the day and time of the eviction.  And we also leave

17   two physical copies at the property and we send another one

18   in the mail.

19   Q.  Okay.  So each time that you go out that entails three

20   total notices, correct?

21   A.  Physically two, and one mailed.

22   Q.  Okay.  How do you get around in the field, Ms. Taylor?

23   A.  In a vehicle.

24   Q.  Okay.  Is it vehicle that's for the sheriff's office or

25   your own personal vehicle?

Taylor - Direct                              218

1   A.  It's a personal vehicle.

2   Q.  Okay.  And are you armed when you go out?

3   A.  Yes.

4   Q.  Okay.  And are you in plain clothes or street or -- are

5   you wearing your uniform as you are today?

6           MS. HARPER:  Objection.  Assumes facts not in

7   evidence.

8           MR. FILIPOVIC:  Sorry?

9           THE COURT:  What's the question?

10          MS. HARPER:  We're assuming (indiscern.) uniform and

11  she may have had in her prior position.  She's not in the

12  same position.

13          MR. FILIPOVIC:  I -- I'm sorry, I don't follow.  I

14  asked -- the question was maybe you didn't hear my question.

15          THE COURT:  The question was, did you go in the same

16  uniform you're in today and Ms. --

17          MR. FILIPOVIC:  Okay.  I see what's she's saying.

18  She's wearing family court.  Okay.  Retract that, strike

19  that.

20  BY MR. FILIPOVIC:

21  Q.  When you used to serve writs and not with the family

22  court, when you used to serve writs and eviction notices, did

23  you go in the field in your uniform, sheriff's uniform or

24  plain clothes?

25  A.  Plain clothes.

Taylor - Direct                                        219

```
 1   Q.  And I'm sorry, you said, you were armed or unarmed?

 2   A.  Armed.

 3   Q.  Armed?  Armed in plain clothes.  And forgive me for

 4   asking and perhaps, you know, we -- there's reasons you may

 5   not want to answer, but when you wear your gun, is it a gun

 6   that you're armed with, a handgun?

 7   A.  Yeah.

 8   Q.  Are you armed with a handgun?

 9   A.  Yes.

10   Q.  Okay.  I assume -- am I correct to assume that's the only

11   weapon you're armed with?

12           MS. HARPER:  Objection.  Where is this going, and

13   how much further --

14           MR. FILIPOVIC:  Well, what do you mean?  Well, you

15   mean that --

16           THE COURT:  She's asking where --

17           MR. FILIPOVIC:  What's going to damages.

18           THE COURT:  -- how is it relevant.

19           MR. FILIPOVIC:  It's going to damages -- yeah, Your

20   Honor, if -- if a man sees an armed, you know, person in

21   plain clothes --

22           THE COURT:  What man saw.

23           MR. FILIPOVIC:  Well, if -- if --

24           THE COURT:  Testimony -- the testimony was that, Mr.

25   -- the debtor didn't see anything.
```

Taylor - Direct                    220

1           MR. FILIPOVIC:  The debtor no --

2           THE COURT:  That the debtor didn't see --

3           MR. FILIPOVIC:  -- no that -- Lyndel Topping no,

4    that Barry Whyte didn't see anything, not the Lyndel Topping

5    didn't see anything.

6           THE COURT:  There's no testimony that he did.

7           MR. FILIPOVIC:  He can't talk, Your Honor, it's

8    deductive reasoning.

9           THE COURT:  Then I'm supposed to assume that he did?

10   Counsel, I'll let it for what its worth, I'll allow it for

11   what it's worth.

12          MR. FILIPOVIC:  Okay.

13   BY MR. FILIPOVIC:

14   Q.  Ms. Taylor, you know, we don't have to answer that.  You

15   were armed with a handgun when you go in the field, correct,

16   and you have plain clothes?

17   A.  Plain clothes, sir.

18   A.  Okay.  Fair enough.  Do you go alone or -- in the field

19   or do you go with a partner?

20   A.  Alone.

21   Q.  Okay.  Do you remember do you always go alone or you

22   never with a partner?

23   A.  I go with a partner doing evictions.

24   Q.  Oh, okay.  And when you --

25   A.  (Indiscern.).

Taylor - Direct                    221

1   Q.  Oh, okay.  So am I correct then to interpret that -- that

2   not the eviction notice but when the date comes, that's only

3   eviction notice and you were to go and actually kick people

4   out, if you will, that's when you go with a partner, is that

5   correct?

6   A.  Yes.

7   Q.  Okay.  Ms. Taylor, were you the officer that served the

8   notices or for possession and eviction notices on the

9   property at issue in this litigation?

10  A.  Yes.

11  Q.  Okay.

12        MR. FILIPOVIC:  And at this time, Your Honor, I'd

13  like to recall the Exhibit-C-14.

14  BY MR. FILIPOVIC:

15  Q.  Ms. Taylor, that's C-14, okay.  Do you recognize this

16  document?

17  A.  Yes.

18  Q.  And can you tell the court what it is?

19  A.  It is a 21-day notice to vacate.

20  Q.  Okay.  Do you know -- can you tell us anything -- is this

21  the notice -- is this one of the notices that you served at

22  the -- at the debtor's property?

23  A.  Yes.

24  Q.  Do you recall how you served this particular notice?  Was

25  it in -- in mailbox or was it on the door?  Did somebody

                              Taylor - Direct                    222

 1    answer the door?

 2    A.  It would have been posted to the door if there was a

 3    mailbox, one was left at the mailbox or inside the door and

 4    then one was sent via mail.

 5    Q.  Okay.  Let the record reflect that deputy or -- I'm

 6    sorry, Deputy Taylor now?

 7              THE COURT:  Sergeant I think.

 8              MR. FILIPOVIC:  Deputy Taylor.  Sergeant?

 9              THE COURT:  Is it Deputy or Sergeant?

10    A.  Sergeant.

11              MR. FILIPOVIC:  Sergeant?  I'm sorry.  You know,

12    when we -- I think when we did the deposition, you were --

13    you were just Officer Taylor and then I prepared with that

14    and I congratulations for promotion, Sergeant Taylor.

15    Sergeant Taylor has identified with personal knowledge that

16    the exhibit marked as C-14 as one of the notices she served

17    upon the debtor.

18    BY MR. FILIPOVIC:

19    Q.  Ms. Taylor or Sergeant Taylor, do you recall when you

20    first went out to serve these notices upon the debtor's

21    property?

22    A.  I don't know the actual date.

23    Q.  Okay.  If we can pull up an exhibit now, and I'll tell in

24    a second which one that would be, P-35.

25              MS. HARPER:  I'm sorry.  Just bear with us.  We're

Taylor - Direct                         223

1    trying to get our hard copy in front of us.

2               MR. FILIPOVIC:  Sure.  I'm not even sure that's the

3    right exhibit.

4               THE COURT:  Here is return of service to the Real

5    Estate sale.  That's what that is.

6               MR. FILIPOVIC:  Yeah, yeah.  Understand.  Just one

7    second if --

8               THE COURT:  Or was that P-36?

9               MS. HARPER:  P-35, Your Honor, you're correct.

10              MR. FILIPOVIC:  No, that's P-35.

11              THE COURT:  Okay.

12              MR. FILIPOVIC:  Just one second, Your Honor, I'm

13   sorry.  There are two exhibits that are very much alike

14   but –

15              THE COURT:  You're looking for their documents for

16   the enforcement return of service, that -- I don't know what

17   document that is, that's presumable that's what you're

18   looking for.

19              MR. FILIPOVIC:  No, I'm looking for internal log

20   that was –

21              THE COURT:  Oh, okay.

22              MR. FILIPOVIC:  -- testified to at length.  I'll

23   find it in -- in just a second here.  I do apologize.

24              THE COURT:  It's on a list that you provided?

25              MR. FILIPOVIC:  Yeah, it's on the list.  I -- I

Taylor - Direct                          224

1    just --

2              THE COURT:  John, can you search and find for log,

3    does it say log on it?  What does it say?

