## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Case No. 18-13098-MDC |
| LYNDEL TOPPIN, | : | |
| *Debtor.* | : | Adv. Proc. No. 18-00137-MDC |
| | : | |

| | | |
|---|---|---|
| LYNDEL TOPPIN, | : | |
| *Appellant,* | : | |
| v. | : | Case No. 21-CV-5144-WB |
| | : | |
| JEWELL WILLIAMS, SHERIFF | : | |
| OF THE CITY OF PHILADELPHIA | : | |
| *Appellee.* | : | |


## APPELLANT, LYNDEL TOPPIN'S BRIEF


**Predrag Filipovic, Esquire**
1635 Market Street, Suite 1600
Philadelphia, PA 19103
267-265-0520 Phone
Attorney for Plaintiff


**Stephen M. Dunne, Esquire**
1515 Market Street, Suite 1200
Philadelphia, PA 19102
(215) 551-7109 Phone
Attorney for Plaintiff

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ii

STATEMENT OF THE CASE ............................................................................................2

STATEMENT OF JURISDICTION ....................................................................................3

STANDARD OF REVIEW ................................................................................................3

STATEMENT OF ISSUES PRESENTED ..........................................................................4

STATEMENT OF RELEVANT FACTS .............................................................................4

SUMMARY OF THE ARGUMENT ..................................................................................14

    A. Applicable legal standard for violation of the automatic stay.
    B. There is no dispute the Sheriff's Office acted willfully with actual notice of the stay.
    C. The Debtor established two types of compensatory damages causally connected to the Sheriff's multiple stay violations - emotional distress and out of pocket expenses.
    D. The Bankruptcy Court committed clear error by subordinating Whyte's testimony.

ARGUMENT ..................................................................................................................17

    A.     Whether the bankruptcy court erred in finding that evidence at trial failed to establish any actual damages suffered by Plaintiff as a result of Defendant's violation of the automatic stay provided by 11 U.S.C. § 362(a)?......................................17

    B.     Whether the bankruptcy court erred in holding that a deaf and mute Plaintiff failed to prove emotional distress damages he suffered as a result of Defendant's violations of the automatic stay provided by 11 U.S.C. § 362(a) when Plaintiff is unable to testify on his own behalf due to his disability, and evidence by caretaker/nephew testifying at length to personal observations of Plaintiff indicated that a reasonable person would suffer significant emotional harm?..................22

    C.     Whether the bankruptcy court erred in finding that the evidence of actual damage Plaintiff suffered as a result of Defendant's conduct, produced by Plaintiff in opposition to Defendant's Motion for Summary Judgment, failed to raise a genuine triable issue of fact pursuant to 11 U.S.C. § 362(k)(1)?......................................25

    D.     Whether the bankruptcy court erred in failing to design court procedures in a manner that excluded Plaintiff, Lyndel Toppin from court's view when he was present during the entire testimony of his next of friend, Barryington Whyte, thereby depriving Plaintiff, Lyndel Toppin from emoting a non-verbal response that impacts Plaintiff's credibility as a witness?..............................................................28

CONCLUSION…………………………………………………………………………29

## TABLE OF AUTHORITIES

**STATUTES**

11 U.S.C. § 362...................................................................................1, 2, 4, 6,14,17,22,23,25,27,28

28 U.S.C. § 158...................................................................................................................3

11 U.S.C. § 362(k)(1) ...............................................................................................4,6,7,9,23

42 U.S.C. § 12101..................................................................................................................2

42  U.S.C.  § 1983...................................................................................................................28


**CASES**

*America's Servicing Co. v. Irene Schwartz-Tallard*, No. 12-60052 (9th Cir. 2015)...........................27

*Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir.1974), cert. denied,(1975)..............................29

 *In re Altamirano*, No. 4:20-bk-111836 at *10 (Bankr. D. Ariz. Feb. 2, 2022)..........................14, 23

*Carey v. Piphus*, 435 U.S. 247, 263–64, 264n.20  (1978).....................................................28

*Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.1979)..................................................28

*Fowler v. Califano*, 596 F.2d 600, 603 (3d Cir.1979)...................................................23, 29

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350 (1974)........................................................28

*Gober v. Matthews*, 574 F.2d 772, 777 (3d Cir.1978)..........................................................29

*Hunsaker v. United States*, 902 F. 3d 963(9th Cir. 2018).....................................................27

*In Lansaw v. Zokaites*, 853 F.3d 657, 667 (3d Cir. 2017)..............................17, 22, 25, 28,30

*In re Koeberer*, 632 B.R. 680, 690 (B.A.P. 9th Cir. 2021)..............................................14, 23

*In re Miller*, 447 B.R. 425, 433 (Bankr. E.D. Pa. 2011).................................................14,23, 27

*In re Odom*, 570 B.R. 718, 721 (Bankr. E.D. Pa. 2017) ............................................15, 23, 26

*In re Professional Insurance Management*, 285 F.3d 268, 282-283 (3d Cir. 2002)...................3, 31

*Law Co. v. Mohawak Constr. & Sup. Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009)...........................25

*Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990).............................................25,29

*Rossi v. Califano*, 602 F.2d 55 (3d Cir.1979)..................................................................29

*Smith v. Califano*, 637 F.2d 968, 972 (3d Cir.1981)..........................................................29

*Van Horn v. Schweiker*, 717 F.2d 871, 874 (3d Cir. 1983)...................................................29

## STATEMENT OF THE CASE

Appellant Lyndel Toppin presents this appeal for review of the Bankruptcy Court's order denying Appellant's complaint for contempt for violation of the automatic stay by the Sheriff of the City of Philadelphia (the "Sheriff's Office), in violation of 11 U.S.C. §362. The stay violation(s) arose from action(s) by the Sheriff's Office in taking six, (6) attempts to evict Mr. Toppin, and to enforce a writ of possession despite having received several notices of Toppin's pending bankruptcy petition. AER (Appellant's Excerpts of Record "AER") Doc. 4-5, pg. 42-43.

Captain Sean Thornton testified that he is the commander of the Civil Enforcement Unit and that a notice of Mr. Toppin's bankruptcy was transmitted to a fax number for the Real Estate Unit of the Sheriff's Office on May 8, 2018. [Id. pg. 43-44], The evidence, in the form of the Sheriff's own admission, established that its Real Estate Unit received notice of the Mr. Toppin's Petition on May 8, 2018. Id.  That notice served as sufficient notice both of the Debtor's Petition and, as importantly for purposes of the automatic stay, that the Property was subject to a pending bankruptcy case. Id. On May 10, 2018, Officer J. Taylor went to Mr. Toppin's Property to serve a Notice to Vacate, giving Mr. Toppin 21 days to vacate the Property [Id.] After knocking on the door of the Property and receiving no response, Officer Taylor taped the Notice to Vacate on the front door and left another copy either in the mail slot or inside the front door. Another copy of the Notice to Vacate was mailed to the Property. Id. Exact copies of red bold letter Eviction Notices at issue, are in the record at Doc. 4-8, pg. 72-76.