4              MR. FILIPOVIC:  It says, internal record and I

5    should know this off top -- I just -- I'm having a brain

6    freeze, Your Honor, I'm sorry.  I've seen this --

7              THE COURT:  It's okay.

8              MR. FILIPOVIC:  -- a million times.

9              THE COURT:  John, any luck with finding it?  Did it

10   have the word log on it?

11             MR. FILIPOVIC:  It should.

12             THE CLERK:  Sorry, Judge, I'm having a hard time

13   unmuting and multitasking.

14             THE COURT:  Oh, okay.  Oh, you mean, answering me,

15   I'm sorry.

16             THE CLERK:  Yeah.

17             THE COURT:  Okay.  Don't worry about it.  I can see

18   you too.  I apologize.

19             THE CLERK:  Because you know, I'm always afraid, I'm

20   going to like close something I shouldn't.

21             THE COURT:  Right.  Okay.

22             THE CLERK:  Does it say log on top?

23             THE COURT:  I don't know.  That's what we're looking

24   for, log.

25             THE CLERK:  Oh, what's this about?

Taylor - Direct                          225

1          THE COURT:  That's a fax, and it's not a fax sent to

2    -- notices, maybe we should be going in the other direction.

3          THE CLERK:  There's a call log, that's not it?

4          THE COURT:  No.  Unless that what he -- I don't

5    think, I think he's --

6          MR. FILIPOVIC:  No, it's not the call log.

7          THE COURT:  Regarding the -- postings and all that

8    other stuff.  Maybe we should be going the other direction

9    because it seems to me that this is all about --

10          MR. FILIPOVIC:  I feel so bad that you guys are --

11          THE CLERK:  Okay.

12          MR. FILIPOVIC:  -- now doing my -- this is -- I

13    should know this.

14          THE CLERK:  Well, I knew it would be the opposite of

15    whatever way I went.  So I figured what's that --

16          THE COURT:  It's got to be the other way.

17          MR. HARPER:  I think it's (indiscern.) about it but

18    I'm not sure.

19          THE COURT:  Okay.  Because that's P-4, P-3, go

20    ahead.  We all, we might as well go –

21          MR. FILIPOVIC:  P- 4, let me see P-4, I'm sorry.

22    Can we -- no, no, that --

23          THE COURT:  P-4 we stipulated.

24          MR. FILIPOVIC:  We stipulated.  We stipulated to all

25    that.  Your Honor, may I take like a one minute recess just

Taylor - Direct                              226

1    to find this thing?

2            THE COURT:  No problem.  Put everybody on mute, John

3    and --

4        (Off the record)

5            THE COURT:  All right.  I'm back.  It's City-4?

6            MR. FILIPOVIC:  Yes, it is, Your Honor.  It is City-

7    4.

8        (City's Exhibit-4 previously marked for identification)

9            THE COURT:  Okay.  Wait a minute, wait, we come some

10   down, counsel because we don't -- I can only see the bottom.

11   I mean, Ms. -- I mean -- okay.  Sir.

12           MR. FILIPOVIC:  I'm not doing anything.  Can

13   everybody see me?  Am I -- I can't see myself.  I'm still

14   here, right?

15           THE COURT:  We can see you.  You're here.

16           MR. FILIPOVIC:  Okay.  All right.  Thank you.

17   BY MR. FILIPOVIC:

18   Q.  Ms. Taylor, I'm going to direct your attention to this

19   particular document.  Take a minute.  Now that we found it to

20   -- to review it and I'll help you.  I'll tell you it's the

21   same where we use it in your deposition.  Let me know when

22   you're ready.

23   A.  I'm ready.

24   Q.  Okay.  Do you know what this document is, Ms. Taylor?

25   A.  Yes.

Taylor - Direct                    227

1   Q.  And what is it -- what is it though?

2   A.  It's a service event report.

3   Q.  Okay.  And there is a service event details that's like

4   third underline prong, it says, the date of 5/10/2018, do you

5   see that?

6   A.  Yes.

7   Q.  Okay.  Could you please read for the record, what does it

8   say there?

9   A.  "Deputy Sergeant Taylor being duly sworn according to

10  law, posted one, true and attested copy of the written writ

11  of possession upon real estate located at 146 South 62nd

12  Street, Philadelphia, P.A. 19139, it's 21-day notice posted."

13  Q.  Okay.  Thank you.  Mr. -- can we scroll down just a

14  little?  Thank you.  Thank you.  That's good.  Ms. Taylor,

15  did you enter this note?

16  A.  Yes.

17  Q.  You did?  Okay.  And where did you enter it.  What is

18  this screen that we're looking at?

19  A.  It's a part of the Jewel system.

20  Q.  Uhm-hum.  And what is Jewel System?

21  A.  It's a -- a pretty much a system where we keep all of our

22  things that need to be enforced.  So any of our, like court

23  documents that we needs to enforce, they go to the system.

24  We get assign -- we get a assigned those documents from this

25  system.

Taylor - Direct                    228

1    Q.  Okay.  So you created this document and --

2    A.  No.

3    Q.  -- you authored it?  No?

4    A.  I didn't create the document.

5    Q.  Okay.  Well -- I'm sorry.  I'm going to rephrase that.

6    You inserted the note, correct?

7    A.  Yes.

8    Q.  Okay.  And you inserted the date of May 10th, 2018,

9    correct?

10   A.  2018, yes.

11   Q.  Yeah.  Okay.  And does that correctly and accurately

12   represent your actions on that day?

13   A.  Yes.

14   Q.  Okay.

15        MR. FILIPOVIC:  Your Honor, I'm going to move to

16   admit this into evidence.  It's been authenticated by Ms.

17   Taylor, who now is the creator of the note that's here.  And

18   we would like it to be entered.  Well, yeah.  I would like to

19   enter it.  And you know what, if I may, I'm going to catch

20   myself -- well, never mind.  We'd like to enter it into

21   evidence at this time.

22        THE COURT:  Any objection, Ms. --

23        MS. HARPER:  Objection.  Yes, Your Honor.

24   Unfortunately, as to authentication.  I don't think we've

25   gone through the right steps here just yet.

Taylor - Direct                                    229

```
 1              THE COURT:  Okay.  What steps do you think are

 2   missing?

 3              MS. HARPER:  Well, I don't know what --

 4              MR. FILIPOVIC:  I think I know.  I think I know,

 5   Your Honor.  If I -- I can --

 6              THE COURT:  All right.  Then just go ahead, counsel.

 7              MR. FILIPOVIC:  Okay.  Thank you.

 8   BY MR. FILIPOVIC:

 9   Q.  Ms. Taylor, in your regular course of duties when you

10   were assigned to this particular unit, Civil Enforcement, was

11   this a regular part of your job to make the notes of such

12   nature?

13   A.  Yes.

14   Q.  And does the Office of the Sheriff keep and maintain

15   these types of notes in their system, as you said?

16   A.  Yes.

17              MR. FILIPOVIC:  So at this time, Your Honor, I'd

18   like to move this into evidence as business record exception

19   to the hearsay rule and –

20              THE COURT:  I know that Ms. Harper is going to

21   object.  And I can tell -- Ms. Harper, why are you objecting?

22   Ms. Harper?

23              MS. HARPER:  Yes.

24              THE COURT:  Are you objecting?

25              MS. HARPER:  I am, Your Honor.
```

Taylor - Direct                    230

1          THE COURT:  And tell me why?  Counsel, you haven't

2     picked up on why she's going to object?

3          MR. FILIPOVIC:  No.

4          THE COURT:  The rest of the document.  Did she put

5     them on there?

6          MS. HARPER:  He's only asked her about one portion

7     of the document.

8          THE COURT:  So that portion can be admitted, but the

9     rest you haven't asked her about.  I could just say yeah and

10    stop, but counsel, I'm not trying to prejudice you.  Ask her

11    about the entire document so I can --

12         MR. FILIPOVIC:  I thought I was asking about the

13    entire document, but that's fine.

14         THE COURT:  You didn't.  You only asked her about

15    the first entry.

16         MR. FILIPOVIC:  All right.

17         THE COURT:  And she said she put it in.  I don't

18    know if she put the second or the third in.  Come on.