On June 1, 2018, Officer Taylor returned to the Property to serve an Eviction Notice ordering Mr. Toppin to vacate the Property by June 25, 2018. AER Doc. 4-5, pg. 44. After knocking on the door of the Property and receiving no response, Officer Taylor taped the

Eviction Notice on the front door and left another copy either in the mail slot or inside the front door. Another copy of the Eviction Notice was mailed to the Property. Id.

At the trial, Sheriff's Office raised many arguments as to why they are not liable including quasi-judicial immunity, sovereign immunity, lack of notice of the petition, all unsuccessfully. The sole reason Toppin appeals herein, is that the Bankruptcy Court denied Toppin's action for contempt for violation of the automatic stay pursuant to 11 U.S.C. §362 on the sole basis of alleged lack of proof by the Debtor of any damages causally connected to the stay violation. See Sheriff's Motion for Directed Verdict, AER Doc. 4-5, pg.7-14.

The Bankruptcy court held against the Sherriff on all other issues, however found that despite a willful violation of the Stay by the Sheriff , none of the six (6) separate notices/attempts to enforce creditor's writ of possession by evicting the Debtor Toppin and his family from their primary residence, all of them performed in due course by armed personnel of the Sheriff's office, none of them resulted in any actual out of pocket or even emotional harm to the Debtor. AER Doc. 4-5, pg.74.

This appeal follows as Appellant submits that the record begs a contrary conclusion, that there is a slew of evidence of both actual out of pocket losses, as well as emotional distress damages one would expect would reasonably occur in the process of eviction from one's primary residence by armed personnel appearing on more than several occasions leaving red tape notices on the premises.

Such evidence was overlooked by the Court, evidently because the Appellant Debtor, Lyndel Toppin is severely disabled and regarded as disabled under the meaning of the 42 U.S.C. § 12101 (Americans with Disabilities Act), as he has been deaf and for the most part mute, for most of his adult life due to an underlying health condition he barely survived in his adolescence,

wherein the Court issued an Order early in the case allowing Whyte to testify on Toppin's behalf, as a "Friend of Court" AER Doc. 4-6, pg. 1 . As such, Toppin's attorneys' petitioned the Bankruptcy Court for Toppin's nephew and housemate, Mr. Barry Whyte to serve as a "friend of the Court" and testify in Toppin's place. However, in deciding this matter, the Bankruptcy Court neglected its own Order by discounting Mr. Whyte's testimony regarding all hardships Toppin experienced as a result of illegal attempts at eviction by the Sherriff's Office, and very obviously at the end of it all, held Mr. Toppin's inability to speak for himself against him.

## STATEMENT OF JURISDICTION

The United States District Court for the Eastern District of Pennsylvania has jurisdiction for bankruptcy appeals pursuant to 28 U.S.C. §158(d)(1), and specifically for appeals from the United States Bankruptcy Court for the Eastern District of Pennsylvania, Philadelphia Division. (hereinafter "Bankruptcy Court").

The order of the Bankruptcy Court in Appellant's Chapter 13 adversary proceeding bearing case number 18-00137 concerning Appellant's complaint for contempt for violation of the automatic stay is dated November 8, 2021 and bears docket entry 164 in the record of the adversary proceeding case. This is a final, appealable order within the meaning of 28 U.S.C. §158(a)(1).

## STANDARD OF REVIEW

The standard of review applicable to this appeal is threefold: the Court must "review the Bankruptcy Court's legal determinations de novo, its factual determinations for clear error, and its exercises of discretion for abuse thereof." *See In re Professional Insurance Management,* 285 F.3d 268, 282-283 (3d Cir. 2002).

## STATEMENT OF ISSUES PRESENTED

1.      Whether the bankruptcy court erred in finding that evidence at trial failed to establish any actual damages suffered by Plaintiff as a result of Defendant's violation of the automatic stay provided by 11 U.S.C. § 362(a)?

2.  Whether the bankruptcy court erred in holding that a deaf and mute Plaintiff failed to prove emotional distress damages he suffered as a result of Defendant's violations of the automatic stay provided by 11 U.S.C. § 362(a) when Plaintiff is unable to testify on his own behalf due to his disability, and evidence by caretaker/nephew testifying at length to personal observations of Plaintiff indicated that a reasonable person would suffer significant emotional harm?

3.  Whether the bankruptcy court erred in finding that the evidence of actual damage Plaintiff suffered as a result of Defendant's conduct, produced by Plaintiff in opposition to Defendant's Motion for Summary Judgment, failed to raise a genuine triable issue of fact pursuant to 11 U.S.C. § 362(k)(1)?

4. Whether the bankruptcy court erred in failing to design court procedures in a manner that excluded Plaintiff, Lyndel Toppin from court's view when he was present during the entire testimony of his next of friend, Barryington Whyte, thereby depriving Plaintiff, Lyndel Toppin from emoting a non-verbal response that impacts Plaintiff's credibility as a witness?

## STATEMENT OF RELEVANT FACTS

Appellant Lyndel Toppin presents this appeal for review of the Bankruptcy Court's order denying Appellant's complaint for contempt for violation of the automatic stay by the Sheriff of the City of Philadelphia (the "Sheriff's Office), in violation of 11 U.S.C. §362. The stay violation(s) arose from action(s) by the Sheriff's Office in taking six, (6) attempts to evict

Mr. Toppin, and to enforce a writ of possession despite having received several notices of Toppin's pending bankruptcy petition. AER (Appellant's Excerpts of Record "AER") Doc. 4-5, pg. 42-43.

Captain Sean Thornton testified that he is the commander of the Civil Enforcement Unit and that a notice of Mr. Toppin's bankruptcy was transmitted to a fax number for the Real Estate Unit of the Sheriff's Office on May 8, 2018. [Id. pg. 43-44], The evidence, in the form of the Sheriff's own admission, established that its Real Estate Unit received notice of the Mr. Toppin's Petition on May 8, 2018. Id. That notice served as sufficient notice both of the Debtor's Petition and, as importantly for purposes of the automatic stay, that the Property was subject to a pending bankruptcy case. Id. On May 10, 2018, Officer J. Taylor went to Mr. Toppin's Property to serve a Notice to Vacate, giving Mr. Toppin 21 days to vacate the Property [Id.] After knocking on the door of the Property and receiving no response, Officer Taylor taped the Notice to Vacate on the front door and left another copy either in the mail slot or inside the front door. Another copy of the Notice to Vacate was mailed to the Property. Id. Exact copies of red bold letter Eviction Notices at issue, are in the record at Doc. 4-8, pg. 72-76.