19         MR. FILIPOVIC:  All right.

20    BY MR. FILIPOVIC:

21    Q.  Did you put in the name that says, "Unknown Occupants?"

22    Did you put that in there?  Do you know what that is?

23    A.  No.

24         THE COURT:  Where is that at?  Oh, okay.

25         MR. FILIPOVIC:  Yeah, okay.

Taylor - Direct                        231

 1    BY MR. FILIPOVIC:

 2    Q.  And how about the address?

 3    A.  No.

 4    Q.  Okay.  And what about your name there, Jetaria Taylor?

 5    A.  Yes.

 6    Q.  Yes, okay.

 7              MR. FILIPOVIC:  So Your Honor, you know, we have --

 8              THE COURT:  What about the rest, counsel?

 9    Possession date.  Did she put that in there?

10    BY MR. FILIPOVIC:

11    Q.  Did you write the possession date?

12              THE COURT:  The entire document.

13    BY MR. FILIPOVIC:

14    Q.  Did you write the possession date, 6/25/18 there?

15    A.  No.

16    Q.  No?  But it's --

17    A.  No.

18    Q.  This is -- okay.  Okay.  And what about, "cancelled per

19    Defendant bankruptcy," did you write that?

20    A.  No.

21    Q.  Okay.

22              MR. FILIPOVIC:  Your Honor, I'm still going to move

23    to admit this, because she testified that this is the type of

24    document that the Defendant keeps -- that she creates this in

25    the regular course of business and that it's kept by the

Taylor - Direct                    232

1    Jewel system of the Office of the Sheriff in their regular

2    course of business.  And so I think it meets the exception.

3    And it's admission of the party opponent.  Otherwise --

4              THE COURT:  How can she -- she's just a -- she's not

5    the representative.  How is that an admission?  Never mind, I

6    need to stop.

7              MR. FILIPOVIC:  She's a sergeant.  She's a sergeant

8    with the --

9              MS. HARPER:  It's hearsay within hearsay, Your

10   Honor.

11             THE COURT:  What's hearsay within hearsay?

12             MS. HARPER:  She did not make those entries and

13   there's multiple entries she didn't make.  She has testified

14   as to one entry she made on this document herself.

15             THE COURT:  Okay.  So --

16             MS. HARPER:  I don't think that makes this document

17   admissible through Deputy Taylor -- through Sergeant Taylor,

18   pardon me.

19             MR. FILIPOVIC:  I disagree, Your Honor.  I think we

20   have ample evidence and testimony.  She swore in it.  And it

21   is what it is.  It's close --

22             THE COURT:  That's not how it is what it is.

23   Counsel, you have -- there's a way to do this, you're just

24   not doing it.

25             MR. FILIPOVIC:  Okay.

Taylor - Direct                    233

1        THE COURT:  You want her -- she can tell you -- she
2   can authenticate the document as to what she put on there,
3   okay?
4        MR. FILIPOVIC:  Right.  Right.
5        THE COURT:  Now, that's what she can do.  Anything,
6   you are going to have to lay a foundation on how the rest can
7   get in.  I can put in with only that portion that she admits
8   she did.  I don't know what else to tell you, but you --
9        MR. FILIPOVIC:  Okay, that's fine.  That's fine,
10  Your Honor.  We can admit just the portion that she said that
11  she put in, the date and the note.
12       THE COURT:  And -- well, she put in the date and she
13  put in the note that -- can you move that down, John?
14  There's a lot of other information that says -- you know, I
15  guess we don't want that in there, because somebody else did
16  something and did something else, and entered stuff.
17  Whatever.  All right.
18       MR. FILIPOVIC:  Plaintiff is -- yeah.  Plaintiff is
19  amenable to redacting all of the stuff that's on the bottom.
20       THE COURT:  Right.  Because it says entered by
21  somebody else on a different date.  So I don't know what to
22  tell you.  I don't know what any of that stuff means.  The
23  only thing we can admit -- John, can you move that down?
24  John?
25       MR. FILIPOVIC:  Move it how?

Taylor - Direct                          234

```
 1              THE COURT:  Move it -- yes.  Okay.  I guess I'm
 2    calling it down.  I guess it's up.  That she put in -- what
 3    did you say you put in, Ms. Taylor?
 4    A.  So my name and then the deputy part, that's a template.
 5    So I just click on it and then my information pops up.
 6              THE COURT:  And then you said that you posted it on
 7    May 10th?
 8    A.  Yes.
 9              THE COURT:  Okay.  And the rest you didn't.
10    Anything else, you don't know what.
11    A.  No.
12              THE COURT:  Okay.  All right, so we'll -- Ms.
13    Harper, any objection to just that portion being admitted as
14    being on the document, or do you think it has to be done as a
15    whole?  I don't know.
16              MS. HARPER:  I think the record is clear enough as
17    to our intent for allowing this to be admitted at this time.
18    But I'll rely on the record.
19              THE COURT:  So the record is only that the date, the
20    word posted, and that first paragraph that says she posted
21    it,  the 21 day notice, and that's it.
22              MR. FILIPOVIC:  That's fine.
23         (City's Exhibit-4 admitted into evidence)
24              THE COURT:  Okay.
25              MR. FILIPOVIC:  That's really all we're trying to
```

Taylor - Direct                          235

1    introduce anyway.  Okay.

2    BY MR. FILIPOVIC:

3    Q.  Ms. Taylor, is May 10th the very first time you went out

4    there to this property?

5    A.  Yes.

6    Q.  Yes.  Okay.  Ms. Taylor, at this time, I'd like to recall

7    your deposition transcript.  I believe it's City-28.  No.

8    City-30.  Yeah, City-30.  Okay.  Let's go to page 13.

9           MS. HARPER:  Your Honor, I might as well put this

10   out here now.  Again, this is an objection.  This is, like --

11   I don't know, is this impeachment testimony we're doing here?

12   What is the purpose of having Deputy Taylor -- Sergeant

13   Taylor, who is sitting next to me, refer to her deposition

14   transcript?

15          MR. FILIPOVIC:  That's fine.  You're right.  We

16   don't need to.

17          THE COURT:  Okay.

18   BY MR. FILIPOVIC:

19   Q.  Okay.  I'm not trying to make this difficult for anybody.

20   So May 10th, there was no -- went out -- just to go back to

21   where we left off before this.  Your first trip out there was

22   May 10th, 2018.  Do you recall your second time that you went

23   out there?  You said you went out there two times.

24   A.  Not off the top, no.

25   Q.  You don't recall, okay.  So then I -- I will then, to

                          Taylor - Direct                    236

1    refresh your recollection, if you don't remember, I will

2    direct you to your -- again, to your deposition testimony.

3    And let's go to -- now, I have the mini-transcript that was

4    submitted by the City.  So I'll have you read pages -- this

5    is page 5, but you know, there's pages 17, 18, 19, and 20

6    there.  If you want to take a minute and read it.  And let me

7    know if that --

8                THE COURT:  So she's looking at the pages at the

9    top?  What page is she looking at?

10               MR. FILIPOVIC:  Well, there is -- it's on page --

11               MS. HARPER:  (Indiscern.).

12               THE COURT:  Just use the pages at the top.

13               MR. FILIPOVIC:  Yeah, so --

14               THE COURT:  What page is at the top that you want

15   her to --

16               MR. FILIPOVIC:  18, 19, and 20.  They're pretty

17   small.  Maybe just 20.

18               THE COURT:  Okay.

19               MR. FILIPOVIC:  Maybe just 20.  It'll do -- maybe

20   you'll remember if you just look at page 20.

21               THE COURT:  Okay.

22       (Witness reviews document)

23               MR. FILIPOVIC:  And 19.

24               THE COURT:  All right.  Go back up to --

25               MR. FILIPOVIC:  18, I'm sorry.  Bottom of the page

Taylor - Direct                    237

1    18.  That's why I said 18, 19, and 20.

2    BY MR. FILIPOVIC:

3    Q.  Page 18, line 21 through 24.

4    A.  I'm done.

5    Q.  Okay.  Now, Ms. Taylor, having read your deposition

6    testimony, do you now recall when you went out the second

7    time?