On June 1, 2018, Officer Taylor returned to the Property to serve an Eviction Notice ordering Mr. Toppin to vacate the Property by June 25, 2018. AER Doc. 4-5, pg. 44. After knocking on the door of the Property and receiving no response, Officer Taylor taped the Eviction Notice on the front door and left another copy either in the mail slot or inside the front door. Another copy of the Eviction Notice was mailed to the Property. Id.

At the trial, Sheriff's Office raised many arguments as to why they are not liable including quasi-judicial immunity, sovereign immunity, lack of notice of the petition, all unsuccessfully. The sole reason Toppin appeals herein, is that the Bankruptcy Court denied

Toppin's action for contempt for violation of the automatic stay pursuant to 11 U.S.C. §362 on the sole basis of alleged lack of proof by the Debtor of any damages casually connected to the stay violation. See Sheriff's Motion for Directed Verdict, AER Doc. 4-5, pg.7-14.

The Bankruptcy Court held against the Sheriff on all other issues, however, found that despite a willful violation of the Stay by the Sheriff , none of the six (6) separate notices/attempts to enforce creditor's writ of possession by evicting the Debtor Toppin and his family from their primary residence, all of them performed in due course by armed personnel of the Sheriff's office, none of them resulted in any actual out of pocket or even emotional harm to the Debtor. AER Doc 4-5, pg.74.

Such evidence was overlooked by the Court, evidently because the Appellant Debtor, Lyndel Toppin is severely disabled and regarded as disabled under the meaning of the Americans with Disabilities Act, as he has been deaf and for the most part mute, for most of his adult life due to an underlying health condition he barely survived in his adolescence, wherein the Court issued an Order early in the case allowing Whyte to testify on Toppin's behalf, as a "Friend of the Court" AER Doc. 4-6, pg. 1. As such Toppin's attorneys' petitioned the Bankruptcy court for Toppin's nephew and housemate, Mr. Barry Whyte to serve as "friend of the Court" and testify in Toppin's place. However, in deciding this matter, the Bankruptcy Court neglected its own Order by discounting Mr. Whyte's testimony regarding all hardships Toppin experienced as a result of the illegal attempts at eviction by the Sherriff's Office, and very obviously at the end of it all, held Mr. Toppin's inability to speak for himself against him.

Following is the evidence on record of actual out of pocket damages as well as emotional damages. Barrington Whyte testified at the hearing and articulated various forms of emotional distress experienced by the Debtor as result of the Sheriff's Notices to Vacate and Eviction

Notices. Doc. 4-8, pg. 72-76. Testimony at trial included evidence that Debtor suffered insomnia; excessive smoking; pacing at night, painful headaches; and loss of appetite, which are all symptomatic of an individual experiencing emotional distress. Mr. Whyte, testified (at trial) as follows:

> *Q. And where did you see these notices?*
>
> *A. Well, they were inside my home at the time I got home.*
>
> *Q. Were they all inside your house?*
>
> *A. Yes.*
>
> **Q. And who were they directed to?**
>
> **14 A. Lyndel Toppin.**
>
> AER Doc. 4-5, pg. 67-68
>
> *Q. Mr. Whyte, how did these –do you know how these notices ended up in the house where you saw them?*
>
> *A. My uncle, Lyndel Toppin. He's the one that brought them inside the house.*
>
> Id. pg .89-90
>
> *Q. How did those notices affect your uncle?*
>
> *A. Well, from me seeing, you know, and knowing, and living with him for so long, he's just – he's been kind of like distorted. You know, he's always like looking at me when he picks up the papers, just like – for me to give a good response to him, you know, basically on it……But on top of that also, just been---you know, he's been off. He hasn't been, like, 100%. You know, he's been smoking cigarettes more a lot. He's been, like, not basically eating the dinners that I, like, serve for him or, like, put out for him to eat.*
>
> Id. pg. 92-93
>
> *Q. I'm asking you if you saw him, your uncle with respect to these notices?*
>
> *A. Yes.*
>
> *Q. What did you see?*

*A. Well, he's picked up the notices a couple of times, and as I say, he's just been looking at me to give him an answer, but I can't really give him an answer.*

*Q. Okay.*

*A. –he nods his head, shakes his head, and you know, we can – I can just – I don't know, I just walk off at that point.*

*Q. What kind of effect, if any do you think that they had on him and did that manifest itself somehow in his behavior. If you could tell the court.*

*A. Well, as I said before, he hasn't been eating. Like his normal routine, and he's been, like, smoking more Newports, you know, now because, you know, I smell it more often now. And like I say, he's like – he's basically not what I'm used to. He's, like, kind of out of it He's been, like, missing sleep and things like that. Because I notice when I come in his, you know, light would be on in his room about 2.00, 3.00 in the morning. Normally, you know, we're asleep and the household is down by that time.*

*Q. And how is he now?*

*A. He's still not eating on, you know, on schedule as we usually do. He's still smoking a lot. He's still doing that. And he's still just, like, sitting around in the living room, you know, just there. He's not –like, with no T.V. on or nothing. He'll just be, like, there.*

Id. pg. 94-95

Mr. Whyte, also testified (by deposition) as follows:

Q.      Do you know if he saw someone with a gun on them on those days?

A.      I wouldn't say actually he was saying like he saw a gun. But, he compared like

the shield thing, he just like made a comparison of the two. Just

showing me the similarity of the two.

AER, Doc. 4-8, pg. 139.

Q.  Okay. Did Mr. Toppin, at any point in time, try and describe to you a person that

came on the property on any one of those days?

A. When I saw him, like I said, he showed me the comparison of like the shield that was

on the notice or whatever, and he just pointed to the similarity. He put the paper next to himself and he showed me he peeked through.

Q. So what is your Understanding?

A. He was showing me the comparison of the two, like he seen that shield on the person.

Q. On the person, okay?

A. Yeah.

Q. And it is your understanding that that question when it says, "You claim to have experienced emotional distress," that that is referring to Lyndel Toppin?

A. Yes.

Q. Tell me how you know Mr. Toppin was caused undue frustration, anxiety and mental anguish as a result of these allegations?

A. Well, his actions started changing during the process of the whole situation. Because he smokes cigarettes, so he actually was smoking more during the time of this whole thing.

Q. Did you notice anything like that occurring before the property was sold at sheriff's sale.

A. He would smoke probably one cigarette a week, if anything.

Q. And then the Notice to Vacate showed up, how much did he start smoking?

A. Well, it kind of –I would say it increased around that time. It was like about three to – three cigarettes maybe a day at that point.

AER, Doc. 4-8, pg. 139.

Q. And Mr. Toppin, was he awake when you got home during this time frame we're talking about, back when the notices were showing up?

9

A. Normally he wasn't but it was a few times I seen his light under his door…..

Q. Where there any other signs or symptoms that you observed, besides the smoking and the light under his door, and made an uneaten meal here and there?