8    A.  Yes.

9    Q.  And when was that?

10   A.  June 1st.

11   Q.  Okay.  Year 2018?

12   A.  Yes.

13   Q.  Okay.  Thanks.  Let's recall now City-15.  Do you

14   recognize that document, Ms. Taylor?

15   A.  Yes.

16   Q.  And can you tell the Court what it is.

17   A.  It's the 21-day notice that would have been posted on the

18   first visit.

19   Q.  Okay.  So this is still part of the first visit.  Okay.

20   And when you say posted, are you talking about the Lyndel

21   Toppin's residence?

22   A.  Whoever lived there.  Whoever lived at that address.

23   Q.  Sure.  Okay.  But 146 South 62nd Street, correct?

24   A.  Yes.

25   Q.  Okay.  And you served it or you posted it?

Taylor - Direct                           238

1    A.   Yes.

2    Q.   Okay.  Let the record reflect that Sergeant Taylor has

3    identified the notice as having personal knowledge of having

4    posted it on the property.  And okay.  So let's go now to

5    City-16.  Ms. Taylor, do you recognize this document?

6    A.   Yes.

7    Q.   And can you tell the Court what it is.

8    A.   It's a 21-day notice, which would have been given out on

9    the first visit.

10   Q.   Okay.  Still a part of the first visit.  Okay.  Do you

11   remember if this particular notice was -- well, you posted

12   this.  Did you post this notice?

13   A.   I'm not sure if this one was posted or not.

14   Q.   Okay.  Yeah.  So do you recall ever anybody answering the

15   door when you went out there?

16   A.   No.

17   Q.   Okay.  And do you recall how you -- how did you go about

18   posting it?  Are you leaving it the property?  Did you --

19   what did you do to post it?

20   A.   I would have taped it to the door.

21   Q.   To the front door?

22   A.   Yes.

23   Q.   Okay.  Let's go to City-17.  What about this particular

24   document?  Have you seen it before?

25   A.   Yes.

Taylor - Direct                              239

1   Q.  And what does it represent?

2   A.  This is the final notice that would be posted the second

3   time, and it shows the actual date of the eviction and the

4   time.

5   Q.  Okay.  Did you deliver this notice?

6   A.  Did I post it?  Yes.

7   Q.  Do you remember how you posted this particular notice?

8   A.  On the door with tape.

9   Q.  What color tape did you use?  Do you recall?

10  A.  Clear tape.

11  Q.  Clear tape.  Okay.  You sure you didn't use red tape?

12  A.  Sir, we don't have red tape.

13  Q.  You don't have red tape.  Okay.  Just give me a second.

14  Okay.  I'm going to direct your attention back to your

15  deposition testimony.  And page 10 this time.

16          MS. HARPER:  Counsel, can you identify the City --

17          MR. FILIPOVIC:  City-30.  It's her testimony.  It's

18  her deposition.

19  BY MR. FILIPOVIC:

20  Q.  And Ms. Taylor, I'm going to read from your deposition.

21          MS. HARPER:  Objection.

22          MR. FILIPOVIC:  What's the objection?

23          MS. HARPER:  The declarant's available.  Again, what

24  is -- this is --

25          MR. FILIPOVIC:  Well, I'm allowed to impeach her

Taylor - Direct                    240

1    with some testimony.  That doesn't matter that she's on

2    direct.  I mean, she testified before and now -- you know,

3    now she's testifying under oath at trial.  So I'm -- I don't

4    know where you get the rule that it only applies to cross.

5    She's a direct witness and I'm allowed to impeach her with a

6    prior -- any witness can be impeached, right?

7              MS. HARPER:  Okay.  If your representation -- I just

8    thought we were going with the failure to recall something.

9    But if your testimony -- but if you're trying to use the

10   testimony for impeachment.  Okay.  Go ahead.

11             MR. FILIPOVIC:  Yeah.  Yeah.

12   BY MR. FILIPOVIC:

13   Q.  So I'm going to read this and maybe I'm just

14   misunderstanding this, but it says on page 9, "Do you use any

15   color coding?"  It says, "Just with some tape."  It says,

16   "No."  "Are they pre-printed?  What are the colors that are

17   on these notices?"  "The notices are by colors, it depends.

18   We were using, I think it was red, the notices to vacate, but

19   we didn't have it anymore, so we just did photocopy of that."

20   But they were supposed --

21             MS. HARPER:  Objection.

22             MR. FILIPOVIC:  Okay.

23   BY MR. FILIPOVIC:

24   Q.  Okay.  Now, when you were talking about red, is that the

25   tape that's red or the notice is red?  Which -- just if you

Taylor - Direct                    241

 1   could clarify that for me.
 2   A.  If you -- so it was the notices that would have been red.
 3   Q.  Okay.  Okay.  I understand.  But the tape was clear.
 4   Okay.  But the notices were red.  All right.
 5           MR. FILIPOVIC:  Let me just review my notes for
 6   further questions.  Can we take a short one?  A very short
 7   one.
 8           MS. HARPER:  It looks like we've lost the judge.
 9           MR. FILIPOVIC:  Yeah.  I know, that's kind of why I
10   wanted -- I hope she's all right.  So let's take a short --
11           THE COURT:  Hold on.  I'm back.  I'm back.  I'm
12   back.
13           MR. FILIPOVIC:  Judge.
14           THE COURT:  I don't know what happened.  I think --
15           MS. HARPER:  Was it recording, Your Honor?
16           THE COURT:  Well, I think sometimes when I touch my
17   mouse, it just does whatever it wants to.  Counsel, what I
18   was saying is that we need to be clear.  We shouldn't be
19   wasting time.  I'm just saying for the record that maybe --
20   you know, Ms. -- she didn't mention the word red.  You asked
21   her about it.  So I get that you may have been a little
22   confused, but you know --
23           MR. FILIPOVIC:  I'm sorry.  I don't mean to waste
24   anybody's time, Your Honor.  I just wanted -- I know --
25           THE COURT:  I'm just saying, just -- I get it.  The

```
 1   word red stuck in your head and you thought it was something.

 2   I get it.  So if you want to take some time to consult with

 3   Mr. Dunne about whether there is any more questions, you get

 4   to do that.  Okay?

 5             MR. FILIPOVIC:  Thank you, Your Honor.

 6             THE COURT:  All right.  So we're going to put

 7   everybody on --

 8             MS. HARPER:  I think she muted herself.  I think

 9   you're muted, Your Honor.

10             MR. FILIPOVIC:  No, she's back.

11             THE COURT:  I'm back.  I'm here.  I was like

12   everybody go on mute, except Mr. -- but then we can hear

13   them.  Can we hear them if -- if we go on mute and they talk,

14   can we hear them?

15             MR. FILIPOVIC:  Your Honor, I can call Mr. Dunne on

16   the phone.

17             THE COURT:  All right.

18             MR. FILIPOVIC:  All right.

19             THE COURT:  All right.  But you have to go on mute

20   and Mr. Dunne has to go on mute so we can't hear you guys.

21       (Pause in the proceedings)

22             MR. FILIPOVIC:  Well, we're back on.

23             THE COURT:  Everybody back on?

24             MS. HARPER:  Yes, Your Honor.

25             MR. FILIPOVIC:  Back on.  Okay.  Okay.
```

Taylor - Direct                          243

1    BY MR. FILIPOVIC:

2    Q.  Just two more -- a few more questions, Ms. Taylor.  You

3    had said that you went out there and nobody answered the

4    door, correct?

5    A.  Yes.

6    Q.  Neither time?

7    A.  No.

8    Q.  Nobody answered.

9    A.  No.

10   Q.  Okay.  Now, I want to ask you about how you approached

11   the door.  Well, did you knock?  Did you ring a doorbell?  Do

12   you recall?

13   A.  Knock.

14   Q.  Knock.  Do you recall there being a door and a screen

15   door, or just a front door?

16   A.  I can't recall.

17   Q.  Okay.  Did you happen to look inside?  Was there a way to

18   see inside at all?