A. Just him, he never actually paced before. But that was another thing I noticed also, it was kind of weird to me. And then like it was only one time out of that he was telling me he had like a little headache in his head. He just indicated to me that he wanted a pill because his head was hurting.

Q. In response to interrogatory No. 17 it says, "Out of pocket expenses include all the time I spent visiting my attorney's office….; lost potential income due to the time I was unavailable to work as a result of spending time at my attorney's office and transportation costs to/from my attorney's office." Do you see that information?

A. Yes.

Q. Is it your understanding that this refers to Mr. Toppin and not you, correct?

A. Yes.

Q. Did you have to make the phone calls to his employer to say he needed time off?

A. Yes.

Q.…..do you recall how many times you went to Mr. Dunne's office?

A. I went there a lot of times myself. I have been there a lot.

Q. Was Mr. Toppin with you every time you went?

A. He was only with me a time times because I didn't really want to keep pulling him out of work every single time for it.

Q. Can you estimate the number of times he had to go?

A. Probably about two.

Q. …And on those two occasions that you remember him going down to the Attorney's office, did you call out of work for him?

A. Yes.

Mr. B. Whyte Deposition. AER Doc. 4-6, pg. 139-164.

It is telling that the Bankruptcy Court's made the following remarks about Mr. Whyte's testimony:

*THE COURT:*

*"I'm not quite sure why we're talking about what Mr. Whyte observed. Nobody's telling me how even the debtor would have responded to that. Okay? And so this is the problem as I see it. This is all about what Mr. Whyte is talking about? Okay.  Nothing about what the debtor reads, you know?"And all I'm hearing is Mr. Whyte. So I'm just going to put that out there."*

AER Doc. 4-4, pg. 114

Mr. FILIPOVIC:  Plaintiff will also show damages through the testimony of a firsthand witness of such damages, Mr. Barrington Whyte, who is a plaintiff's nephew and a household member who has been and ordered in front of the court, by this court to a specific explicit order, which vested him with explicit authority to  testify on Mr. Toppin's behalf.

THE COURT: But counsel, let's -- what did you say he would be testifying to regarding when you listed his testimony on the witness list?

MR. FILIPOVIC: I will read verbatim of what his test -- he is going to testify about, Barrington Whyte, Your  Honor, will be testifying. I'll just read it verbatim. I don't want to misquote myself.

THE COURT: Uhm-hum.

11

MR. FILIPOVIC: "Summary of testimony. Will testify regarding plaintiff's residence, relevant financial affairs, bankruptcy filing, the notices to the Sheriff of the bankruptcy filing. Will also relate firsthand knowledge of all the ill effects that the post-bankruptcy notice collection and writ enforcement by the sheriff had on the plaintiff.

THE COURT: So he's going to be testifying on his own observations?

MR. FILIPOVIC: Correct. His own observation of the plaintiff and of the Sheriff's actions and his condition

THE COURT: Right. Well, so he's not going to – so was the Debtor going to testify himself regarding the effect upon him?

MR. FILIPOVIC:  Your Honor, the Debtor is deaf and mute as was noted in the order.

THE COURT: Okay. So --

MR. FILIPOVIC: So he can't testify. That's why this court --

THE COURT: But that's -- counsel, I get what my order says but. But we're going to limit to his personal observation –

MR. FILIPOVIC: Correct. Correct.

THE COURT: –- to find on behalf of the Debtor. In this case, he's not testifying on behalf of the Debtor with respect to his observations, correct?

MR. FILIPOVIC: Well, he's testifying in the capacity of the Debtor and that of his own. He's going to testify –

THE COURT: That's not what that says. It says he's going to testify regarding his own personal observations.  That's why I'm asking you about it.

MR. FILIPOVIC: Yes.

THE COURT: His personal -- so I don't want to hear.  So he's not testifying on behalf of the Debtor with respect to the damages. He is supporting the Debtor but based on his own personal knowledge. He's not there testifying on what the Debtor would have said. Because that's not what that says.

MR. FILIPOVIC: No, he's not to testify on what a Debtor could -- would have said. The Debtor doesn't speak so.

THE COURT: Debtor can write --

MR. FILIPOVIC: -- his own personal observation

THE COURT: -- I don't know. Does the Debtor know how to write?

MR. FILIPOVIC: Well, he is deaf and mute, Your Honor, he does not.

THE COURT: That -- that doesn't mean you can't write because you deaf and --

MR. FILIPOVIC: You would have to learn to write.

THE COURT: Well, he couldn't have counsel, that's why I'm asking the question. Helen Keller was deaf and mute. So she --

MR. FILIPOVIC: Yeah, I know.

THE COURT: -- could communicate; that was the question. Does he know --

MR. FILIPOVIC: Yeah, we're not going to be offering. THE COURT: -- how to communicate? Okay. That -- MR. FILIPOVIC: No, very limited -- he's very limited, Your Honor. He's disabled to that regard and  15 THE COURT: Okay.

AER Doc. 4-4, pg. 113-115.

## SUMMARY OF THE ARGUMENT

The Bankruptcy Court erred when it ruled that the Sheriff's Office was not liable for violating the automatic stay and ruled that there was no evidence demonstrating that that disabled debtor was negatively impacted by the Sheriff's Office post-petition enforcement actions.

**A. Applicable legal standard for violation of the automatic stay.**

The filing of a bankruptcy case operates as an automatic stay against most entities from, among other actions, "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. §362(a).

If a party willfully violates the automatic stay a debtor who is injured by the willful violation is entitled to recover his or her actual damages including costs and attorneys' fees, and if appropriate, may also recover punitive damages. 11 U.S.C. §362(k).

The Bankruptcy Code requires the imposition of sanctions on a party violating the automatic stay upon the satisfaction of three elements: (1) the offending party violated the automatic stay; (2) the violation of the stay was willful; (3) the willful violation must have caused the debtor _**some**_ injury. _In re Miller,_ 447 B.R. 425, 433 (Bankr. E.D. Pa. 2011).

While the moving party must show "injury," and the court may consider the severity of the violation when deciding the amount of sanctions, there is no category of violations so "minor" that it automatically negates the mandatory language of § 362(k). _In re Koeberer,_ 632 B.R. 680, 690 (B.A.P. 9th Cir. 2021); _In re Altamirano_, No. 4:20-bk-111836 at *10 (Bankr. D. Ariz. Feb. 2, 2022). Section 362(k) provides that the court "shall" award sanctions to "any individual injured" by "any willful violation of a stay provided by" § 362. _Id._

14

**B. There is no dispute the Sheriff's Office acted willfully with actual notice of the stay.**

In the present case, there is no dispute that the Sheriff's Office acted willfully with actual notice of the automatic stay.  The trial court held that the Sheriff (1) violated the automatic stay; and (2) that the violation was willful. The evidence at Trial conclusively established that the Sheriff's Office violated the automatic stay multiple times between May 8, 2018 through June 7, 2018 in its personal service of the Notices to Vacate and Eviction Notices.