19   A.  I don't recall.

20   Q.  How hard do you usually knock when you knock?

21   A.  Hard enough for someone to hear.

22   Q.  How big is that property; do you recall?

23   A.  It was a --

24   Q.  I mean, is it a one-story, two-story?

25   A.  I'm not sure.

Taylor - Direct                    244

1    Q.   Okay.  Do you use the full fist to knock or just your

2    knuckles?

3                MS. HARPER:  Objection as to relevance.

4                MR. FILIPOVIC:  Well, it's to a man who's -- well,

5    she can -- it's relevant as to the type of --

6                MS. HARPER:  (Indiscern.) represented that the

7    debtor is deaf and mute.  I just -- at this point, I think

8    we're just getting argumentative with the witness.  I don't

9    understand.

10                MR. FILIPOVIC:  No, no.  I'm just asking how hard

11    she knocked, that's all.

12                THE COURT:  And she's objecting on the basis of

13    relevance.  What's the relevance?

14                MR. FILIPOVIC:  Well, I want to hear if she -- the

15    relevance is as to how she made her presence at the premises.

16    I'm trying to determine that.  But that's fine.  We don't --

17    outside of that, if the Court won't allow it, I'll --

18                THE COURT:  Counsel, I'll allow it for what it's

19    worth.  I'm not sure how it's going to do anything.

20                MR. FILIPOVIC:  Okay.

21                THE COURT:  The Plaintiff is deaf.  He wouldn't have

22    heard.

23                MR. FILIPOVIC:  Right, right.

24                THE COURT:  So I'm not quite sure what this is going

25    to.  And I've had no evidence that he was there.  There's no

Taylor - Direct                    245

1   evidence from anybody that he was there.

2            MR. FILIPOVIC:  Right.  Okay.  That's fine.

3            THE COURT:  So I'm not sure where this is going to

4   -- I don't know what this is going to help with.

5            MR. FILIPOVIC:  Okay.  Then in that case, we -- you

6   know, we don't -- she's already said she knocked hard enough

7   for somebody to hear who could hear.  So that's fine.  We

8   don't have any further questions, Your Honor.

9            THE COURT:  All right.  Counsel, I'm not trying to

10  give you a hard time, but I just --

11           MR. FILIPOVIC:  No, no.  I understand.  We didn't

12  have any further questions anyway.

13           THE COURT:  All right.  So okay --

14           MR. FILIPOVIC:  It was sort of --

15           THE COURT:  All right.  Ms. Harper, do you have any

16  cross-examination for Sergeant Taylor?

17           MS. HARPER:  No, I do not, Your Honor.  But I do

18  reserve the right to call her as a witness in the --

19           THE COURT:  So no cross.  You reserve the right to

20  call her as a witness.

21           MS. HARPER:  Yes, Your Honor.

22           MR. FILIPOVIC:  Your Honor --

23           THE COURT:  Yes.  Who said something?

24           MR. FILIPOVIC:  I did.  I hate to be the bearer of

25  bad news, but I'm getting -- as I'm sure, but I'm getting a

246

1    really bad headache.

2              THE COURT:  I've already had one, which is why I had

3    to recess a couple of times.  But do you have any other

4    witnesses for today?

5              MR. FILIPOVIC:  No, we didn't list anybody else.

6    That's -- we're done.

7              THE COURT:  Do you rest?  You rest then?

8              MR. FILIPOVIC:  We rest.  We're moving all the

9    evidence that we've already moved --

10             THE COURT:  Well, I've already admitted -- what was

11   admitted -- John, can you read back to me what's been

12   admitted?

13             THE CLERK:  Read back to you?

14             THE COURT:  Yes, so we're all on the same page.

15             THE CLERK:  I think we have C-14, C-15, C-16, and

16   when I say C, I mean City, sorry.  City-17, City-18, City-19.

17   Those were all with the first witness.  Then we went on to

18   there's a City-26, and then there's the new P-23, which takes

19   over the old 23 through 34.  There was a couple that were not

20   admitted.  And then the last one that was admitted, C-4.

21             THE COURT:  What's C-4?

22             MS. HARPER:  That was the Service Event Report, Your

23   Honor.

24             THE COURT:  With the --

25             MR. FILIPOVIC:  Service -- yeah, at 4.

```
 1              THE COURT:  Right.  With the limited information.
 2    All right.  Anybody have -- those were all.  Did we miss any?
 3              MS. HARPER:  I don't believe so, Your Honor.
 4              MR. FILIPOVIC:  I thought we -- Your Honor, I
 5    thought was admitted C-2.
 6              THE COURT:  Go back to my notes.  What's C-2?
 7              MR. FILIPOVIC:  It's the fax that -- the first fax.
 8              THE COURT:  I don't think so.  Unless it was a fax
 9    -- maybe we did.  I don't know.
10              MR. FILIPOVIC:  I'm pretty sure we did.
11              MS. HARPER:  It was admitted in the same fashion
12    that C-4 was admitted, just simply -- I think counsel may be
13    correct on that.
14              THE COURT:  Hold on.  Hold on.
15              THE CLERK:  So according to my checklist C-2 and C-3
16    were brought up during the second witness, and I don't think
17    they were admitted.  Same with P --
18              MR. FILIPOVIC:  No, C-2 was admitted.
19              THE CLERK:  Same with P-10.
20              THE COURT:  Wait a minute.  I'm going to go look
21    through my notes, because I wrote whether it was or wasn't.
22    So this would have been -- but C-2 was Ms. Taylor?
23              MS. HARPER:  No, Your Honor, that was Captain
24    Thornton.
25              MR. FILIPOVIC:  No, lieutenant.
```

248

```
 1              THE CLERK:  Thornton.  Yeah, the second witness.

 2              THE COURT:  Wait the second, I'm sorry.  Never mind.

 3    So Mr. Thornton, and I'm not giving him his due title, but

 4    let's start with Mr. Thornton.  We did Mr. Whyte.

 5              MS. HARPER:  Your Honor, may I dismiss Sergeant

 6    Taylor?  I hate to interrupt you there, but it is 5 o'clock,

 7    it's after 5 o'clock and City counsel has rested.

 8              THE COURT:  No, she's rested and she can go.  You

 9    can reserve her for yours.

10              MS. HARPER:  Thank you, Your Honor.

11              THE COURT:  Thank you very much, Sergeant Taylor.

12    A.  Thank you.

13              MR. FILIPOVIC:  Thank you, Sergeant.

14              THE COURT:  All right.  So let's go to -- okay,

15    we've got D-3 was not admitted.

16              MR. FILIPOVIC:  There's no D-3.

17              THE COURT:  D-3 was no foundation, not admitted, or

18    was it C-3.  Did I call it C when it should have been C-3.

19              MR. DUNNE:  Exhibit C-3.

20              MR. FILIPOVIC:  Yeah, you're right.  But C-2 was.

21              THE COURT:  Let me get to C-2.

22              THE CLERK:  Now, C-2 was brought up right before

23    that and I thought they were both not admitted for the same

24    reasons, Your Honor.

25              THE COURT:  Well, let me go back.  C-3.
```

```
 1            MR. FILIPOVIC:  No.

 2            THE COURT:  C-3 was -- I'm just calling them -- is

 3    that a C or a -- C, yeah.  C, all right.  City Exhibit, it

 4    was C-2?  City.

 5            MR. FILIPOVIC:  Yeah.

 6            THE COURT:  From Mr. Dunne.  He didn't recognize it.

 7    He didn't know what it is.

 8            MR. FILIPOVIC:  What?  We admitted it.

 9            THE COURT:  No.  No foundation.

10            MR. FILIPOVIC:  No, Your Honor.  We admitted C-2 for

11    what it was worth.  That he recognized, even Ms. Harper

12    agrees that it was admitted for the truth --

13            THE COURT:  Well, I don't see any notes.  Ms.

14    Harper, you agree it was admitted for the limited purpose

15    that he recognized it?

16            MS. HARPER:  The only note -- is it all right if Mr.

17    Domer speaks at this point, because it was his note.  I don't

18    want to read his note.

19            THE COURT:  What did you say?

20            MR. FILIPOVIC:  What do you mean his note?

21            MR. DOMER:  Permission to speak, Your Honor.  In my

22    notes, I have that City-2 was admitted for what it says.  It

23    was presented to the witness who said --

24            MR. FILIPOVIC:  Yeah.

25            MR. DOMER:  -- this is what it says, and that's what
```

250

1    you recognize, but not for receipt.