**C. The Debtor established two types of compensatory damages causally connected to the Sheriff's multiple stay violations – emotional distress and out of pocket expenses.**

Debtor's Next Friend, Barrington Whyte provided credible testimony that Debtor experienced various forms of emotional distress in response to the Sheriff's enforcement actions – including insomnia; excessive smoking; pacing at night, painful headaches; skipping meals; as well as out of pocket expenses in the form of loss of employment wages to visit his lawyer's office. [cite to record above].  The low threshold of injury required to establish emotional distress injury is reflected in *In re Odom,* 570 B.R. 718, 721 (Bankr. E.D. Pa. 2017) where a debtor experienced frustration, confusion and stress in connection to the Philadelphia Parking Authority impounding his car in violation of the stay. The Court held that "given the circumstances surrounding the PPA's violation of the automatic stay, I am satisfied the Debtor adequately established the PPA's conduct caused him emotional harm." *Id*. Given the circumstances that the Sheriff's Office spent the better part of May 2018 attempting to evict Debtor from this residence, it would be apparent that that would cause him "some" emotional harm.

Debtor's Next Friend, Barrington Whyte provided credible deposition testimony on December 12, 2019 that he called the Debtor's employer to take time off work to visit his

lawyer's office to discuss the Sheriff's Notices to Vacate and Eviction Notices. AER, Doc. 4-8, pg. 152, Line 1-14, Line 19-21; Pg. 153, Line 8-16. Almost nine months prior, Debtor's Next Friend, Barrington Whyte submitted a Declaration to the Court stating that he had "personally witnessed his Uncle, Lyndel Toppin experience headaches; loss of sleep; anxiety; dread; and a general loss of enjoyment of life due to the repeated visits by Jewell Williams, Sheriff of the City of Philadelphia." AER, Doc. 4-8, pg. 43-33. Debtor incurred reimbursable out of pocket losses for lost work and legal expenses casually related to the Sheriff's stay violation(s).

**D. The Bankruptcy Court committed clear error by subordinating Whyte's testimony**

The Bankruptcy Court committed clear error subordinating the testimony of Mr. Whyte and allocating little weight to Mr. Whyte's personal observations that the disabled Debtor experienced emotional distress as a result of the Sheriff's post-petition enforcement actions.

Moreover, the prevailing case authority delineated below, illustrates that the Bankruptcy Court clearly held Appellant Toppin to a higher threshold of proof of resulting damages applicable to a willful stay violation than required under evidentiary rules. This is especially the case, since there was no evidence of any sort, either lay testimony, certainly not any expert testimony offered either prior to the trial or introduced at trial, by the Sheriff's Office to contradict any of Toppin's evidence by Mr. Whyte, as to all ill effects Sheriff's aggressive ejectment activities had on Toppin. Sheriff's Trial Witness list and Summary of their testimonies, paints an accurate picture as to the lack of any attempt to contradict Toppin's emotional distress damages that they knew Barrington Whyte would testify to. AER Doc. 4-6,  p -122-126.

Thus, given the lack of any attempt to contradict Toppin's evidence of damages, by the Sheriff's Office, (such as Physician's IME report, private investigator's findings, etc.) or any

testimony contradicting Toppin/Whyte's testimony on emotional distress by any witnesses including officer(s) who served eviction notices at Toppin's residence,  the only way the Bankruptcy Court could find that Toppin's unopposed evidence was insufficient to prove he suffered <u>any</u> damages, is by abuse of discretion, misapplication of preponderance of evidence standard, and plain prejudice against the disabled Debtor.

## <u>ARGUMENT</u>

**A.     Whether the Bankruptcy court erred in finding that evidence at trial failed to establish any actual damages suffered by Plaintiff as a result of Defendant's violation of the automatic stay provided by 11 U.S.C. § 362(a)?**

In *Lansaw v. Zokaites*, 853 F.3d 657, 667 (3d Cir. 2017), the Third Circuit held that Congress intended the automatic stay to protect both financial and non-financial interests, and that the term "actual damages" as used in §362k includes damages for emotional distress resulting from a willful violation of the automatic stay. The *Lansaw* court stated that:

> "And we agree with the Bankruptcy Court that, at least where a stay violation is patently egregious, a claimant's credible testimony alone can be sufficient to support an award of emotional-distress damages." *Lansaw* at 669.

The Bankruptcy Court's finding that there was no proof of actual damages was clearly erroneous. In fact, Debtor's Next Friend, Barrington Whyte testified at the hearing and articulated various forms of emotional distress experienced by the Debtor as result of the Sheriff's Notices to Vacate and Evictions Notices admitted into evidence and available for Court's review),  – including insomnia; excessive smoking; pacing at night, painful headaches; and loss of appetite, which are all symptomatic of an individual experiencing emotional distress. AER, Doc. 4-8, pg. 152, Line 1-14, Line 19-21; Pg. 153, Line 8-16. Furthermore, Mr. Whyte provided credible deposition testimony on December 12, 2019 that he called the Debtor's employer to take time off work to visit his lawyer's office to discuss the Sheriff's Notices to

Vacate and Eviction Notices. Almost nine months prior, Debtor's Next Friend, Barrington Whyte submitted a Declaration to the Court stating that he had "personally witnessed his Uncle, Lyndel Toppin experience headaches; loss of sleep; anxiety; dread; and a general loss of enjoyment of life due to the repeated visits by Jewell Williams, Sheriff of the City of Philadelphia." AER, Doc. 4-8, pg. 43-33.

Debtor's Next Friend, Barrington Whyte provided the Court a Declaration of his personal observations; along with detailed deposition testimony and consistent trial testimony explaining how the Sheriff's stay violation(s) impacted his disabled Uncle Toppin. Mr. Whyte, testified (at trial) as follows, (citation to the record to these portions are found in the preceding Statement of Fact section above):

> Q. And where did you see these notices?
>
> A. Well, they were inside my home at the time I got home.
>
> Q. Were they all inside your house?
>
> A. Yes.
>
> Trial Transcript at pg. 65-66.
>
> Q. Mr. Whyte, how did these –do you know how these notices ended up in the house where you saw them?
>
> A. My uncle, Lyndel Toppin. He's the one that brought them inside the house.
>
> Q. How did those notices affect your uncle?
>
> A. Well, from me seeing, you know, and knowing, and living with him for so long, he's just – he's been kind of like distorted. You know, he's always like looking at me when he picks up the papers, just like – for me to give a good response to him, you know, basically on it…...But on top of that also, just been---you know, he's been off. He hasn't been, like, 100%. You know, he's been smoking cigarettes more a lot. He's been, like, not basically eating the dinners that I, like, serve for him or; like, put out for him to eat.
>
> Q. I'm asking you if you saw him, your uncle with respect to these notices?