2              THE COURT:  That it said what it said.

3              MR. DOMER:  Correct.

4              MR. FILIPOVIC:  Yeah.

5              THE COURT:  But not that it's proof that they

6    received it or anything.  It's just this is a document.  And

7    I don't even think it was for that it was authenticated, just

8    that this document is what it is.

9              MS. HARPER:  Yes, Your Honor.  That's our position.

10             THE COURT:  I'm not -- it's admitted for the sole

11   purpose -- I do have admitted for the sole purpose --

12             MR. FILIPOVIC:  Thank you.

13             THE COURT:  -- that this was the document and

14   nothing else, that they have no proof that they actually

15   received it.  No proof that he knew anything.  Okay.  C-3 was

16   not admitted.  I denied 3 again.  Okay.  So are we missing C-

17   3?

18             MR. FILIPOVIC:  No.  C-3 is not admitted.  We're

19   good on that.

20             THE COURT:  Okay.  C-2.  C-2.

21             MR. FILIPOVIC:  C-2 has been admitted for limited

22   purpose.

23             THE COURT:  Okay.  All right.  Anything else you

24   believe we missed on that list?

25             MR. FILIPOVIC:  No, I believe that's it.

1          THE COURT:  Okay.  John, do you want to go over that

2     list again just so we're all on the same page?

3          THE CLERK:  Okay.  C-14, C-15, City-16, City-17,

4     City-18, City-19, City-26, the new P-23, and then now we just

5     said C-2 was in.

6          THE COURT:  For a limited purpose.

7          THE CLERK:  Okay.  And then C-4.

8          THE COURT:  Again, only a portion.  Is that the one

9     where the --

10          MR. FILIPOVIC:  Yeah, the portion.  Correct.

11          THE COURT:  Only her portion.

12          MR. FILIPOVIC:   Yeah, only her portion.

13          THE COURT:  Okay.  And that's it for the -- the

14     Plaintiff rests?

15          MR. FILIPOVIC:  The Plaintiff rests, Your Honor.

16          THE COURT:  Okay.  So then Ms. -- what's that Mr.

17     Dunne, P-10.  What is that supposed to mean?

18          MR. FILIPOVIC:  P-10, okay.  Let's see.

19          MR. DUNNE:  I have P-10 as not being admitted.

20     Maybe I misunderstood something.

21          MR. FILIPOVIC:  Let me take a look.

22          THE COURT:  What did we talk about P-10?  Who talked

23     about P-10?

24          MR. FILIPOVIC:  Thornton, I believe.

25          THE CLERK:  Yeah, it was Captain Thornton, the

1   second witness.

2           THE COURT:  Right.  I don't see it yet.

3           MR. DUNNE:  It was the last one --

4           THE COURT:  Ten.  P-10, only doing it -- only that

5   it was -- I have not admitted.  Am I missing something?

6   Maybe I'm missing it.  Did I say it was admitted?

7           MS. HARPER:  No, Your Honor, not per my notes.

8           THE CLERK:  I'm not sure what Mr. Dunne's trying to

9   show us.

10          THE COURT:  I don't know.  It is what it is.

11          MR. FILIPOVIC:  P-10.

12          THE COURT:  It was only -- he looked at it during

13  trial.

14          MR. FILIPOVIC:  No, yeah.

15          THE COURT:  No, it wasn't admitted.

16          MR. FILIPOVIC:  It was not admitted.  No, it was not

17  admitted.

18          THE COURT:  No, I don't know what's -- no.  All

19  right, next.  That's everything.  Okay.  So you rest,

20  correct?

21          MR. FILIPOVIC:  Yes, Your Honor.

22          THE COURT:  Ms. Harper?

23          MS. HARPER:  Yes, Your Honor.

24          THE COURT:  Does the City plan to call any rebuttal

25  witness -- opposition to the motion -- an adversary, rather?

1    Opposition to the adversary.

2         MS. HARPER:  At this point, Your Honor, the City

3    would move for involuntary dismissal for 7041/41(b) of the

4    Federal Rules of Civil Procedure and the Federal Rules of

5    Bankruptcy Procedure.

6         THE COURT:  And you want dismissal on the what?  40?

7         MS. HARPER:  7041(b).

8         THE COURT:  Wait a minute.  Hold on.

9         MR. FILIPOVIC:  I think she's talking about that

10   Plaintiff has failed to --

11        THE COURT:  I know what she is, but I just want --

12   I --

13        MS. HARPER:  (Indiscern.) directed verdict, but I

14   think the appropriate context in an adversary is 7041.

15        THE COURT:  Okay.  Hold on.  7041(b)(1), you

16   believe?

17        MS. HARPER:  Let me double check.

18        THE COURT:  Okay, hold on.

19        MS. HARPER:  Involuntary dismissal at (b), 7041(b).

20        THE COURT:  Okay.  So do you believe that I should

21   dismiss -- oh my goodness, come on page.  Mr. Filipovic, you

22   have a headache.  I've had a headache since (indiscern.),

23   which why I've been taking breaks.  When my sugar drops, it's

24   like, never mind.  7041(b), where are we at?  7041, which

25   one, Ms. --

1          MS. HARPER:  7041(b), involuntary dismissal, Your

2     Honor.

3          THE COURT:  Okay.  So the Plaintiff fails to

4     prosecute or -- well, this says it fails to prosecute or

5     comply with these rules or a Court order, a Defendant may

6     move to dismiss the action or any claim.  So this is for

7     failure to prosecute.

8          MS. HARPER:  Yes, Your Honor.  Or I could -- you

9     know, Your Honor, case law suggests that the actual stance of

10     the -- that a motion for a directed verdict is only related

11     to a trial by jury.  So case law does suggest that it is

12     Federal Rules of Procedure 41(b), pursuant to what you

13     seek --

14          THE COURT:  Dismissal for failure --

15          MS. HARPER:  Yes, Your Honor.

16          THE COURT:  Okay.  Yes.  I mean, if you're saying --

17     yes, it doesn't say -- it's not involuntary dismissal.  I

18     mean, I know that people move for judgments.

19          MS. HARPER:  Yes.  And I'll move however Your Honor

20     wishes me to couch it.  This is my understanding, having done

21     some research.  But we are moving for a directed verdict,

22     essentially.  Whether --

23          THE COURT:  Right, but you believe that the

24     appropriate is on the 7041(b), because there's no equivalent

25     under these civil rules for a -- because it's not a jury

255

1   trial, right?

2          MS. HARPER:  Yes, Your Honor.

3          THE COURT:  Okay.  I don't know what you call it.  I

4   know what you're asking for.  I've just got to figure out do

5   I have the authority.  It may actually be judgment in favor

6   of -- I don't what it's called.  I get what you're asking.

7   I'm not going to rule on that today, obviously.  I have to go

8   back and look at the elements, look at what they gave me.

9   I'm not in a position to say whether they met their burden or

10  not.  I'm not about to do that today.

11      What we're going to do today is we're going to set a

12  continued trial date to -- Ms. Harper, do you intend to put

13  witnesses on?

14          MS. HARPER:  Your Honor, it's a tough call for me to

15  make.  As you say, it's the end of day.  Everybody's getting

16  headaches.  But I will need to set a date just to reserve

17  that right, yes.

18          THE COURT:  Okay.  And the only witnesses I'm --

19  let's be clear.  I'm not hearing any witness that wasn't on

20  that list for today.

21          MS. HARPER:  Of course.

22          THE COURT:  We are not doing that.

23          MS. HARPER:  No, Your Honor.

24          THE COURT:  (Indiscern.) think that this is some

25  opportunity for them to put some more evidence in, to --

1          MR. FILIPOVIC:  No, Your Honor.

2          THE COURT:  -- more documents.  The trial was for

3     today.  We're not -- that's it.  All right.