*A. Yes.*

*Q. What did you see?*

*A. Well, he's picked up the notices a couple of times, and as I say, he's just been looking at me to give him an answer, but I can't really give him an answer.*

*Q. Okay.*

*A. –he nods his head, shakes his head, and you know, we can – I can just – I don't know, I just walk off at that point.*

*Q. What kind of effect, if any do you think that they had on him and did that manifest itself somehow in his behavior. If you could tell the court.*

*A. Well, as I said before, he hasn't been eating. Like his normal routine, and he's been, like, smoking more Newports, you know, now because, you know, I smell it more often now. And like I say, he's like – he's basically not what I'm used to. He's, like, kind of out of it He's been, like, missing sleep and things like that. Because I notice when I come in his, you know, light would be on in his room about 2.00, 3.00 in the morning. Normally, you know, we're asleep and the household is down by that time.*

*Q. And how is he now?*

*A. He's still not eating on, you know, on schedule as we usually do. He's still smoking a lot. He's still doing that. And he's still just, like, sitting around in the living room, you know, just there. He's not –like, with no T.V. on or nothing. He'll just be, like, there.*

The facts of this case clearly establish that the Sheriff's Office violated the automatic stay and must suffer sanctions.  It is manifestly unjust to dismiss the aforementioned personal observations of Mr. Whyte given the profound disability of the Debtor.  Mr. Whyte's personal observations provide the only window into the Debtor's emotional state at the time the Sheriff was attempting to evict him from his property in violation of the automatic stay.  A close examination of Mr. Whyte's personal observations during both his trial testimony and his deposition testimony reveal a sufficient level of emotional distress to qualify as "some damages", and warrant sanctions.

*Mr. Whyte, testified (by deposition) as follows:*

Q.      Do you know if he saw someone with a gun on them on those days?

A.      I wouldn't say actually he was saying like he saw a gun. But, he compared like the shield thing, he just like made a comparison of the two. Just showing me the similarity of the two.

Q.   Okay. Did Mr. Toppin, at any point in time, try and describe to you a person that came on the property on any one of those days?

A.   When I saw him, like I said, he showed me the comparison of like the shield that was on the notice or whatever, and he just pointed to the similarity. He put the paper next to himself and he showed me he peeked through.

Q.   So what is your Understanding?

A.   He was showing me the comparison of the two, like he seen that shield on the person.

Q.   On the person, okay?

A.   Yeah.

Q.   And it is your understanding that that question when it says, "You claim to have experienced emotional distress," that that is referring to Lyndel Toppin?

A.   Yes.

*Mr. Whyte Deposition page. 58*

Q.   Tell me how you know Mr. Toppin was caused undue frustration, anxiety and mental anguish as a result of these allegations?

A.   Well, his actions started changing during the process of the whole situation. Because he smokes cigarettes, so he actually was smoking more during the time of this whole thing.

Q.   Did you notice anything like that occurring before the property was sold at sheriff's sale.

A.   He would smoke probably one cigarette a week, if anything.

*Q. And then the Notice to Vacate showed up, how much did he start smoking?*

*A. Well, it kind of –I would say it increased around that time. It was like about three to –three cigarettes maybe a day at that point.*

Mr. Whyte Deposition page. 60-61

*Q. And Mr. Toppin, was he awake when you got home during this time frame we're talking about, back when the notices were showing up?*

*A. Normally he wasn't but it was a few times I seen his light under his door…..*

Mr. Whyte Deposition page. 62

*Q. Where there any other signs or symptoms that you observed, besides the smoking and the light under his door, and made an uneaten meal here and there?*

*A. Just him, he never actually paced before. But that was another thing I noticed also, it was kind of weird to me. And then like it was only one time out of that he was telling me he had like a little headache in his head. He just indicated to me that he wanted a pill because his head was hurting.*

Mr. Whyte Deposition page. 63

*Q. In response to interrogatory No. 17 it says, "Out of pocket expenses include all the time I spent visiting my attorney's office….; lost potential income due to the time I was unavailable to work as a result of spending time at my attorney's office and transportation costs to/from my attorney's office." Do you see that information?*

*A. Yes.*

*Q. Is it your understanding that this refers to Mr. Toppin and not you, correct?*

*A. Yes.*

*Q. Did you have to make the phone calls to his employer to say he needed time off?*

21

*A. Yes.*

*Q.....do you recall how many times you went to Mr. Dunne's office?*

*A. I went there a lot of times myself. I have been there a lot.*

*Q. Was Mr. Toppin with you every time you went?*

*A. He was only with me a time times because I didn't really want to keep pulling him out of work every single time for it.*

*Q. Can you estimate the number of times he had to go?*

*A. Probably about two.*

*Q. ...And on those two occasions that you remember him going down to the Attorney's office, did you call out of work for him?*

*A. Yes.*

The Bankruptcy Court committed clear error when it ruled that there was no evidence presented that the Debtor experienced emotional distress as a result of the Sheriff's post-petition enforcement actions. As a result, this matter must be reversed and remanded for the award of appropriate sanctions.


**B.     Whether the bankruptcy court erred in holding that a deaf and mute Plaintiff failed to prove emotional distress damages he suffered as a result of Defendants' violations of the automatic stay provided by 11 U.S.C. § 362(a) when Plaintiff is unable to testify on his own behalf due to his disability, and evidence by caretaker/nephew testifying at length to personal observations of Plaintiff indicated that a reasonable person would suffer significant emotional harm?**


The *Lansaw* court stated that: "It is sufficient that stay violations were so egregious that a reasonable person could be expected to suffer "some" emotional harm and that the Lansaws credibly testified that the violations did cause such harm." *Lansaw* at 670.

In the present case, the Sheriff's Office was evicting Lyndel Toppin from his home. Nothing is more threatening than the strong arm of the law engaging in unlawful enforcement against a disabled individual. Any reasonable person would be emotionally distressed if he/she witnessed their neighbor being evicted from their home – and very distressed if they were the target of the Sheriff's eviction. Unfortunately, the Debtor cannot emote his emotional distress for our edification and his silence is truly deafening, not because of his deaf and mute disability but because he is a reasonable person that suffered "some" emotional harm and these attestations by his nephew/caretaker have largely been ignored by the Bankruptcy Court.