4          MS. HARPER:  (Indiscern.) date, and then of course

5     let the Court know immediately if we change our approach on

6     that.  I haven't really had a chance to confer at length with

7     my co-counsel here.

8          THE COURT:  Okay.  Let's pick a date that gives me

9     enough time to figure out whether I can rule on your motion

10    that the Debtor didn't meet its evidentiary burden is what

11    you're saying.

12         MS. HARPER:  And, Your Honor, also, this was my

13    initial -- I intended to initially ask --

14         MR. FILIPOVIC:  And Your Honor, we do get to oppose

15    that, right?  I can make argument now or about how we did

16    meet the burden, and I would only direct --

17         THE COURT:  All right.  Well, wait.  Before we get

18    there, I'm just asking Ms. Harper whether we wanted a date

19    for a continued date.  I'm not doing anything on that yet.

20    Okay.  Go ahead, Ms. Harper.  And I may -- and I'm probably

21    going to ask the parties to give me something in writing on

22    what the standard is and what evidence there.  I'm not

23    (indiscern.) to that.

24         All right, Ms. Harper, what do you want for -- what were

25    you saying about a date?

257

         1           MS. HARPER:  It sounds like we would need to request

         2     transcripts from the hearing from today in order to fully

         3     brief the matter.

         4           THE COURT:  Yeah.

         5           MS. HARPER:  So the date -- I'm not sure.  We

         6     haven't had to request a transcript in quite some time, and

         7     certainly not during this time frame.

         8           THE COURT:  It doesn't matter.  We get them on time.

         9           MS. HARPER:  Okay.

        10           THE COURT:  The pandemic is not stopping anything.

        11     John, is it?

        12           THE CLERK:  What's that?  I'm sorry, about the --

        13           THE COURT:  Requests for transcripts are on --

        14           THE CLERK:  I think they're still working fine.

        15     Yeah.  They're still on time.

        16           THE COURT:  Okay.  So, Ms. Harper, what you're going

        17     to do is you're going to file an appropriate motion for

        18     whatever verdict you're calling this: directed verdict,

        19     whatever.  I don't know what the proper term is.  And you're

        20     going to put in in support of that, and they're going to

        21     respond.

        22           MS. HARPER:  Yes, Your Honor.

        23           THE COURT:  That's the only way I'm handling it.

        24     I'm not going through that and trying to figure this out on

        25     my own.  And it's not that I'm trying to figure it out on my

258

1   own, it's the parties -- you know, you're making a motion.

2   You file it of record.  You put all your -- this is the

3   standard.  This is the evidence.  Why you believe it's not

4   sufficient.  They're going to respond this is the standard

5   and we've -- and this is the evidence we've given in support.

6           MS. HARPER:  And, Your Honor, at this point, we

7   would not request to move forward with trial until the motion

8   is resolved.  So --

9           THE COURT:  Well, what I'm going to do is put out

10  longer.  Put it out far enough.  That's --

11          MS. HARPER:  Okay.  I don't want to waive the right

12  to -- you know, there's some case law that if you continue

13  with trial, then you sort of waive the whole --

14          THE COURT:  All right.

15          MS. HARPER:  (Indiscern.) is if our request is

16  denied and we have a continued trial date, I still may choose

17  not to go forward at that time, from a procedural

18  perspective, and there's a reason why.

19          THE COURT:  So you want me to rule on your motion

20  and set a trial date after I move.

21          MS. HARPER:  If that's possible, Your Honor, I'd

22  prefer that, just from a procedural, to protect this --

23          THE COURT:  But if you believe that setting a trial

24  date you're waiving that?

25          MS. HARPER:  I don't -- no, not necessarily.

```
 1            THE COURT:  Don't know?  I don't know, Ms. Harper.
 2    You've said you've researched it.
 3            MS. HARPER:  Yes.  I'm concerned with moving forward
 4    -- with agreeing to move forward at any point without a
 5    ruling on the motion.
 6            THE COURT:  All right.  So we can set dates for the
 7    motion.
 8            MS. HARPER:  Thank you, Your Honor.
 9            THE COURT:  (Indiscern.) what to do after that.  So
10    you believe that -- you want to file a motion -- we're going
11    to call it directed.  I don't know what the correct term is,
12    because you don't believe that's what it's called, because
13    it's not a jury.  But I've done them.  I don't know what
14    people call them.  I can't --
15            MS. HARPER:  (Indiscern.).
16            THE COURT:  -- recall just what they've said.  I
17    mean, they've called them something.  I don't think they're
18    directed verdict, but they're just saying dismissed for
19    failure to submit -- I don't know.
20        All right.  So how much time do you need to -- you're
21    going to need to get the transcript.
22            MS. HARPER:  Yes, Your Honor.
23            THE COURT:  All right.  John, my question was aren't
24    we getting transcripts in the ordinary time, like 7, 14, 30?
25            THE CLERK:  Yeah, I think so.  Yeah, I haven't heard
```

1    of any problems with it.

2              THE COURT:  Any problems.  It's just going to be

3    more expensive if you do it -- the difference between 14 and

4    30 -- well, I know you don't want it on 7 days.  That's going

5    to be astronomical.  So it's 7, 14, and 30, John?

6              THE CLERK:  Yeah, I think -- yeah, it's like

7    overnight, 7, 14, 30.

8              THE COURT:  You know we're not doing overnight.

9              THE CLERK:  No.

10             MR. FILIPOVIC:  It was this thing that was giving me

11   a headache.  Now I feel better.

12             THE COURT:  Well, I have one and unfortunately, I --

13             MR. FILIPOVIC:  Squeezing my head and it was going

14   to --

15             THE COURT:  I can't blame it on that, I have a

16   headache.  Just on a --

17             MR. FILIPOVIC:  Don't ever buy these.

18             THE COURT:  It has nothing to do -- some of it's,

19   you know, a little aggravation, but some of it has nothing to

20   do with anybody.  It's just it is what it is.

21        So Ms. Harper, how many days before you want to be able

22   to file your motion?

23             MS. HARPER:  I would say at least 30, Your Honor, to

24   allow us time to get and digest the transcript.

25             THE COURT:  Well, you can't get -- if you're

261

1    ordering it in 30 days, you're going to need after that.

2    You're going to get it in 30 days.

3              MS. HARPER:  No, no, no.  I was saying perhaps if we

4    were to request it on a two week turn around that --

5              THE COURT:  I mean, it's up to you.

6              MS. HARPER:  Yeah.

7              THE COURT:  I mean, if you want a two-week

8    turnaround, I can just tell you the difference in cost may be

9    a bit.

10             MS. HARPER:  Okay.

11             THE COURT:  I mean, I know, John, I ordered one and

12   it was a $200 difference.

13             MS. HARPER:  That's true.

14             THE COURT:  Mine was pretty short.  I don't know.

15             MS. HARPER:  Your Honor, if your schedule has

16   (indiscern.) to allow us to do a regular order date, non-

17   expedited, then I shouldn't be throwing around the City's

18   money at this time.

19             THE COURT:  I know.  And that's my money too.

20             MS. HARPER:  Yeah.

21             THE COURT:  That's all our money.

22             MR. FILIPOVIC:  That's all our money.  That's right.

23             THE COURT:  It's all our money.  Even if you don't

24   live in the city, you pay some wage taxes.

25             MS. HARPER:  If there's time to allow us --

 1            MR. FILIPOVIC:  And we do, Your Honor.  We both live

 2     in the city.

 3            MS. HARPER:  We will order a non-expedited

 4     transcript.

 5            THE COURT:  Right.  So order it in 30 days, because

 6     I'm not going to get -- counsel, I have trials every Monday

 7     and Friday until October.

 8            MS. HARPER:  Okay.

 9            THE COURT:  So the likelihood I'm going to get to

10     this very soon is slim to none, because I still -- you know,

11     we're trying to catch up on matters that were previously

12     scheduled.  So if 30 days, if you ordered it tomorrow or

13     tomorrow -- no, not tomorrow, Saturday.  You ordered it on

14     Monday for 30 days -- well, first of all, he's going to --

15     has to call and get a quote.  Whatever it is, you're going to

16     need it in 30 days.  Do they give you a check before you

17     order or have you order?