All that is required is that "the willful violation must have caused the debtor ***some*** injury." *In re Miller,* 447 B.R. 425, 433 (Bankr. E.D. Pa. 2011). While the moving party must show "injury," and the court may consider the severity of the violation when deciding the amount of sanctions, there is no category of violations so "minor" that it automatically negates the mandatory language of § 362(k). *In re Koeberer,* 632 B.R. 680, 690 (B.A.P. 9th Cir. 2021); *In re Altamirano*, No. 4:20-bk-111836 at *10 (Bankr. D. Ariz. Feb. 2, 2022). Section 362(k) provides that the court "shall" award sanctions to "any individual injured" by "any willful violation of a stay provided by" § 362. *Id*. Debtor's Next Friend, Barrington Whyte provided credible testimony that Debtor experienced various forms of emotional distress in response to the Sheriff's enforcement actions – including insomnia; excessive smoking; pacing at night, painful headaches; skipping meals; as well as out of pocket expenses in the form of loss of employment wages to visit his lawyer's office. [cite to record above]. The low threshold of injury required to establish emotional distress injury is reflected in *In re Odom,* 570 B.R. 718, 721 (Bankr. E.D. Pa. 2017) where a debtor experienced frustration, confusion and stress in connection to the Philadelphia Parking Authority impounding his car in

violation of the stay. The Court held that "given the circumstances surrounding the PPA's violation of the automatic stay, I am satisfied the Debtor adequately established the PPA's conduct caused him emotional harm." *Id*. Given the circumstances that the Sheriff's Office spent the better part of May 2018 attempting to evict Debtor from this residence, it would be apparent that that would cause him "some" emotional harm.

Mr. Whyte's testimony should have been afforded the same weight as if Mr. Toppin was testifying himself but the fact finder's comments reveal that Mr. Whyte' testimony was subordinated for no good reason.  It is telling that the Bankruptcy Court's made the following remarks about Mr. Whyte's testimony:

THE COURT:

   *"I'm not quite sure why we're talking about what Mr. Whyte observed."*

   *"Nobody's telling me how even the debtor would have responded to that. Okay?"*

   *"And so this is the problem as I see it. This is all about what Mr. Whyte is talking about? Okay.*

   *"Nothing about what the debtor reads, you know?"*

   *"And all I'm hearing is Mr. Whyte. So I'm just going to put that out there."*

Mr. Whyte's personal observations provide the only window into the Debtor's emotional state at the time the Sheriff was attempting to evict him from his property in violation of the automatic stay.  Mr. Whyte clearly articulated the fact that Debtor experienced 'some injury' as a result of the Sheriff's actions - whether that was the fear Mr. Toppin experienced when he witnessed a Sheriff wearing a shield appearing at his home; smoking excessively; pacing at night; painful headaches; skipping meals or missing work to visit his lawyer's office.  It is clear from Mr. Whyte's personal observations that Mr. Toppin experienced some emotional distress as a result of the Sheriff's actions.

The Bankruptcy Court committed clear error when it ruled that there was no evidence presented that the Debtor experienced emotional distress as a result of the Sheriff's post-petition enforcement actions. As a result, this matter must be reversed and remanded for the award of appropriate sanctions.

**C.      Whether the bankruptcy court erred in finding that the evidence of actual damage Plaintiff suffered as a result of Defendant's conduct, produced by Plaintiff in opposition to Defendant's Motion for Summary Judgment, failed to raise a genuine triable issue of fact pursuant to 11 U.S.C. § 362(k)(1)?**

The Bankruptcy Code requires the imposition of sanctions on a party violating the automatic stay upon the satisfaction of three elements: (1) the offending party violated the automatic stay; (2) the violation of the stay was willful; (3) the willful violation must have caused the debtor _some_ injury. *In re Miller,* 447 B.R. 425, 433 (Bankr. E.D. Pa. 2011).

Plaintiff demonstrated the existence of a triable dispute of fact in opposition to Defendant's Motion for Summary Judgment by demonstrating that Lyndel Toppin suffered actual damages in the form of out-of-pocket expenses; lost time; transportation expenses; attorney's fees; along with various form of emotional distress, including: anxiety, difficulty sleeping, depression, and mental anguish.

In the instant matter, the willful stay violation commenced when Sheriff Taylor went out to the Debtor's property on May 10, 2018 to personally serve a Notice to Vacate.  Debtor immediately contacted his counsel and requested that this post-petition enforcement actions immediately cease and desist. In response, Debtor's counsel replied by transmitting the Notice of Bankruptcy Case Filing to the Sheriff via facsimile at 215-686-3555 on May 10, 2018. Ex. E to Reply to SJ Motion. The employment of Debtor's counsel for this post-petition legal service incurred attorney's fees and constitutes a financial harm that the automatic stay was intended to protect against. *Law Co. v. Mohawak Constr. & Sup. Co*., 577 F.3d 1164, 1169 (10th Cir. 2009)

(letters, faxes, and memorandums that were attached to D's SJ response and were on P's letterhead should not have been disregarded without authentication analysis under FRE 901; because they were on P's letterhead, no authentication affidavit was required).

In *Lansaw v. Zokaites*, 853 F.3d 657, 667 (3d Cir. 2017), the Third Circuit held that "Congress intended the automatic stay to protect both *financial and non-financial interests*, and that the term "actual damages" as used in §362k includes damages for emotional distress resulting from a willful violation of the automatic stay.

The Bankruptcy Court noted in its holding that *Lansaw* sets forth what evidence is required to establish emotional distress damages. The *Lansaw* court stated that:

> Depending on the circumstances of each individual case, corroborating medical evidence may be required to prove emotional harm and causation. But we decline to adopt a bright-line rule requiring such evidence to prove emotional-distress damages under §362(k)(1). As we have concluded in the context of other federal statutes, we see no reason to require that a specific type of evidence be introduced to demonstrate injury in the form of emotional distress. And we agree with the Bankruptcy Court that, at least where a stay violation is patently egregious, a claimant's credible testimony alone can be sufficient to support an award of emotional-distress damages. We are confident that courts can ensure that plaintiffs recover only for actual injury even in the absence of expert medical testimony in such cases.

*Id.*, 853 F.3d at 669 (emphasis added, internal citations and quotations omitted).

Mr. Whyte clearly articulated the fact that Debtor experienced 'some injury' as a result of the Sheriff's actions - whether that was the fear Mr. Toppin experienced when he witnessed a Sheriff wearing a shield appearing at his home; smoking excessively; pacing at night; painful headaches; skipping meals or missing work to visit his lawyer's office.  It is clear from Mr. Whyte's personal observations that Mr. Toppin experienced some emotional distress as a result of the Sheriff's actions. The instant matter involved an application of a rule of law involving the resolution of disputed facts rendering summary judgment inappropriate. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990).

Further in In *Hunsaker v. United States,* 902 F. 3d 963(9th Cir. 2018), the Ninth Circuit ruled

that after the debtors filed their Chapter 13 Petition, the IRS sent several notices demanding

payment of back taxes and threatened to levy their bank account, the penalty for emotional

distress in violation of the automatic stay now applies <u>to all creditors including the U.S.