18            MS. HARPER:  That's a tough one for us.  I'd rather

19     not get into it.

20            THE COURT:  No, that was to John.  John, will they

21     order it before you get the check or after you get the check?

22            THE CLERK:  To be completely honest with you, I am

23     not overly experienced with ordering transcripts, so I'd have

24     to ask Tasha.

25            THE COURT:  Okay.  I know Eileen might, but she's

263

1    not on.

2            MR. FILIPOVIC:  You know, in my experience, Your

3    Honor --

4            THE CLERK:  Hold on.  Eileen is on my phone right

5    now.

6            THE COURT:  All right.  Well, ask her.

7            MR. FILIPOVIC:  Every other litigant, we have to pay

8    for transcripts when you order them.  That's how it works.

9            THE COURT:  I think that's the process.

10           MR. FILIPOVIC:  Maybe that's -- maybe the City is

11   treated differently, but not, you know --

12           THE COURT:  I don't think so.

13           MS. HARPER:  No.  I thought she was directing the

14   question to me, counsel.  So that's why -- I thought she was

15   asking whether I pay up front or whether --

16           THE COURT:  Well, I was asking John to make sure,

17   because counsel will give you (indiscern.) -- I don't know

18   how long it would take you to get a check.  If I recall, it

19   took quite a while from some previous matters.

20           MS. HARPER:  It did, Your Honor.

21           THE COURT:  I think you'd have to -- you know, you'd

22   get it, you bring them the check, and then when they get the

23   check, they order it.

24           MS. HARPER:  Yes.

25           THE COURT:  I don't think the Court Reporter works

264

1    until they get their money up front.

2           MS. HARPER:  Right.

3           THE COURT:  Sometimes the Court orders it, but I'm

4    not about to spend the Court's money.  I mean, I order them

5    if I need them.

6           THE CLERK:  Judge?

7           THE COURT:  Yes?

8           THE CLERK:  Eileen just told me that yeah, the ESR

9    gets the check first here.

10          THE COURT:  Right.  That's -- I understood that.  So

11   Ms. Harper, it'll be 30 days from the order.  And then you'll

12   file it as a regular motion, and they'll get to respond in a

13   regular motion, (inaudible) a hearing on the date, and then

14   I'll hear it on that date.  I don't know.  I mean, we're

15   looking at a bit of a time now.  Now, we're looking at right

16   now is August the 21st, right?  That means that if you order

17   it on Monday or any time next week, we're not going to get it

18   until sometime in September, after the 21st.

19          You're going to file your motion.  I'm going to give you

20   a week after that to file it.  I know it's a little crunchy,

21   but you know, unless you say that you need two -- you know,

22   need more than seven days, I'm presuming you'll start working

23   on it.  You have your notes.  Seven days after that, after

24   you receive it to file your motion.  And how much time do

25   they get?  Do they get 14 days?  What's the regular motion

1   response time?

2          MS. HARPER:  If we only have 7 -- if we had 14 days,

3   I would see where they might get 7 is my usual.

4          MR. FILIPOVIC:  No, it's 14 days.  In the Eastern

5   District, it's 14 days for the response to the motion.

6          THE COURT:  Is this governed by regular motion

7   practice?

8          MR. FILIPOVIC:  I don't see why not, Your Honor.

9          THE COURT:  I don't know.  It's an adversary.

10  Sometimes things are different unless I say otherwise.  And

11  then maybe you get 30 days.  I don't know.

12         MR. FILIPOVIC:  We don't need more than 14, Your

13  Honor, after they file their motion.

14         THE COURT:  Right.  That's what I'm only telling you

15  that, you know, it could be that you get more because it's a

16  motion in an adversary, and the federal rules governing to

17  litigation might apply.  But if you think the rules for a

18  regular standard rules apply because I don't know what rules

19  govern that specific motion.  Things at trial are a little

20  bit different than our regular motion practice, sometimes.

21  Not all the time.  For instance, a motion for summary

22  judgment is governed by --

23         MR. FILIPOVIC:  Yeah.

24         THE COURT:  -- the rule of the federal rules.  So

25  that's why I am saying.  So you want two weeks.  Ms. Harper,

1    I'll give you two weeks after receiving the file.  And then

2    they get two weeks after the filing to respond.  Ms. Harper,

3    when you file it, you put those 14 (inaudible) notice of

4    motion.

5              MS. HARPER:  Yes, Your Honor.

6              THE COURT:  And then that way there's a couple of

7    reasons why.  One is they have X amount of time to respond,

8    and then contact Ms. -- I guess we can schedule it in the

9    ordinary course.  Well, not really, because if this is going

10   to be argument, I'm not doing this on a regular motion day.

11   So what you do is when you get ready to file it, we'll put

12   his -- make sure he gets his 14 days, and then you contact

13   Ms, Godfrey for a hearing date so we can specially list it.

14   Okay?

15             MS. HARPER:  Okay.

16             THE COURT:  And then, counsel, you'll respond and

17   we'll have a hearing.  And then if I deny the motion, I'll

18   set a trial date if Ms. Harper says wants to, you know,

19   evidence.  I don't know.  All I'm going to say is whether it

20   was sufficient.  I don't know.  I don't know.  I have no

21   clue.  Okay?

22             MR. FILIPOVIC:  Fine.

23             THE COURT:  Anything further from anybody?  Mr.

24   Offen, that means Mr. Hassan at this time doesn't need to

25   testify.  But if Ms. Harper goes forward, he may just have to

267

1    be available.  I don't know what that means.  We're looking

2    at November maybe.  I don't know.  Okay?

3              MR. OFFEN:  Thank you, Judge.  That's the

4    arrangement I made with everybody.  He'll be available as

5    long as he knows the date, and he's available to testify.

6              THE COURT:  It is what it is.

7              MS. HARPER:  Thank you, Mr. Offen.

8              THE COURT:  All right.  It's Friday at 5:30.

9              MR. OFFEN:  Have a nice weekend, everybody.

10              THE COURT:  Everybody, unless -- there's nothing

11    further from anybody, correct, before I adjourn?

12              MR. FILIPOVIC:  Nothing further.

13              THE COURT:  We have a trial Monday, right?  No.  We

14    don't.  That was my objection date.  Never mind.  Okay.  So

15    court is adjourned until Tuesday at 10:30.  Okay?

16              MR. FILIPOVIC:  Thank you, Your Honor.

17              THE COURT:  All right.  Thank you.  And everybody

18    stay safe and have a good weekend.

19              ALL:  Thank you.

20              THE COURT:  All right, bye-bye.

21       (Court adjourned)

22

23

24

25

268

```
 1                        CERTIFICATION
 2     I certify that the foregoing is a correct transcript from the
 3     electronic sound recording of the proceedings in the above-
 4     entitled matter.
 5
 6
 7                                               9/24/20
 8
 9     _____        _____
10     Signature of Transcriber                Date
```

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**


In re:


Toppin v. Williams et al
              Debtor(s)


Lyndel Toppin

Plaintiff

−v−                                          :   Bankruptcy 18−13098−mdc

Jewell Williams

Defendant                                    :   Adversary No. 18−00137−mdc


### *NOTICE OF FILING OF TRANSCRIPT*
### *AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION*



A transcript of the proceeding held on 8/21/2020 was filed on 9/24/2020.

The following deadlines apply:

The parties have until 10/1/20 (seven (7) calendar days from the date of filing of the transcript) to file with the court a Notice of Intent to request Redaction of this transcript. The deadline for filing a request for redaction is 10/15/20 (21 days from the date of filing of the transcript).

If a Request for redaction is filed, the redacted transcript is due 10/25/20 (31 days from the date of filing of the transcript).

If no such notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is 12/23/20 (90 calendar days from the date of filing of the transcript) unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber (contact the court for contact information) or you may view the document at the clerk's office public terminal.


                                   For the Court


Date: 9/24/20                      Timothy B. McGrath
                                   Clerk of Court


                                   By:Tasha D Dawsonia
                                             Deputy Clerk