Government</u>. Specifically, the Court ruled that sovereign immunity would not preclude an award

of emotional distress damages against the United States for a willful violation of the automatic

stay, and imposed $4,000 in damages for "significant emotional harm" as well as debtors'

attorney's fees. [1]

*Hunsaker* makes clear that the Court found and Ninth Circuit affirmed, that the mere mailing

of the letter notices, including a threat by the creditor, IRS, to levy accounts for the debt due,

when rendered in the face of the willful violation of the stay were sufficient to warrant

"significant emotional harm", and warrant an award of $4,000, in such damages.  In this case,

there were not only letters in the mail, but an armed Sheriff appearing at the debtor's homestead

multiple times threatening not only to levy his bank accounts if the debt was not paid, but

conveyed by use of red tape and bold letters a much more dire message, an eviction from his

home, by an armed Sheriff within 21 days.  It is clear the lower Court turned a blind eye on the

cries of the deaf, mute Debtor and his housemate nephew regarding emotional harm stemming

from this attempted eviction by the Sheriff of his home, a situation which is commonly

recognized to, and is reasonable to expect would cause emotional distress. These damages

compensate for an actual injury: distress.  "Distress is a personal injury familiar to the law" that

---

[1] See also *AMERICA'S SERVICING CO. V. IRENE SCHWARTZ-TALLARD*, No. 12-60052 (9th Cir. 2015), in
affirming the judgment of the Bankruptcy Appellate Panel, the en banc court held that 11 U.S.C. § 362(k) authorizes
an award of attorney's fees reasonably incurred in a debtor's prosecution of a suit for damages to provide redress for
a violation of the automatic bankruptcy stay. The court also awarded Schwartz-Tallard $40,000 in economic and
emotional distress damages, $20,000 in punitive damages, and $20,000 in attorney's fees.

"include[s] mental suffering or emotional anguish." *See Carey v. Piphus*, 435 U.S. 247, 263–64, 264n.20 (1978) (discussing the standard for awarding emotional distress damages as compensatory damages under 42 U.S.C. § 1983). [2]

The Bankruptcy Court's finding that there was no proof of actual damages that impacted the debtor's financial and non-financial interests was clearly erroneous.

**D.    Whether the bankruptcy court erred in failing to design court procedures in a manner that excluded Plaintiff, Lyndel Toppin from court's view when he was present during the entire testimony of his next of friend, Barryington Whyte, thereby depriving Plaintiff, Lyndel Toppin from emoting a non-verbal response that impacts Plaintiff's credibility as a witness?**

Perhaps the most troubling part of Bankruptcy Court's holding under appeal herein, is that the Debtor, Mr. Lyndell Toppin who unfortunately never had the means or resources to learn even the basic sign language to be able to testify even to some degree, was present in person for both his deposition through Mr. Whyte and for entire duration of his zoom trial. However, the manner in which the Court designed the zoom procedures in a difficult task of conducting a trial remotely, it omitted Lyndel Toppin from the view of the Court, during any and all testimony.

It is well established that trial Court as the trier of fact entails a high degree of discretion (abuse of discretion), in findings of fact, and exactly because it is in position to observe witnesses at trial, their facial and overall demeanor in judging its credibility. *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.1979).

While requiring his in person presence for the trial, the Court nevertheless designed its procedures in a way that failed to provide for an unobstructed (or any) view of Mr. Toppin, during the testimonies about him. The Court closed its eyes to Toppin's existence in the virtual courtroom and this case altogether, and with it unfairly lessened its burden as a fact finder at

---

[2] In contrast, punitive damages "are not compensation for injury"; they are instead awarded "to punish reprehensible conduct and to deter its future occurrence." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350 (1974).

Toppin's expense. Although physically present, Mr. Toppin may as well have been anywhere else but the courtroom as his existence was ignored. The Court proceeded to discount each and every portion of testimony that provided for emotional distress, out of pocket damages of Toppin, despite such evidence not being contradicted by anything Sheriff's Office attempted to admit, lacking any documents, expert reports or testimony to contradict Mr. Whyte's testimony on Toppin's distress. In Third Circuit if the Court would discount all of uncontradicted testimony, it must specifically find that it was not credible, which the Court here did not do.

While the ALJ is empowered to evaluate the credibility of witnesses, see, e.g., *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir.1981); *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir.1974), cert. denied, 420 U.S. 931, 95 S.Ct. 1133, 43 L.Ed.2d 403 (1975), we would expect him at least to state that he found a witness not credible before wholly disregarding his testimony. Indeed, if this ALJ did in fact find Van Horn and all of his witnesses devoid of credibility, we cannot understand why he would not have stated some reason for that conclusion. See *Van Horn v. Schweiker,* 717 F.2d 871, 874 (3d Cir. 1983), see also *Fowler v. Califano*, 596 F.2d 600, 603 (3d Cir.1979). See also *Rossi v. Califano*, 602 F.2d 55 (3d Cir.1979); *Gober v. Matthews*, 574 F.2d 772, 777 (3d Cir.1978).

## <u>CONCLUSION</u>

The Bankruptcy Court held there was no stay violation by the Sheriff's Office as the Debtor did not establish a willful violation of the automatic stay by a preponderance of the evidence at Trial.

In the present case, the Sheriff's Office was evicting Lyndel Toppin from his home. Nothing is more threatening than the strong arm of the law engaging in unlawful enforcement against a disabled individual.

The enforcement actions by the Sheriff's Office after May 8, 2018, were done with knowledge of the bankruptcy, and constitute willful violations of the automatic stay.  The Bankruptcy Court found that the Sheriff's Office had knowledge of the Debtor's bankruptcy filing on May 8, 2018, and its service of the Notices to Vacate and Evictions Notices after that date constituted willful violations of the automatic stay.

Any reasonable person would be emotionally distressed if he/she witnessed their neighbor being evicted from their home – and very distressed if they were the target of the Sheriff's eviction.

The *Lansaw* court stated that: "It is sufficient that stay violations were so egregious that a reasonable person could be expected to suffer "some" emotional harm and that the Lansaws credibly testified that the violations did cause such harm." *Lansaw* at 670.

Unfortunately, the Debtor cannot emote his emotional distress for our edification and his silence is truly deafening, not because of his deaf and mute disability but because he is a reasonable person that suffered "some" emotional harm and these attestations by his nephew/caretaker have largely been ignored by the Bankruptcy Court.

Mr. Whyte's testimony should have been afforded the same weight as if Mr. Toppin was testifying himself but the fact finder's comments reveal that Mr. Whyte' testimony was subordinated for no good reason.

For these reasons, Debtor, Lyndel Toppin respectfully requests that this Honorable Court reverse the Order holding that the Sheriff's Office was not liable for sanctions for violating the automatic stay and remand this matter with discretion to award appropriate sanctions.